# EXHIBIT "1"

EXHIBIT 1
Page 58

**SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**DATED AS OF [__], 2015**

**$40,500,000**

**BETWEEN**

**AP-LONG BEACH AIRPORT LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

**AS BORROWER,**

**AND**

**MACQUARIE BANK LIMITED,**
**AN AUSTRALIAN CORPORATION**

**AS LENDER**

EXHIBIT 1
Page 59

# TABLE OF CONTENTS

                                                                                          Page

**ARTICLE 1 COMMITMENT; NOTES; COLLATERAL** ..................................................1
  1.01          Commitment to Lend .............................................................. 1
  1.02          Notes .......................................................................................2
  1.03          Use of Proceeds...................................................................2
  1.04          Superpriority Nature of Obligations ...................................2
  1.05          Collateral .............................................................................2
  1.06          Lien Priority ........................................................................4

**ARTICLE 2 REPAYMENT; PREPAYMENTS; INTERESTS AND FEES** ...........................4
  2.01          Calculation of Interest.........................................................4
  2.02          Payment of Principal and Interest .......................................5
  2.03          Payments Generally .............................................................6
  2.04          Prepayment Rights ...............................................................7
  2.05          Fees .......................................................................................8

**ARTICLE 3 RESERVES** ..........................................................................................9
  3.01          TI/LC Reserve......................................................................9
  3.02          Conditions Precedent to Disbursements ...........................10
  3.03          Direct Payments to Suppliers and Contractors .................12
  3.04          Performance of Reserve Items for TI/LC Reserve............12
  3.05          Property Reserves ..............................................................13
  3.06          Reserves Generally ............................................................14

**ARTICLE 4 LOAN SECURITY AND RELATED OBLIGATIONS** ...................................15
  4.01          Security Instrument ...........................................................15
  4.02          Guaranty..............................................................................15

**ARTICLE 5 CONDITIONS TO LOAN** ........................................................................15
  5.01          Conditions to the Loan ......................................................15

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES** .................................................16
  6.01          Corporate Existence and Power .........................................16
  6.02          Corporate Authorization.....................................................16
  6.03          No Conflicts ........................................................................16
  6.04          Binding Effect.....................................................................17
  6.05          Federal Regulations............................................................17
  6.06          Accuracy of Information.....................................................17
  6.07          Governmental Regulations.................................................17
  6.08          Entitlement to Payment and Exercise of Remedies upon Maturity
                of Obligations.....................................................................17
  6.09          The DIP Order.....................................................................17
  6.010         Requirements of Law .........................................................18
  6.011         Operating Permits ..............................................................18

i

EXHIBIT 1
Page 60

# TABLE OF CONTENTS (CONT'D)

**Page**

| | | |
|---|---|---|
| 6.012 | Leases | 18 |
| 6.013 | Ground Lease | 19 |
| 6.014 | Management Agreement | 20 |
| 6.015 | Complete Disclosure; No Change in Facts or Circumstances | 20 |
| 6.016 | No Litigation | 20 |
| 6.017 | Warranty of Title | 20 |
| 6.018 | No Condemnation | 20 |
| 6.019 | Mechanic Liens | 20 |
| 6.020 | Condition of the Property | 21 |
| 6.021 | Assessments | 21 |
| 6.022 | Taxes | 21 |
| 6.023 | Insurance | 21 |
| 6.024 | No Foreign Person | 21 |
| 6.025 | ERISA | 21 |
| 6.026 | Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Law | 21 |
| 6.027 | Reorganization Matters | 21 |
| 6.028 | Survival | 22 |
| **ARTICLE 7 BORROWER COVENANTS** | | **22** |
| 7.01 | Performance by Borrower | 22 |
| 7.02 | Financial Information, Reports, Searches, Notices, etc | 22 |
| 7.03 | Use of Proceeds | 24 |
| 7.04 | Collateral | 24 |
| 7.05 | DIP Loan Milestones | 24 |
| 7.06 | Defending and Upholding the Liens | 24 |
| 7.07 | Indebtedness | 25 |
| 7.08 | Prohibition on Liens | 25 |
| 7.09 | Limitations on Investments | 25 |
| 7.010 | Chapter 11 Claims | 25 |
| 7.011 | Insurance. | 26 |
| 7.012 | Obligations upon Condemnation or Casualty | 30 |
| 7.013 | Inspections and Right of Entry | 36 |
| 7.014 | Ground Lease | 36 |
| 7.015 | Right to Enter into New Leases | 40 |
| 7.016 | Leasing Decisions | 40 |
| 7.017 | Observance of Lessor Obligations | 40 |
| 7.018 | Subleases | 40 |
| 7.019 | LCS Settlement | 40 |
| 7.020 | Use of Property | 41 |
| 7.021 | Maintenance of Property | 41 |
| 7.022 | Waste | 41 |
| 7.023 | Obligation to Perform | 41 |
| 7.024 | Right to Contest | 41 |
| 7.025 | Property Management | 42 |

ii

EXHIBIT 1
Page 61

TABLE OF CONTENTS (CONT'D)

**Page**

| | | |
|---|---|---|
| 7.026 | Other Agreements | 42 |
| 7.027 | Further Assurances | 43 |
| 7.028 | ERISA | 43 |
| 7.029 | Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws | 43 |
| 7.030 | No Other Indebtedness | 44 |
| 7.031 | Capital Expenditures | 44 |
| 7.032 | Receivership | 44 |
| 7.033 | Change in Nature of Business | 44 |
| 7.034 | Transactions with Affiliates | 45 |
| 7.035 | Transfers | 45 |

**ARTICLE 8 EXIT LOAN FINANCING** ... **46**

| | | |
|---|---|---|
| 8.01 | Conditions to Exit Loan Conversion | 46 |

**ARTICLE 9 EVENTS OF DEFAULT; REMEDIES** ... **49**

| | | |
|---|---|---|
| 9.01 | Events of Default | 49 |
| 9.02 | Action Upon the Occurrence of an Event of Default | 51 |

**ARTICLE 10 MISCELLANEOUS PROVISIONS** ... **52**

| | | |
|---|---|---|
| 10.01 | Notices | 52 |
| 10.02 | Entire Agreement; Modifications; Time of Essence | 53 |
| 10.03 | Indemnification | 53 |
| 10.04 | Successors and Assigns | 54 |
| 10.05 | PATRIOT Act | 54 |
| 10.06 | Duplicate Originals; Counterparts | 54 |
| 10.07 | Unenforceable Provisions | 54 |
| 10.08 | Governing Law | 54 |
| 10.09 | Expenses | 55 |

**ARTICLE 11 LIST OF DEFINED TERMS** ... **56**

| | | |
|---|---|---|
| 11.01 | Definitions | 56 |

**EXHIBIT A** ... **1**

**EXHIBIT B** ... **4**

**EXHIBIT C** ... **5**

iii

EXHIBIT 1
Page 62

## SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SECURED, SUPERPRIORITY, DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is made as of this [____] day of February, 2015 (the "Closing Date"), by and between AP-LONG BEACH AIRPORT LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("Borrower"), as borrower, and MACQUARIE BANK LIMITED, an Australian corporation (together with its successors and assigns, "Lender"), as lender.

### Background

WHEREAS, on December 19, 2014 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (such term and other capitalized terms used in this Agreement without being defined having the meanings set forth in Article 11 of this Agreement) with the United States Bankruptcy Court for the Central District of California (Los Angeles) (the "Court") (such proceedings being administered under Bankruptcy Petition #2:14-bk-33372-VZ and any other proceeding in respect of the Borrower administered under the Bankruptcy Code, are hereinafter referred to as the "Chapter 11 Case"). The Borrower continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lender provide a secured super-priority debtor-in-possession term loan facility in the aggregate principal amount of up to $40,500,000, on the terms and conditions set forth herein.

WHEREAS, the Lender is willing to provide such financing only if, among other things, (a) all of the Obligations hereunder and under the other Loan Documents (i) constitute an allowed super-priority, administrative expense claim in the Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code, as more particularly set forth herein and in the DIP Order, (ii) are secured by valid, perfected first priority Liens on the Collateral pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, as more particularly set forth herein and in the DIP Order; and (b) the financing and the Loan Documents are authorized and approved by the DIP Order, which shall be acceptable in form and substance to the Lender in its sole discretion.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Borrower and the Lender hereby agree as follows:

### ARTICLE 1
### COMMITMENT; NOTES; COLLATERAL

1.01    Commitment to Lend.

(a)    Loan Amount. Subject to the terms and conditions set forth herein, and in reliance on Borrower's representations, warranties and covenants set forth herein, Lender agrees that such Lender will make a loan (the "Loan") to the Borrower in the amount of Forty Million Five Hundred Thousand and No/100 Dollars ($40,500,000.00) or such lesser amount as equals the sum of the items described in subsections 1.03(i)-(iii) herein below (the "Loan Amount").

EXHIBIT 1
Page 63

(b)    Disbursement to Borrower.  Borrower may request and receive only one borrowing in respect of the Loan and any amount borrowed and repaid in respect of the Loan may not be reborrowed.

1.02    Notes.  The Borrower agrees that, upon the request of the Lender, the Borrower will execute and deliver to the Lender a Note evidencing the Loan made by, and payable to the order of, the Lender in a maximum principal amount equal to the Loan Amount.  The Borrower hereby irrevocably authorizes the Lender to make (or cause to be made) appropriate notations on the grid attached to the Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of and the outstanding principal amount of the Loan and the Applicable Interest Rate.  Such notations shall be prima facie evidence of the existence and amounts of the obligations so recorded; provided, however, that the failure of the Lender to make any such notations or any error in such notations shall not limit or otherwise affect any Obligations of the Borrower.

1.03    Use of Proceeds.  The proceeds of the Loan shall be used to:  (i) repay in full that certain loan (the "Prepetition Credit Facility") secured by Deed of Trust recorded February 6, 2012 as Instrument No. 20120207150 with the Official Records of Los Angeles County, California ("U.S. Bank Deed of Trust"), (ii) pay certain expenses incurred in connection with the closing of the Loan as approved by Lender, and (iii) fund the Initial TI/LC Deposit (as defined herein).

1.04    Superpriority Nature of Obligations.  Subject to the terms of the DIP Order, as applicable, all Obligations hereunder and under the Loan Documents shall constitute an allowed superpriority administrative expense claim against the Borrower with priority in the Chapter 11 Case over any and all administrative expense claims and unsecured claims against the Borrower and its Chapter 11 estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113 or 1114 of the Bankruptcy Code; provided, however, that the Obligations shall be junior to  the amounts payable to LCS under that LCS Settlement Agreement pursuant to and on the terms set forth in Section 6 of that certain Second Addendum to Order Granting Debtor's Emergency dated February 3, 2015.

1.05    Collateral.  As security for the prompt and complete payment and performance of the Obligations when due (whether due because of stated maturity, acceleration, mandatory prepayment, or otherwise) and to induce the Lender to make the Loan, the Borrower hereby grants to the Lender the following continuing Liens upon and security interests in the property and interests in property identified in clauses (a) and (b) of this Section 1.05 (subject to the proviso in this sentence), all such property and interests in property, collectively, the "Collateral":

(a)    First-Priority Lien on Unencumbered Property.  To the extent set forth in the DIP Order, as applicable, a first-priority, senior security interest in and Lien upon all pre-and post-petition property of the Borrower, whether existing on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible or intangible, wherever located, that, on or as of the Petition Date, was not subject to valid, perfected and non-avoidable Liens or

2

EXHIBIT 1
Page 64

was not subject to Liens perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash, Cash Equivalents and Cash Collateral of the Borrower, (b) all personal property of the Borrower, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, inventory, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, goods, general intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the Borrower's equity interest in any other Persons (including, without limitation, Affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds of the foregoing, (c) all of the Borrower's interest in any real property, including, without limitation, the Land and the buildings, improvements, fixtures and structures situated thereon, leasehold interests, and the income, products and proceeds of the foregoing, which security interest and Lien shall be granted, and have the priority established, pursuant to section 364(c)(2) of the Bankruptcy Code, and (d) to the extent not otherwise covered in subsections (a)-(c) above, the Property (all such property described in subclauses ((a), (b), (c) and (d) above, the "Unencumbered Property"). The Unencumbered Property shall exclude Borrower's claims and causes of action under chapter 5 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but, subject only to, and effective upon, entry of the Final Order (as defined below), shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.

      (b)    Junior Lien on Encumbered Property. To the extent set forth in the DIP Order, as applicable, a perfected security interest in and Lien upon all pre- and post-petition property of the Borrower (other than the property described in clause (a) of this Section 1.05, as to which property the Liens and security interests granted to the Lender are as described in such clause (a)), together with the income, products and proceeds thereof, whether existing on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible or intangible, wherever located, that is subject to valid, perfected and non-avoidable Liens in existence immediately prior to the Petition date or to valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash and Cash Collateral of the Borrower, (b) all personal property of the Borrower, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, inventory, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, goods, general intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the Borrower's equity interest in any other Persons (including, without limitation, Affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the Borrower's interest in any real property, including, without limitation, the buildings, improvements, fixtures and structures situated thereon, leasehold interests, and the income, products and proceeds of the foregoing, which security interests and Liens granted to the Lender shall be junior in priority to such valid,

3

EXHIBIT 1
Page 65

perfected and non-avoidable Liens and shall be granted, and have the priority established, pursuant to section 364(c)(3) of the Bankruptcy Code.

1.06    Lien Priority.  Notwithstanding anything to the contrary set forth herein, the Liens and claims granted by the Borrower pursuant to Section 1.05 shall be senior first-priority liens with respect to any Collateral, except that the Liens shall be junior to (x) the Prior Liens (with respect to each such Prior Lien, only to the extent, if any, that such Prior Lien is nonavoidable and has priority over the DIP Liens under applicable law) and (y) the amounts payable to LCS Constructors, Inc., a California corporation ("LCS") under that certain Settlement and Release Agreement (the "LCS Settlement Agreement") dated as of December 17, 2014, by and among Borrower, U.S. Bank National Association and LCS pursuant to and on the terms set forth in Section 6 of that certain Second Addendum to Order Granting Debtor's Emergency dated February 3, 2015.

## ARTICLE 2
## REPAYMENT; PREPAYMENTS; INTERESTS AND FEES

2.01    Calculation of Interest.

(a)    Calculation Basis.  Interest due on the outstanding principal balance of the Loan shall be calculated for each Interest Accrual Period based on a 360-day year and paid for the actual number of days elapsed in the period for any which interest is being calculated.

(b)    Applicable Interest Rate.  Interest shall accrue on outstanding principal balance of the Loan at a rate per annum (the "Applicable Interest Rate") equal to the sum of ten percent (10%).

(c)    Intentionally Omitted.

(d)    Intentionally Omitted.

(e)    Adjustment for Impositions on Loan Payment.  All payments made by Borrower under this Agreement and under the other Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, and all liabilities with respect thereto, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (all such non-excluded taxes, levies, imposts, duties, charges, fees, deductions, withholdings and liabilities, collectively, "Applicable Taxes").  If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) Borrower shall make all such required deductions and shall pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law, and (ii) the sum payable to Lender shall be increased in an amount determined by Lender in its sole discretion, as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.01(e)), Lender receives an amount equal to the sum Lender would have received had no such deductions been made.  Payments made pursuant to this Section 2.01(e) shall be made within ten (10) days after Lender makes written demand therefor, and Borrower

EXHIBIT 1
Page 66

shall provide at Lender's request a receipt evidencing such payments have been made to the relevant Governmental Authority.

(f)      Increased Costs of Maintaining Interest. Borrower shall pay to Lender all Funding Losses incurred from time to time by Lender upon demand. Lender shall deliver to Borrower a statement for any such sums to which Lender is entitled to receive pursuant to this Section 2.01(f), which statement shall be binding and conclusive absent manifest error. Payment of Funding Losses hereunder shall be in addition to any obligation to pay a prepayment fee or Breakage Costs in circumstances where such prepayment fee and Breakage Costs would be due and owing.

(g)      Acceleration. Notwithstanding anything to the contrary contained herein, if Borrower is prohibited by law from paying any amount due to Lender under Section 2.01(e) or (f), Lender may elect to declare the unpaid principal balance of the Loan, together with all unpaid interest accrued thereon and any other amounts due hereunder, due and payable within one hundred twenty (120) days of Lender's written notice to Borrower. Lender's delay or failure in accelerating the Loan upon the discovery or occurrence of an event under Section 2.01(e) or (f) shall not be deemed a waiver or estoppel against the exercise of such right.

(h)      Intentionally Omitted.

2.02    Payment of Principal and Interest.

(a)      Mandatory Payment Amount. On the Closing Date, Guarantor shall deposit into escrow with Lender an amount equal to the difference between (i) Two Million and No/Dollars ($2,000,000.00) minus (ii) the amount paid to Lender prior to the Closing Date as a deposit for the payment of Lender's costs and expenses incurred in connection with the origination of the Loan (the "Mandatory Payment Amount"). On the date which is ten (10) days following the Closing Date, the Mandatory Payment Amount shall be applied to the Loan as a prepayment of principal (the "Mandatory Payment"). The Mandatory Payment shall not be subject to the conditions set forth in Section 2.04(b) of this Agreement.

(b)      Payment at Closing. If the Loan is funded on a date other than the fifteenth (15th) day of a calendar month, Borrower shall pay to Lender at the time of funding an interest payment calculated by multiplying (i) (x) if the Closing Date is prior to the fifteenth (15th) day of a calendar month, the number of days from and including the Closing Date to (but excluding) the fifteenth (15th) day of the current month and (y) if the Closing Date is after the fifteenth (15th) day of the month, the number of days from and including the Closing Date to (but excluding) the fifteenth (15th) day of the next calendar month by (ii) a daily rate based on the Applicable Interest Rate effective on the Closing Date and calculated for a 360-day year.

(c)      Payment Dates. Borrower shall commencing on the ninth (9th) day of April, 2015, and continuing on the ninth (9th) day of each and every successive month thereafter, provided that, if the ninth (9th) day of any month is not a Business Day, such payment shall be due and payable on the immediately preceding Business Day (each, a "Payment Due Date"), through and including the Payment Due Date immediately prior to the Maturity Date, pay consecutive monthly payments of interest, at the Applicable Interest Rate, based on principal

5

EXHIBIT 1
Page 67

advanced and outstanding during the Interest Accrual Period immediately preceding the applicable Payment Due Date and any amounts due pursuant to <u>Section 2.01</u> of this Agreement. For the period from and including the Closing Date to and including the Payment Due Date occurring on the Maturity Date, interest accruing at the Applicable Interest Rate in excess of the Monthly Payment Rate (the "<u>Accrued Interest</u>") shall accrue and be deferred and shall be added to the outstanding principal balance of the Loan and, to the extent not prohibited by the applicable law, shall earn interest at the Applicable Interest Rate.

(d)    <u>Maturity Date</u>.    On the Maturity Date, Borrower shall pay the entire outstanding principal balance of the Loan, including the Accrued Interest together with all accrued but unpaid interest thereon through the end of the then current Interest Accrual Period and all other amounts due under this Agreement, the Note or any other Loan Document, including, without limitation, the Exit Fee; provided that, if the Maturity Date occurs on a day that is not a Business Day, such payment shall be due and payable on the immediately preceding Business Day.

2.03    <u>Payments Generally</u>.

(a)    <u>Delivery of Payments</u>.    All payments due to Lender under this Agreement and the other Loan Documents are to be paid in immediately available funds to Lender at Lender's office or at such other place as Lender may designate to Borrower in writing from time to time.    All amounts due under this Agreement and the other Loan Documents shall be paid without setoff, counterclaim or any other deduction whatsoever.

(b)    <u>Credit for Payment Receipt</u>.    No payment due under this Agreement or any of the other Loan Documents shall be deemed paid to Lender until received by Lender at its designated office on a Business Day prior to 2:00 p.m. Eastern Time.    Any payment received after the time established by the preceding sentence shall be deemed to have been paid on the immediately following Business Day.    Each payment that is paid to Lender within ten (10) days prior to the date on which such payment is due shall not be deemed a prepayment and shall be deemed to have been received on the Payment Due Date solely for the purpose of calculating interest due.

(c)    <u>Invalidated Payments</u>.    If any payment received by Lender is deemed by a court of competent jurisdiction to be a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, and is required to be returned by Lender, then the obligation to make such payment shall be reinstated, notwithstanding that the Note may have been marked satisfied and returned to Borrower or otherwise canceled, and such payment shall be immediately due and payable upon demand.

(d)    <u>Late Charges</u>.    If any payment due on a Payment Due Date is not received by Lender in full on or before the Payment Due Date, Borrower shall pay to Lender, immediately and without demand, a late fee equal to five percent (5%) of such delinquent amount.

(e)    <u>Default Interest Rate</u>.    If the Loan is not paid in full on or before the Maturity Date or if the Loan is accelerated following an Event of Default or if an Event of Default exists, the interest rate then payable on the Loan shall, as of the date the Default giving

6

EXHIBIT 1
Page 68

rise to such Event of Default occurs, immediately increase to the Applicable Interest Rate plus five percent (5%) per annum (the "Default Rate") and continue to accrue at the Default Rate until full payment is received or such Event of Default is waived in writing by Lender.  In addition, Lender shall have the right, without acceleration of the Loan, to collect interest at the Default Rate on any payment due hereunder (including, without limitation, late charges and fees for legal counsel) which is not received by Lender on or before the date on which such payment originally was due.  Interest at the Default Rate also shall accrue on any judgment obtained by Lender in connection with collection of the Loan or enforcement of any obligations due under the other Loan Documents until such judgment amount is paid in full.

       (f)    Application of Payments.  Payments of principal and interest due from Borrower shall be applied first to the payment of late fees, then to Lender advances made to protect the Property or to perform obligations which Borrower failed to perform, then to the payment of accrued but unpaid interest (including, without limitation, any interest at the Default Rate), and then to reduction of the outstanding principal.  If at any time Lender receives less than the full amount due and payable on a Payment Due Date, Lender may apply the amounts received to amounts then due and payable in any manner and in any order determined by Lender in its sole discretion.  Following an Event of Default, Lender may apply all payments to amounts then due in any manner and in any order determined by Lender in its sole discretion. Lender's acceptance of a payment from Borrower in an amount that is less than the full amount then due and Lender's application of such payments to amounts then due from Borrower shall not constitute or be deemed to constitute a waiver of the unpaid amounts or an accord and satisfaction.

    2.04   Prepayment Rights.

       (a)    Generally.  Borrower acknowledges that Lender is making the Loan to it at the interest rate and upon the other terms herein set forth in reliance upon Borrower's promise to pay the Loan over the full stated term of this Agreement and that Lender may suffer loss or other detriment if Borrower were to prepay all or any portion of the Note prior to its stated Maturity Date.  Except as provided in Section 2.04(b) and Section 2.04(c) of this Agreement, Borrower agrees that Borrower has no right to prepay all or any part of the Loan prior to the Maturity Date.

       (b)    Prepayment.  Borrower may prepay principal in whole, but not in part, on any Payment Due Date as long as each of the following conditions are satisfied:

           (i)    Borrower provides written notice to Lender of its intent to prepay not more than sixty (60) days and not less than thirty (30) days prior to the intended prepayment date.

           (ii)    No Default or Event of Default exists as of the date Borrower delivers notice of intent to prepay and as of the date such prepayment is made.

           (iii)    Borrower shall pay an amount equal to the Yield Maintenance Amount with such prepayment.

7

EXHIBIT 1
Page 69

(iv)    Borrower pays an exit fee equal to $770,000.00 (the "Exit Fee").

(v)    Borrower pays an amount equal to any Breakage Costs (if any) with such prepayment.

(vi)    Borrower pays with such prepayment (A) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the date such prepayment is made, (B) an amount equal to the interest that would have accrued at the Applicable Interest Rate on the amount of principal being prepaid through the end of the Interest Accrual Period in which such prepayment occurs and (C) all other outstanding amounts then due and unpaid under this Agreement and the other Loan Documents.

(c)    Prepayment After Default. If, following the occurrence and during the continuance of an Event of Default, Borrower tenders payment of all or any part of the Loan, or if all or any portion of the Loan is recovered by Lender after such Event of Default, Borrower shall pay, in addition to the Loan, (i) all accrued and unpaid interest calculated at the Applicable Interest Rate on the amount of principal being prepaid through and including the date such prepayment is made together with an amount equal to the interest that would have accrued at the Applicable Interest Rate on the amount of principal being prepaid through the end of the Interest Accrual Period in which such prepayment occurs, (ii) the Yield Maintenance Amount (iii) Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clause (ii); (iv) the Exit Fee; and (v) all other sums due under this Agreement, the Note or the other Loan Documents in connection with a partial or total prepayment.

(d)    Notice Irrevocable. Notwithstanding any provision of this Agreement to the contrary, Borrower's notice of prepayment in accordance with Section 2.04(b) above shall be irrevocable, and the principal balance to be prepaid shall be absolutely and unconditionally due and payable on or about the date specified in such notice.

2.05    Fees.

(i)    Exit Fee. The Exit Fee (or any portion remaining unpaid) shall be due and payable by Borrower to Lender on the earliest of (i) the date when the outstanding principal balance of the Loan is paid in full, (ii) the Maturity Date, (iii) the date on which the Loan shall have become due and payable after the occurrence of an Event of Default, or (iv) in the case of partial or full prepayment through the application of insurance or condemnation proceeds to reduce the outstanding principal balance of the Loan. The Exit Fee is deemed earned in full on the Closing Date notwithstanding the timing of its required payment as herein provided above. No tender of a prepayment of the Loan with respect to which an Exit Fee is due shall be effective unless such prepayment is accompanied by the applicable Exit Fee.

8

EXHIBIT 1
Page 70

(ii)     <u>Commitment Fee</u>.  The Commitment Fee shall be due and payable by Borrower to Lender on the Closing Date and shall be fully earned and non-refundable when paid.

## ARTICLE 3
## RESERVES

3.01    <u>TI/LC Reserve</u> .

(a)     <u>TI/LC Reserve Generally</u>.  Effective as of the Closing Date, a portion of the Loan Amount equal to $3,000,000 (the "Initial TI/ LC Deposit") shall be deposited by Lender into a reserve for the purpose of funding the costs of Tenant Improvements and Leasing Commissions under new Leases that are paid by Borrower during the term of the Loan (such funds held by Lender, being the "TI/LC Reserve").

(b)     <u>Additional Deposits to the TI/LC Reserve</u>.  All Lease Termination Payments and any payments of Rents, whether in the form of base rent, additional rent or otherwise, with respect to the Property, which constitute reimbursement or payments in the nature of reimbursement for Tenant Improvements performed or to be performed pursuant to Leases, other than any GSA Reimbursement Payment, shall be deposited with Lender in to the TI/LC Reserve within one (1) Business Day following Borrower's or Property Manager's receipt thereof.

(c)     <u>Disbursements from the TI/LC Reserve</u>.  Provided no Default or Event of Default exists, Lender shall make disbursements from the TI/LC Reserve as follows:

(i)     Lender shall make disbursements from the TI/LC Reserve to reimburse Borrower for Tenant Improvements required under any new Lease to be paid by Borrower, in accordance with the disbursement procedures (including evidence of lien-free performance) set forth in <u>Section 3.02</u> hereof, provided that: (A) the Tenant Improvements are required under any new Lease, provided that any such Lease has been approved by Lender in accordance with this Agreement; (B) the cost of such Tenant Improvements is market, reasonable and customary; (C) the Tenant Improvements are fully performed in accordance with the standards set forth in <u>Section 3.02</u> hereof and have been accepted without condition by the related tenant; (D) unless otherwise agreed to by Lender, the related tenant is occupying the space benefited by the Tenant Improvements and has commenced paying rent; and (E) if required by Lender, the related tenant shall have executed and delivered a subordination, non-disturbance and attornment agreement and an estoppel certificate, in each case on such form as is reasonably acceptable to Lender.

(ii)     Lender shall make disbursements from the TI/LC Reserve to reimburse Borrower for Leasing Commissions paid by Borrower provided that: (A) such Leasing Commissions are market, reasonable and customary for properties similar to the Property and

9

EXHIBIT 1
Page 71

the portion of the Property leased for which a commission is due and, unless otherwise agreed by Lender, with respect to a new Lease at the Property do not exceed four percent (4%) of the total amount of base rent payments under the related Lease and with respect to renewal Leases with existing tenants at the Property to not exceed two percent (2%) of the total amount of the base rent payments under the related Lease; (B) the amount of such Leasing Commissions are determined pursuant to arm's-length transactions between Borrower and each such leasing agent to which a commission is due; (C) the Lease has been approved by Lender in accordance with this Agreement; and (D) unless otherwise agreed by Lender, the tenant under the Lease for which such Leasing Commission is claimed is occupying the leased space and commenced paying rent.

3.02    Conditions Precedent to Disbursements from the TI/LC Reserve.  The following provisions apply to each request (a "Request") for disbursement from the TI/LC Reserve:

(a)    Disbursement Only for Completed Repairs.  Disbursements shall be limited to Reserve Items that are fully completed and paid for in full by Borrower and, in the case of Leasing Commissions, fully and unconditionally earned and paid for in full by Borrower. Disbursements from the TI/LC Reserve shall be made to Borrower to reimburse Borrower for payments of Reserve Items made by Borrower or to fund Borrower's payment of Reserve Items, as the case may be, or, at Borrower's request, directly to the applicable payee. Lender shall have no obligation to make any succeeding disbursement until the documentation set forth in this Section 3.02(a) is delivered to Lender.  At no time shall Lender be obligated to pay amounts to Borrower in excess of the current balance in the TI/LC Reserve at the time of disbursement.

(b)    Partial Completion.  Lender may agree to disburse funds for Reserve Items prior to completion thereof where (i) the contractor performing such work or supplying such materials requires periodic payments pursuant to the terms of its written contract with Borrower and, if required by Section 3.02, Lender has given its prior written approval to such contract, and (ii) the cost of the portion of the Reserve Item to be completed under such contract exceeds $10,000.

(c)    Request; Maximum Frequency and Amount.  Borrower shall submit to Lender a Request together with the paid receipts and such additional information as Lender may reasonably request in connection with the Request at least thirty (30) days prior to the date on which Borrower requests Lender to make a disbursement from the TI/LC Reserve.  Unless otherwise agreed to by Lender, Borrower may not submit, and Lender shall not be required to make, more than one (1) disbursement during any calendar month.  No Request shall be made for less than $10,000 or the total cost of the Reserve Items, if less.

(d)    No Existing Default.  Lender may refuse to make any disbursement from the TI/LC Reserve if a Default or Event of Default exists as of the date on which Borrower submits the Request or on the date the disbursement is actually to be made.

10

EXHIBIT 1
Page 72

      (e)     <u>Responsible Officer Certificate</u>.  Lender must receive a certificate, signed by a Responsible Officer of Borrower (and, at Lender's option, also signed by Borrower's project architect or engineer if the cost of a single Reserve Item or the aggregate amount of the Request exceeds $25,000), which certifies that:

          (i)     All information stated in the Request is true and correct in all material respects, each attachment to the Request is correct and complete, and if the attachment is a copy of the original, that it is a true and an accurate reproduction of the original;

          (ii)     Each of the Reserve Items to be funded in connection with the Request was performed in a good and workmanlike manner and in accordance with all Requirements of Law, and has been paid in full by Borrower (for the portion for which reimbursement is sought in the case of reimbursements authorized in accordance with <u>Section 3.02(b)</u> hereof);

          (iii)     The Leasing Commission has been fully and unconditionally earned and paid in full by Borrower (for the portion for which reimbursement is sought in the case of reimbursements authorized in accordance with <u>Section 3.02(b)</u> hereof), if the Reserve Item to be funded is a Leasing Commission;

          (iv)     Subject to <u>Section 3.03</u>, each party that supplied materials, labor or services has been paid in full (for the portion for which reimbursement is sought in the case of reimbursements authorized in accordance with <u>Section 3.02(b)</u> hereof);

          (v)     In the case of disbursements authorized in accordance with <u>Section 3.02(b)</u> hereof, the materials for which the request are made are on-site at the Property and properly secured or have been installed in the Property; and

          (vi)     All prior amounts previously reimbursed have been applied to the payment of the items stated in the applicable Request.

      (f)     <u>Inspection to Confirm Completion</u>.  Prior to making any disbursement or disbursements, Lender may require an inspection of the Property, performed at Borrower's expense, to verify completion thereof.

      (g)     <u>Absence of Liens</u>.  Lender may require that Borrower provide Lender with any or all of the following: (i) a written lien waiver acceptable to Lender from each party to be paid in connection with the Request; (ii) a search of title to the Property effective to the date of the disbursement which shows no Liens other than the Permitted Encumbrances; or (iii) an endorsement to the Title Insurance Policy which updates the effective date of such policy to the date of the disbursement and shows no Liens other than the Permitted Encumbrances.

EXHIBIT 1
Page 73

(h)    <u>Payment of Lender's Expenses</u>.  Borrower shall pay all expenses incurred by Lender in processing Borrower's Request including, without limitation, any inspection costs (whether performed by Lender or an independent inspector selected by Lender) and legal fees and expenses.

(i)    <u>No Material Adverse Change</u>.  Since the Closing Date, there shall have been no change in the business, the Property, condition (financial or otherwise), or results of operations of the Borrower that, taken as a whole, could reasonably be expected to have a Material Adverse Effect.

(j)    <u>Other Items Lender Deems Necessary</u>.  Lender shall have received such other evidence as Lender reasonably requests in connection with its confirmation that each Reserve Item to be paid in connection with the Request has been completed or performed in accordance with the terms of this Agreement.

3.03    <u>Direct Payments to Suppliers and Contractors</u>.  Lender, at its option, may make disbursements directly to the supplier or contractor to be paid in connection with the Request. Borrower's execution of this Agreement constitutes an irrevocable direction and authorization for Lender to make requested payments directly to the supplier or contractor, notwithstanding any contrary instructions from Borrower or notice from Borrower of a dispute with such supplier or contractor.  Each disbursement so made by Lender shall satisfy Lender's obligation under this Agreement.

3.04    <u>Performance of Reserve Items for TI/LC Reserve</u>.

(a)    <u>Performance of Reserve Items</u>.  Borrower agrees to commence each Reserve Item in a timely manner and to pursue completion diligently of each Reserve Item on or before its completion date, if any, stated on the applicable Exhibit attached to this Agreement and, in the absence of a commencement date or completion date being specified, when necessary in order to keep the Property in good order and repair, in a good and marketable condition and as necessary to keep any portion thereof from deteriorating, or in the case of Tenant Improvements, when required under the Leases.  Borrower shall complete each Reserve Item in a good and workmanlike manner, using only new materials of the same or better quality than that being replaced.  All Reserve Items shall be performed in accordance with, and upon completion shall comply with, all Requirements of Law (including without limitation obtaining and maintaining in effect all necessary permits and governmental approvals) and all applicable insurance requirements.

(b)    <u>Contracts</u>.  Borrower shall promptly provide to Lender copies of all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors or other parties providing labor or materials in connection with the Reserve Items.  Borrower shall not enter into any such contract or work order for $10,000 or more without Lender's prior written approval.

(c)    <u>Entry onto Property</u>.  In order to perform inspections or, following an Event of Default, to complete Reserve Items which Borrower has failed to perform, Borrower

12

EXHIBIT 1
Page 74

hereby grants Lender and its agents the right, from time to time, to enter onto the Property, subject to the terms of the Ground Lease, applicable Leases, and all Requirements of Law.

(d)    Lender Remedy for Failure to Perform.  In addition to Lender's remedies, following an Event of Default, Borrower acknowledges that Lender shall have the right (but not the obligation) to complete or perform the Reserve Items for which amounts have been reserved under this Agreement (or pay the Leasing Commissions as applicable) and for such purpose, Borrower hereby appoints Lender as its attorney-in-fact with full power of substitution (and which shall be deemed to be coupled with an interest and irrevocable until the Loan is paid in full and the Security Instrument is discharged of record, with Borrower hereby ratifying all that its said attorney shall do by virtue thereof):  (i) to complete or undertake such work in the name of Borrower; (ii) to proceed under existing contracts or to terminate existing contracts (even where a termination penalty may be incurred) and employ such contractors, subcontractors, watchmen, agents, architects and inspectors as Lender determines necessary or desirable for completion of such work; (iii) to make any additions, changes and corrections to the scope of the work as Lender deems necessary or desirable for timely completion; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property or as may be necessary or desirable for completion of such work; (v) to execute all applications and certificates in the name of Borrower which may be required to obtain permits and approvals for such work or completion of such work; (vi) to prosecute and defend all actions or proceedings in connection with the repair or improvements to the Property; and (vii) to do any and every act which Borrower might do in its own behalf to fulfill the terms of Borrower's obligations under this Agreement.  Amounts expended by Lender which exceed amounts held in the TI/LC Reserve shall be added to the Loan Amount, shall be immediately due and payable, and shall bear interest at the Default Rate from the date of disbursement until paid in full.

3.05    Property Reserves.    Effective as of the termination of the Receivership, all monies held by the Receiver as of such termination date exclusive of the funds which are to be used to pay United States Trustee fees and pre-petition non-insider unsecured claims pursuant to that certain First Addendum to Order Granting Debtor's Emergency Motion for Entry of Order in an amount which shall not exceed $141,440.32 (the "Receivership Funds") shall be deposited by the Receiver with Lender for deposit into the following reserves: (a) an amount equal to One Hundred Thousand and No/100 Dollars ($100,000.00) of the Receivership Funds shall be held by Lender as a working capital reserve (the "Working Capital Reserve") and (b) the remainder of the Receivership Funds shall be held by Lender as a cash collateral reserve (the "Cash Collateral Reserve"), and in the case of each of (a) and (b) shall be disbursed only in accordance with the terms of this Agreement.

(a)    Working Capital Reserve. The Working Capital Reserve shall be held by Lender for the purpose of funding, from time to time subject in all cases to Lender's approval which shall be given or denied in Lender's sole and absolute discretion, Operating Expenses of the Property in amounts set forth in a budget approved by Lender solely to the extent that there is insufficient cash flow from the Property to pay such Operating Expenses after payment of all amounts required to be paid in accordance with the cash management waterfall then in effect pursuant to the requirements of Section 7.032 of this Agreement.

13

EXHIBIT 1
Page 75

(b)    Cash Collateral Reserve. The Cash Collateral Reserve shall be held by Lender for the purpose of funding, subject in all cases to Lender's approval which shall be given or denied in Lender's sole and absolute discretion, (i) the payment of Tenant Improvements and Leasing Commissions to the extent that sufficient funds to pay such Tenant Improvements or Leasing Commissions are not available in the TI/LC Reserve and for which the conditions in Sections 3.01 and 3.02 have been satisfied, and (ii) payments made by Borrower under or with with respect to the Ground Lease, other than payments of rent or additional rent required thereunder.

(c)    Conditions Precedent to Disbursements. The following provisions apply to each Request for disbursement from the Working Capital Reserve or Cash Collateral Reserve: (i) Borrower shall submit to Lender a Request together with such additional information as Lender may request in connection with the Request, (ii) unless otherwise agreed to by Lender, Borrower may not submit, and Lender shall not make more than one (1) disbursement during any calendar month, and (iii) no Request shall be made for less than $10,000 or the total cost of the Reserve Items, if less. Lender may refuse to make any disbursement from the Working Capital Reserve or Cash Collateral Reserve if a Default or Event of Default exists as of the date on which Borrower submits the Request or on the date the disbursement is actually to be made.

3.06   Reserves Generally. Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserves to the payment of the Loan in any order as determined by Lender in its sole discretion. Funds on deposit in the Reserves shall not constitute trust funds and may be commingled with other monies held by Lender. Borrower hereby grants to Lender a first-priority security interest in any and all sums on deposit in the Reserves as additional security for payment of the Obligations. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in the sums deposited in the Reserves or permit any lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. The insufficiency of funds on deposit in the Reserves shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever. All conditions and requirements of this Agreement relating to the Reserves are for the sole benefit of Lender and no other person or party (including, without limitation, any architect, any contractor, any subcontractor and any materialmen now or hereafter engaged in any work at the Property) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Lender shall have the right, in its sole and absolute discretion, to waive any such condition or requirement. The making of a disbursement from the Reserves by Lender shall not constitute Lender's approval or acceptance of the construction related thereto (if any) theretofore completed.

14

EXHIBIT 1
Page 76

## ARTICLE 4

## LOAN SECURITY AND RELATED OBLIGATIONS

4.01    Security Instrument. Payment of the Loan and performance of the Obligations shall be secured by the Security Instrument.  Borrower shall execute and deliver at closing the Security Instrument and abide by its obligations thereunder.

4.02    Guaranty.  Guarantor will be required to execute and deliver at closing the Guaranty and to abide by its obligations thereunder.

## ARTICLE 5

## CONDITIONS TO LOAN

5.01    Conditions to the Loan. The obligations of the Lender to fund the Loan shall be subject to the prior or concurrent satisfaction of the following:

(a)    DIP Order.  The DIP Order shall have been entered by the Court and be in full force and effect, and no order amending or modifying (without the consent of the Lender, which consent may be withheld or denied in the Lender's sole discretion) or reversing, staying or vacating the DIP Order shall have been entered, and, if the DIP Order is the subject of a pending appeal in any respect, neither the making of the Loan nor the performance by the Borrower of its respective obligations hereunder or under the other Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)    Final Documentation.  The Borrower shall have executed and delivered to the Lender (or shall have caused to be executed and delivered to the Lender by the appropriate Person) this Agreement evidencing, among other things, the Loan and the Obligations hereunder, the DIP Liens and the DIP Superpriority Claim, which may be reasonably requested by and are acceptable to the Lender in its sole discretion, provided, that the terms and provisions of such documents do not materially modify or increase the obligations of the Borrower hereunder.

(c)    Compliance with Warranties. Both before and after giving effect to the Loan, the representations and warranties set forth in each Loan Document shall be true and correct with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date).

(d)    Loan Deliveries. The execution and/or delivery (as applicable) of all definitive documentation, and other customary documents and deliverables, including the following, each in form and substance as approved by Lender in its sole discretion:

(i)    an estoppel and agreement from the Ground Lessor along with any necessary documents or notices that are required under the Ground Lease, including, without limitation, a notice to the airport manager, a notice to the Ground Lessor, and a recorded request for notice as more specifically described in the Ground Lease;

15

EXHIBIT 1
Page 77

(ii)    an estoppel from the City of Long Beach under their Lease at the Property;

(iii)   written evidence of that certain Property Management Agreement dated as of January 1, 2007, by and between Borrower and The Abbey Management Company LLC, a Delaware limited liability company, having been terminated effective as of the Closing Date;

(iv)   any organizational or authority documents required by Lender, including, without limitation, operating agreements, resolutions, certificates of good standing, certificates of formation, and officer's certificates from each of Borrower and Guarantor;

(v)    any legal opinions required by Lender;

(vi)   the Title Insurance Policy;

(vii)  any necessary deliveries, affidavits or documentation necessary for Lender to obtain the Title Insurance Policy; and

(viii) any other deliveries requested by Lender as listed on the closing checklist delivered to Borrower from Lender.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower represents and warrants to the Lender as set forth in this Article 6:

6.01    Corporate Existence and Power.  The Borrower: (i) is a corporation, limited liability company, limited partnership or general partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable; and (ii) subject to the entry of the DIP Order by the Court, has the power and authority and all governmental licenses, authorizations, permits, consents and approvals to own its assets and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party. The Borrower has no direct or indirect Subsidiaries.

6.02    Corporate Authorization.  Upon the entry by the Court of the DIP Order, the execution, delivery and performance by the Borrower of this Agreement and any other Loan Document has been duly authorized by all necessary action, and do not and will not contravene the terms of any of the Borrower's organizational documents.

6.03    No Conflicts.  The borrowing of the Loan by Borrower and Borrower's execution, delivery and performance of its obligations under the Loan Documents to which it is a party will not: (a) violate, conflict with or result in a default (following notice and/or expiration of the related grace/cure period without cure or both, as applicable) under any agreement or other instrument to which Borrower or Guarantor is a party or by which the Property may be bound or

16

EXHIBIT 1
Page 78

affected, or any Requirements of Law (including, without limitation, usury laws); (b) result in the creation or imposition of any Lien whatsoever upon any of its assets, except the Liens created by the Loan Documents; nor (c) approval, consent, exemption, authorization, or other action, by or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document except for the Court.

6.04    <u>Binding Effect</u>. Upon the entry by the Court of the DIP Order, this Agreement and each other Loan Document to which the Borrower is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms.

6.05    <u>Federal Regulations</u>. The Borrower is not engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of the Loan will be used to purchase or carry margin stock in a way which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this <u>Section 6.05</u> with such meanings. The Borrower is not in violation of the PATRIOT Act.

6.06    <u>Accuracy of Information</u>.  None of the factual information contemporaneously furnished by or on behalf of the Borrower in writing to the Lender for purposes of or in connection with this Agreement, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make any information not misleading, and no other such factual information hereafter furnished by or on behalf of the Borrower to the Lender, when taken as a whole, will contain any untrue statement of a material fact or will omit to state any material fact necessary to make any information not misleading on the date as of which such information is dated or certified.

6.07    <u>Governmental Regulations</u>. The Borrower is not subject to regulation under the Federal Power Act, the Interstate Commerce Act (to the extent applicable to the transactions contemplated hereby) or the Investment Company Act of 1940 or under any other federal or state statute or regulation (other than the Bankruptcy Code) which in any case may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.

6.08    <u>Entitlement to Payment and Exercise of Remedies upon Maturity of Obligations</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Borrower hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations and shall be entitled to enforce the rights and remedies provided for hereunder and under applicable law without further application to or order by the Court other than as may be expressly required in accordance with the terms of the DIP Order.

6.09    <u>The DIP Order</u>.  On the date of the making of the Loan hereunder, the DIP Order will have been entered, will be in full force and effect, will not have been vacated or reversed and will not be subject to a stay or injunction issued by any court or tribunal (including, without

EXHIBIT 1
Page 79

limitation, a stay pending appeal) and no order amending or modifying (without the consent of the Lender, which consent may be withheld or denied in the Lender's sole discretion) the DIP Order will have been entered.

6.010  <u>Requirements of Law</u>.  The Property and its present and contemplated use and occupancy are in full compliance with all Requirements of Law (including, without limitation, all Access Laws).

6.011  <u>Operating Permits</u>.  Borrower has obtained all licenses, permits, registrations, certificates and other approvals, governmental and otherwise (including, without limitation, zoning, building code, land use and environmental), necessary for the use, occupancy and operation of the Property and the conduct of its business thereat, all of which are in full force and effect as of the date hereof.  Other than the Chapter 11 Cases, no event or condition currently exists which could result in the revocation, suspension, or forfeiture thereof.

6.012  <u>Leases</u>.  With respect to the Leases:  (a) the Rent Roll attached hereto and dated as of the Closing Date is true, complete and correct and the Property is not subject to Leases other than the Leases identified on such Rent Roll; (b) Borrower has delivered to Lender complete and accurate copies of all Leases and no verbal or written agreements exist which terminate, modify or supplement the Leases, except as otherwise disclosed to Lender in writing and acknowledged by Lender, and the standard form of lease used with respect to the Property; (c) unless otherwise agreed to by Lender, and except for the GSA Lease, each Lease, by its terms, is subordinate to the lien of the Security Instrument or the subject of a separate subordination agreement subordinating the Lease to the lien of the Security Instrument; (d) Borrower is the sole owner of the entire lessor's interest in the Leases and has not assigned, pledged or otherwise transferred the Rents reserved in the Leases (except to Lender); (e) all of the Leases are bona fide, arm's-length agreements with tenants unrelated to Borrower; (f) none of the Rents have been collected for more than one (1) month in advance (and for such purpose, a security deposit shall not be deemed Rent collected in advance); (g) all security deposits reflected on the Rent Roll have been collected and are being held by Borrower in the full amount reported on the Rent Roll; (h) except for work being performed in connection with the LCS Settlement Agreement, all work to be performed by Borrower under each Lease has been performed as required and has been accepted unconditionally by the applicable tenant; (i) no offsets or defenses exist in favor of any tenant to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (j) Borrower has not received notice from any tenant challenging the validity or enforceability of any Lease; (k) except as may be set forth on the Rent Roll, all payments due from tenants under the Leases are current; (l) except as may be set forth on the Rent Roll, no tenant under any Lease is in default thereunder, or is a debtor in any bankruptcy, reorganization, insolvency or similar proceeding, or has demonstrated a history of payment problems which suggest financial difficulty; (m) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; (n) no brokerage commissions, finder's fees or similar payment obligations are due and unpaid by Borrower or any Affiliate of Borrower regarding any Lease which have not been disclosed in writing to Lender and for which adequate amounts have been set aside in the TI/LC Reserve; and (o) no party to the LCS Settlement Agreement  is in default in any respect of the terms and conditions thereof, and no event has occurred which, but for the passage of time or the giving of notice, would constitute a default by a party thereto.

EXHIBIT 1
Page 80

6.013    <u>Ground Lease</u>.  Borrower hereby represents and warrants to Lender the following with respect to the Ground Lease:

(a)    The Ground Lease or a memorandum of the Ground Lease has been duly recorded.  The Ground Lease permits the interest of Borrower to be encumbered by a mortgage without the consent or approval of the Ground Lessor.  There have not been amendments or modifications to the terms of the Ground Lease.

(b)    The Ground Lease may not be terminated, surrendered or amended without the prior written consent of Lender; *provided* that the Ground Lessor shall not be prevented from exercising its remedies in accordance with the Ground Lease if the obligations of Borrower under the Ground Lease are not performed as provided in the Ground Lease, subject to the applicable notice and cure period of Ground Lessee and Lender.

(c)    Except for the Permitted Encumbrances, Borrower's interest in the Ground Lease is not subject to any Liens or encumbrances superior to, or of equal priority with, the Security Instrument other than the Ground Lessor's related fee interest.

(d)    Borrower's interest in the Ground Lease is assignable to Lender and to the purchaser at any foreclosure sale or the Lender or its designee under a deed or assignment in lieu of foreclosure in connection with the foreclosure of the Lien of the Security Instrument or transfer of Borrower's leasehold estate by deed or assignment in lieu of foreclosure, in each of the foregoing cases without the consent of the Ground Lessor.  Thereafter, the Ground Lease is further assignable by such transferee and its successors and assigns in accordance with the terms of the Ground Lease.

(e)    As of the date hereof, the Ground Lease is in full force and effect and no event of default has occurred on the part of the Borrower under the Ground Lease other than events of arising out of or relating to (1) the Chapter 11 Case and (2) litigation filed by U.S. Bank National Association on August 11, 2014 in the Superior Court of the State of California for the County of Los Angeles, Southern District, against Lessee seeking, among other things, the appointment of a receiver and to foreclose on the Property, which defaults have been waived in writing by Ground Lessor, nor to Borrower's knowledge has any default occurred by the Ground Lessor under the Ground Lease.  There is no existing condition which, but for the passage of time or the giving of notice, could result in a default by the Borrower or to Borrower's knowledge, Ground Lessor under the terms of the Ground Lease.

(f)    Under the terms of the Ground Lease and the Loan Documents, taken together, any related insurance and condemnation proceeds or awards that are paid or awarded to Borrower with respect to the leasehold interest will be applied either to the repair or restoration of all or part of the Property, with Lender having the right subject to the terms of the Ground Lease and Loan Documents to hold and disburse the proceeds as the repair or restoration progresses, or to the payment of the outstanding principal balance of the Loan together with any accrued interest thereon.

(g)    The Ground Lease requires the Ground Lessor to give notice of any default by Borrower to Lender prior to exercising its remedies thereunder.

19

EXHIBIT 1
Page 81

(h)    Lender is permitted the opportunity to cure any default under the Ground Lease, which is curable after the receipt of notice of the default before the Ground Lessor thereunder may terminate the Ground Lease.

(i)    Borrower has assumed the Ground Lease pursuant to section 365 of the Bankruptcy Code.

6.014    <u>Management Agreement</u>. Property Manager is not an Affiliate of Borrower. No change in the Property Manager or Property Management Contract has occurred since the date of the most recent information submitted to Lender with respect thereto, other than has been disclosed in writing to Lender.

6.015    <u>Complete Disclosure; No Change in Facts or Circumstances</u>.    Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially inaccurate, incomplete or misleading.    All information provided in or supplied with the application for Loan, or in satisfaction of the terms thereof, remains true, complete and correct in all material respects, and no adverse change in any condition or fact has occurred that would make any of such information materially inaccurate, incomplete or misleading.

6.016    <u>No Litigation</u>.    Other than the Chapter 11 Case, no action, suit, or proceeding or investigation, judicial, administrative or otherwise (including, without limitation, any reorganization, bankruptcy, insolvency or similar proceeding) currently is pending or, to the best of Borrower's knowledge, threatened or contemplated against or affecting Borrower, Guarantor or the Property, in each case that has not been disclosed by Borrower in writing to Lender prior to the Closing Date.

6.017    <u>Warranty of Title</u>. Borrower has good, marketable and insurable leasehold title to the Property pursuant to the Ground Lease, free and clear of all Liens whatsoever except for the Prior Liens and the Permitted Encumbrances. None of the Permitted Encumbrances, individually or in the aggregate: (a) materially interferes with the benefits of the security intended to be provided by the Security Instrument, (b) materially and adversely affects the value of the Property, or (c) materially and adversely impairs the use and operations of the Property. Borrower owns or has rights in all collateral given as security for the Loan, free and clear of any and all Liens except for the Liens created in favor of Lender in connection with the Loan, the Prior Liens and the Permitted Encumbrances.    Borrower shall forever warrant, defend and preserve the title and the validity and priority of the Liens created in favor of Lender in connection with the Loan and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

6.018    <u>No Condemnation</u>.    No Condemnation proceeding has been commenced or, to the best of Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

6.019    <u>Mechanic Liens</u>.    No mechanics', materialmen's or similar liens or claims have been, or may be, filed for work, labor or materials affecting the Property which are or may be Liens prior, equal or subordinate to the Security Instrument.

EXHIBIT 1
Page 82

6.020  <u>Condition of the Property</u>.  The Improvements are structurally sound, in good repair and free of defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the Improvements (including, without limitation, the heating and air conditioning systems, the electrical systems, plumbing systems, and all liquid and solid waste disposal, septic and sewer systems) are in good working order and condition, and in compliance with all Requirements of Law. The Property is free from damage caused by fire or other casualty.

6.021  <u>Assessments</u>.  No unpaid assessments for public improvements or assessments otherwise affecting the Property currently exist or, to the best of Borrower's knowledge, are pending, nor are improvements contemplated to the Property that may result in any such assessments.

6.022  <u>Taxes</u>.  Borrower and Guarantor have filed all federal, state, county, municipal, and city income tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them.  Borrower does not know of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

6.023  <u>Insurance</u>.  Borrower has obtained and delivered to Lender all insurance policies Lender has required pursuant to <u>Section 7.011</u> of this Agreement, with all Insurance Premiums prepaid thereunder, reflecting the insurance coverage, amounts and other requirements set forth in this Agreement.  No claims have been made under any of such insurance policies, and no party, including Borrower, has done, by act or omission, anything which would impair the coverage of any of such insurance policies.

6.024  <u>No Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Tax Code.

6.025  <u>ERISA</u>. (a) Borrower is not, and neither maintains, contributes to, or has any obligation to contribute to, an "employee benefit plan," as defined in §3(3) of ERISA, subject to Title I of ERISA, a "plan" as defined in and subject to Section 4975 of the Tax Code, and subject thereto, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (b) none of the assets of Borrower constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. §2510.3; and (c) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans.

6.026  <u>Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Law</u>.  Borrower, Guarantor, the Property Manager, and to the best of Borrower's knowledge, after having made reasonable inquiry (a) each Person owning an interest in Borrower or Guarantor and (b) each tenant at the Property: (i) is not currently identified on the OFAC List, and (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States.  Borrower agrees to confirm this representation and warranty in writing on an annual basis if requested by Lender to do so.

6.027  <u>Reorganization Matters</u>.

21

EXHIBIT 1
Page 83

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice under the circumstances for (x) the motion seeking approval of the Loan Documents and requesting entry of the Interim Order (y) the hearing for the approval of the Interim Order, and (z) the hearing for the approval of the Final Order will be given. The Borrower shall give on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute the DIP Superpriority Claim, subject to the terms and conditions set forth in the Interim Order and Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by valid and perfected DIP Liens on all of the Collateral, subject to the terms and conditions set forth in the Interim Order or Final Order, as applicable.

(d)    The Interim Order (upon entry thereof and with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the consent of the Lender.

6.028    Survival. The representations and warranties contained in this Article 6 survive for so long as the Loan remains payable and any Obligation remains to be performed.

## ARTICLE 7

## BORROWER COVENANTS

7.01    Performance by Borrower. Borrower shall observe, perform and fulfill each and every covenant, term and provision of each Loan Document, when and as required by the Loan Documents, executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, wavier, supplement, termination or other modification of any Loan Document without the prior consent of Lender.

7.02    Financial Information, Reports, Searches, Notices, etc.    The Borrower will furnish, or will cause to be furnished, to the Lender copies of the following financial statements, reports, notices and information:

(a)    Financial Reporting. The Borrower shall deliver to the Lender any and all reports, studies, analyses, accountings, budgets, projections, financial statements and other information and data (collectively, the "Financial and Business Reports") that the Borrower or their agents, (i) file with the Court or (ii) submit to the U.S. Trustee, including, without limitation, any and all Financial and Business Reports concerning the Borrower's financial condition, their businesses and/or their property (including, without limitation, the Collateral).

22

EXHIBIT 1
Page 84

Such Financial and Business Reports shall be provided to the Lender at the same time as such reports are filed with the Court or submitted to the U.S. Trustee, as applicable.

(b)     Bankruptcy Information.  Borrower shall provide Lender with reasonable opportunity to review and comment on all motions, proposed orders, and related papers, including, without limitation, the Plan, the Disclosure Statement, and the Plan Confirmation Order and the Disclosure Statement, no later than five (5) days before such papers are filed with the Court. Borrower shall not file any form of the Final Order, Plan, Disclosure Statement, Plan Confirmation Order, or any other motion that is adverse to the Lender's interests or inconsistent with the Loan Documents, unless the Lender consents in writing.  The form of the Final Order shall be in form and substance satisfactory to Lender in its sole discretion.  The Plan, Disclosure Statement, Plan Confirmation Order, and any other motion, when filed with the Court, shall be, in form and substance, reasonably satisfactory to the Lender; provided that with respect to any provisions of such documents that relate to the Lender, the Loan, or the treatment or payment thereof, such provisions must be, in form and substance, satisfactory to the Lender in its sole discretion. Promptly after the same is available, the Borrower shall furnish or cause to be furnished or made available to counsel for the Lender all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower with the Court or the U.S. Trustee in connection with the Chapter 11 Case or any Successor Case or, to the extent not privileged or subject to a requirement of non-disclosure, distributed by or on behalf of the Borrower to any Committee, and without limiting the generality of the foregoing, the Borrower shall promptly deliver to, and discuss with, the Lender and its counsel any and all information and developments in connection with any proposed sale or disposition of any assets or properties the sale or disposition of which would constitute a Disposition, including, without limitation, any letters of intent, commitment letters or engagement letters received by the Borrower, and any other event or condition which is reasonably likely to have a material effect on the Borrower or the Chapter 11 Case or any Successor Case, including, without limitation, the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization.

(c)     Financial Statements. All such financial statements and forms shall be complete and correct and shall be prepared in reasonable detail and, where applicable, in accordance with customary accounting standards applied consistently throughout the periods reflected therein.

(d)     Receiver Reports. Borrower shall deliver or cause to be delivered any and all reports or other filings submitted by the Receiver to the Court.

(e)     Monthly Reports. If the Receivership over the Property is terminated, then Borrower shall deliver to Lender:

(i)      as soon as available, but in any event within fifteen (15) days after the end of each calendar month, a monthly Rent Roll providing the required information, and a monthly leasing report as of the end of such calendar month, certified by a Responsible Officer to be true, correct, accurate and complete;

23

EXHIBIT 1
Page 85

(ii)    not later than twenty (20) days following the end of each calendar month, monthly and year-to-date statements of income and expense and cash flow prepared for such month with respect to the Property, certified by a Responsible Officer to be true, correct, accurate and complete; and

(iii)    within fifteen (15) days after the end of each calendar month, a monthly Compliance Certificate.

(f)    <u>Leasing Calls</u>. On a quarterly basis Borrower shall make key members of its organization available to have a conference call with Lender that provides for a review of the leasing status at the Property, including new leases, renewals, prospective tenants, marketing strategy, and any tenant concerns or issues. Borrower and Lender will establish a mutually agreeable time and date to conduct such quarterly meeting.

(g)    <u>Lien Searches</u>. Lender shall have the right to require from time to time at Borrower's sole cost and expense, such Lien, UCC, credit, litigation and judgment searches as Lender may deem necessary or advisable from time to time to confirm compliance with the terms and provisions of this Agreement and the other Loan Documents. Lender may order or cause to be ordered any such searches at Borrower's sole cost and expense, and Borrower shall reimburse Lender all such costs and expenses incurred in connection therewith within five (5) Business Days following written notice form Lender. All such costs and expenses shall be secured by the Lien of the Security Instrument.

(h)    <u>Notice</u>. The Borrower shall promptly give written notice to the Lender of the occurrence of any Default or Event of Default.

(i)    <u>Notice Statement</u>. Each notice pursuant to this <u>Section 7.02</u> shall be accompanied by a statement of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

7.03    <u>Use of Proceeds</u>.  The Borrower shall apply the proceeds of the Loan in accordance with <u>Section 1.03</u> hereof.

7.04    <u>Collateral</u>.  The Borrower, at all times, will cause all of the Collateral to be subject to a first priority perfected security interest in favor of and to be pledged to the Lender in accordance with the DIP Order or, as applicable, subject only to the Prior Liens (with respect to each such Prior Lien, only to the extent, if any, that such Prior Lien is nonavoidable and has priority over the DIP Liens under applicable law).

7.05    <u>DIP Loan Milestones</u>. The Borrower shall timely satisfy each of the DIP Loan Milestones on or before the dates required therefor and promptly upon Lender's request provide Lender with any relevant documentation or information necessary to evidence such satisfaction.

7.06    <u>Defending and Upholding the Liens</u>. Following the occurrence and during the continuance of any Event of Default, the Lender may, upon at least five Business Days' prior written notice to the Borrower and the U.S. Trustee, (i) appear in and defend any action or proceeding, in the name and on behalf of the Lender or the Borrower, in which the Lender is

24

EXHIBIT 1
Page 86

named or which the Lender in its sole discretion determines is reasonably likely to materially adversely affect any Collateral, the Lien in respect thereof or any other Loan Document and (ii) institute any action or proceeding which the Lender reasonably determines should be instituted to protect the interest or rights of the Lender in any Collateral or under this Agreement or any other Loan Document.

7.07    Indebtedness.  The Borrower shall not directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, nor apply to the Court for any authority to do so, except: (a) the Borrower may become and remain liable with respect to the Obligations; (b) the Borrower may remain liable with respect to Prepetition Indebtedness (other than the Prepetition Credit Facility) without giving effect to any extensions, renewals, refinancings, supplemental borrowings or other incurrences thereof; (c) the Borrower may become and remain liable with respect to or in connection with Indebtedness incurred in connection with the rejection of Borrower's or any of their Affiliates' leases and/or executory contracts in the Chapter 11 Case or any Successor Case; provided, that the obligation of the Borrower in respect of such Indebtedness shall be determined by a final order of the Court entered at the time of such rejection, to be a general, unsecured, non-priority claim; (d) other secured Indebtedness of the Borrower, to the extent such Indebtedness, and the Liens securing such Indebtedness, are junior to the Obligations of the Borrower hereunder; (e) other unsecured Indebtedness of the Borrower, to the extent such Indebtedness is junior to the Obligations of the Borrower hereunder, provided that the Borrower may only incur Indebtedness under clause (d) or (e) on terms acceptable to the Lender, and the aggregate amount of outstanding Indebtedness under clauses (d) and (e) may not exceed $25,000 at any time; and (f) Indebtedness evidencing overdrafts in respect of the banking arrangements of the Borrower, to the extent such Indebtedness does not remain overdue for more than fifteen (15) Business Days.

7.08    Prohibition on Liens.  The Borrower shall not directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, or apply to the Court for the authority to do any of the foregoing, nor apply to the Court for authority to do so, except: (i) Permitted Liens; (ii) Liens created in favor of the Lender pursuant to the DIP Order; and (iii) Prior Liens.

7.09    Limitations on Investments.  The Borrower will not make or permit to remain outstanding any Investments, nor will it apply to the Court for authority to do so, except: (a) Investments in the form of a loan or other extension of credit in or to Persons which are not Affiliates of the Borrower outstanding on the date hereof, but not any extensions, renewals or replacements of such Investments; (b) operating deposit accounts with banks; and (c) Investments in Cash Equivalents.

7.010    Chapter 11 Claims.  Other than with respect to the Prior Liens (with respect to each such Prior Lien, only to the extent, if any, that such Prior Lien has priority over the DIP Liens under applicable law), the Borrower shall not incur, create, assume, suffer or permit any

EXHIBIT 1
Page 87

claim, Lien or encumbrance against it or any of its property or assets in any Chapter 11 Case that is *pari passu* with or senior in priority to (i) the claims of the Lender against the Borrower in respect of the Obligations hereunder, including, without limitation, the DIP Superpriority Claim, or (ii) the DIP Liens, nor will the Borrower apply to the Court for authority to do so.

    7.011  Insurance.

        (a)    Insurance Required During the Loan Term.  Borrower, at Borrower's expense, shall obtain and maintain during the term of the Loan such insurance coverage (including, without limitation, type, minimum coverage amount, maximum deductible and acceptable exclusions) for Borrower and the Property as Lender deems reasonably necessary considering, among other things, the location and occupancy of the Property and all uses of the Property. Lender reserves the right to periodically review the insurance coverage Lender has required (types, minimum coverage amounts and maximum deductibles) and to increase or otherwise change the required coverage should Lender deem an increase or change to be reasonably necessary under then-existing circumstances. Without limiting Lender's rights hereunder in any respect, it shall be deemed reasonable for Lender to require no less coverage than the coverage Lender required to be in place on the Closing Date. Subject to the foregoing, Lender shall require the following insurance coverage to be effective during the term of the Loan, coverage amounts and deductibles to be acceptable to Lender:

        (i)    Property Insurance.  Casualty insurance must be maintained for the Improvements and all Personal Property insuring against any peril now or hereafter included within the classification "all risk" or "special perils" and in an amount at all times sufficient to prevent Borrower or Lender from becoming a co-insurer within the terms of the applicable policies but in any event at all times equal to the full replacement cost (as reasonably determined and adjusted from time to time by Lender) of the Improvements and Personal Property (without taking into account any depreciation and exclusive of excavations, footings and foundations, landscaping and paving), without any exclusions for windstorms.  Where any part of the Improvements constitutes a legal non-conforming use or structure under the Requirements of Law, such insurance must include "Ordinance of Law Coverage," with "Time Element," "Loss to the Undamaged Portion of the Building," "Demolition Cost" and "Increased Cost of Construction" endorsements, in the amount of coverage requested by Lender.  The policy must include a debris removal clause. The policy must name Lender as an insured mortgagee and as loss payee under a standard mortgagee clause that contains a waiver of subrogation in favor of Lender. The deductible shall not exceed $10,000.

        (ii)    Insurance against Acts of Terrorism.  The insurance coverage provided under this Section 7.011(a) in effect as of the Closing Date and during the Loan term must also insure against loss or damage resulting from acts of terrorism or comparable coverage

acceptable to Lender in its discretion, including, without limitation, in such amount as is at all times sufficient to prevent Borrower or Lender from becoming a co-insurer within the terms of the applicable policy(ies). The deductible shall not exceed $10,000.

(iii)     <u>Boiler and Machinery Insurance</u>. Broad form boiler and machinery insurance (without exclusion for explosion) and systems breakdown coverage must be maintained, covering all steam boilers, pipes, turbines, engines or other pressure vessels, electrical machinery, HVAC equipment, refrigeration equipment and other similar mechanical equipment located in, on or about the Property in such amount per accident equal to the full replacement cost thereof (as reasonably determined and adjusted from time to time by Lender) and also providing coverage against loss of occupancy or use arising from any breakdown thereof. The policy must name Lender as an insured under a standard joint loss clause and provide that all proceeds are to be paid to Lender.

(iv)     <u>Flood Insurance</u>. Flood insurance must be maintained if any portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as a 100-year flood zone or special hazard area. The required coverage amount shall be equal to the maximum allowable per building under the then-current guidelines published by the Federal Emergency Management Agency or any successor thereto plus any additional excess flood insurance limits required by Lender in its sole and absolute discretion. Such coverage may need to be purchased through excess carriers if the required coverage exceeds the maximum insurance available for the Property under the then-current guidelines published by the Federal Emergency Management Agency or any successor thereto. The policy must name Lender as an insured mortgagee under a standard mortgagee clause.

(v)     <u>Business Interruption</u>. Business interruption insurance must be maintained in an amount sufficient to provide the lost rental income for the Property for a period of not less than eighteen (18) months from the date of Casualty, with at least a twelve (12) month extended period of indemnity. Coverage shall include acts of foreign and domestic terrorism. For purposes of this coverage, "rental income" means the sum of (A) the total, then ascertainable Rents payable under the Leases and (B) the total ascertainable amount of all other payments to be received by Borrower from third parties which are the legal obligation of the tenants under Leases, reduced to the extent such amounts would not be received because of operating expenses not incurred during the period that any portion of the Property cannot be occupied as a result of the

27

EXHIBIT 1
Page 89

Casualty. The policy must name Lender as a loss payee and provide that all proceeds are to be paid to Lender.

(vi)     Liability Insurance.    Commercial general liability insurance coverage must be maintained, covering bodily injury or death and property damage, including all legal liability to the extent insurable and all court costs, legal fees and expenses, arising out of, or connected with, the possession, use, leasing, operation, maintenance or condition of the Property in such amounts generally required by institutional lenders for properties comparable to the Property but in no event for a combined single limit of less than $2,000,000 aggregate and $1,000,000 per occurrence with a deductible no greater than $2,500 per occurrence.    In addition to the required commercial general liability insurance, Borrower shall maintain an "Umbrella" and Excess Liability Policy for an amount equal to a minimum of $50,000,000.   If the aggregate limit that applies to the Property is reduced by the payment of a claim or establishment of a reserve equal to or greater than fifty percent (50%) of the annual aggregate limit, Borrower shall immediately arrange to have the aggregate limit restored by endorsement to the existing policy or the purchase of an additional insurance policy unless, in Lender's reasonable judgment, Borrower maintains sufficient concurrent excess liability insurance to satisfy the liability requirements of this Section 7.011 without the reinstatement of the aggregate limit. This insurance shall be primary and non-contributory and the additional insureds required will be added to both the commercial general liability insurance and "Umbrella" and Excess Liability Policy. The required coverage must provide for claims to be made on an occurrence basis. The policies must name Lender as an additional insured and contain a waiver of subrogation in favor of Lender. The policies shall cover acts of foreign and domestic terrorism.

(vii)    Workers' Compensation Insurance.    Workers' compensation insurance must be maintained with respect to all employees employed at the Property, in compliance with the laws of the state in which the Property is located.

(viii)    Earthquake Insurance.    If the Property is determined to be in a Federal Emergency Management Agency seismic zone or if the Probable Maximum Loss is greater than twenty percent (20%), earthquake insurance must be maintained in form, amount and with deductibles satisfactory to Lender.

(ix)     Other Coverage.    Without limiting Lender's rights under this Section 7.011(a), Lender may also require Borrower to maintain

28

EXHIBIT 1
Page 90

builder's risk insurance written on a completed value basis and in form and substance acceptable to Lender in their sole discretion during any period of construction, renovation or alteration of the Improvements, equipment breakdown, motor vehicles liability insurance (which may be satisfied by endorsement of existing property and liability insurance policies) in connection with all owned or non-owned motor vehicles used in connection with the management or maintenance of the Property, fidelity bond coverage for employees handling Rents and other income from the Property, environmental insurance, earth movement coverage, sinkhole coverage and other insurance with respect to the Property or on any replacements or substitutions thereof or additions thereto against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(b)    Qualified Insurers; Lender's Consent.  All insurance must be issued under valid and enforceable policies of insurance acceptable to Lender and issued by one or more domestic primary insurers authorized to issue insurance in the state in which the Property is located.  Each insurer must have a minimum investment grade rating of "A" from S&P and "A X" by AM Best or equivalent ratings from one or more Rating Agencies acceptable to Lender. Lender's approval of insurance coverage at any time is not a representation or warranty concerning the sufficiency of any coverage or the solvency of any insurer, and Lender shall not be responsible for, nor incur any liability for, the insolvency of the insurer or other failure of the insurer to perform.

(c)    Policy Requirements.  All policies must be for a term of not less than a year and name Lender as a beneficiary of such coverage as provided in this Section 7.011(c) or otherwise identified by Lender.  Each policy must also contain: (i) an endorsement or provision that permits recovery by Lender notwithstanding the negligent or willful acts or omission of Borrower; (ii) a waiver of subrogation endorsement as to Lender to the extent available at commercially reasonable rates; (iii) a provision that prohibits cancellation or termination before the expiration date, denial of coverage upon renewal, or material modification without at least thirty (30) days prior written notice to Lender, and ten (10) days notice for nonpayment of premium; and (iv) effective waivers by the insurer of all claims for Insurance Premiums against Lender.  To the extent not specified in this Section 7.011(c), the deductibles and loss payees under each policy shall be subject to Lender's approval.  If the required insurance coverage is to be provided under a blanket policy covering the Property and other properties and assets not part of the Property, such blanket policy must specify the portion of the total coverage that is allocated to the Property and any sublimit in such blanket policy which is applicable to the Property and shall otherwise comply in all respects with the requirements of this Section 7.011(c).

(d)    Evidence of Insurance.  In connection with each insurance policy required hereunder, Borrower shall deliver to Lender one of the following: (i) the original of each insurance policy or (ii) such other evidence of insurance acceptable to Lender in its sole

29

EXHIBIT 1
Page 91

discretion.  Evidence of the required coverage for the first year of the Loan (as well as proof of payment of the first year's premium) must be delivered to Lender on or before the Closing Date and thereafter not less than thirty (30) days prior to the expiration date of each policy.

(e)    <u>Lender's Right to Obtain Insurance for Borrower</u>.  If Borrower fails to deliver to Lender the evidence of insurance coverage required by this Agreement and does not cure such deficiency within five (5) days after Lender's notice of nondelivery, an Event of Default shall be deemed to have occurred (without further cure period or notice) and Lender may procure such insurance at Borrower's expense, without prejudice to Lender's rights upon an Event of Default.  All amounts advanced by Lender to procure the required insurance shall be added to principal, secured by the Security Instrument and bear interest at the Default Rate. Lender shall not be responsible for, nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Lender has caused the insurance to be placed with the insurer after Borrower's failure to furnish such insurance.

(f)    <u>Additional Insurance</u>.  Borrower shall not obtain insurance for the Property in addition to that required by Lender without Lender's prior written consent, which consent will not be unreasonably withheld provided that (i) Lender is named insured on such insurance, (ii) Lender receives evidence of such insurance as required by subsection (d) above, and (iii) such insurance complies with all of the applicable requirements set forth in this Agreement.

(g)    <u>Certification</u>.  Borrower shall furnish to Lender, on or before thirty (30) days after the close of each of Borrower's fiscal years, a statement certified by a Responsible Office of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

7.012  <u>Obligations upon Condemnation or Casualty</u>. If the Property, or any portion thereof, shall be damaged or destroyed by a Casualty or become subject to any Condemnation, the following shall apply:

(a)    <u>Generally</u>.  Borrower shall promptly notify Lender in writing of any actual or threatened Condemnation or of any Casualty that damages or renders unusable the Property or any part thereof and, except as otherwise provided below, shall promptly and diligently pursue Borrower's claim for a Condemnation award or insurance proceeds, as applicable.  Borrower shall not make any agreement in lieu of Condemnation or accept any Condemnation award of $50,000 or more without Lender's prior written consent.  Borrower shall not accept any settlement of insurance proceeds of $50,000 or more with respect to a Casualty without Lender's prior written consent.  If requested by Lender, Borrower agrees to provide copies to Lender of all notices or filings made or received by Borrower in connection with the Casualty or Condemnation or with respect to collection of the insurance proceeds or Condemnation award, as applicable.  Notwithstanding that a Casualty or Condemnation has occurred, or that rights to a Condemnation award or insurance proceeds are pending, Borrower shall continue to pay the Loan at the time and in the manner provided in this Agreement.

30

EXHIBIT 1
Page 92

(b)    <u>Lender's Right to Pursue Claim</u>.  Borrower hereby grants Lender the authority, at Lender's option, either: (i) to settle and adjust any claim arising with respect to the Casualty or Condemnation without Borrower's consent, or (ii) to allow Borrower to settle and adjust such claim; provided that, in either case, the insurance proceeds or Condemnation award, as applicable, is paid directly to Lender.  Borrower hereby appoints Lender as its attorney-in-fact with full power of substitution (and which shall be deemed to be coupled with an interest and irrevocable until the Loan is paid and the Security Instrument is discharged of record, with Borrower hereby ratifying all that its said attorney shall do by virtue thereof) to endorse any agreements, instruments or drafts received in connection with a Casualty or Condemnation.  If any portion of the insurance proceeds or Condemnation award, as applicable, should be paid directly to Borrower, Borrower shall be deemed to hold such amounts in trust for Lender and shall promptly remit such amounts to Lender.  If the Property is sold, through foreclosure or otherwise, prior to the receipt of the Condemnation award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the proceeds of such sale in an amount sufficient to pay the Loan in full.  All expenses incurred by Lender in the settlement and collection of amounts paid with respect to a Casualty or Condemnation (including, without limitation, reasonable legal fees and expenses) shall be deducted and reimbursed to Lender from the insurance proceeds or Condemnation award, as applicable, prior to any other application thereof.  The insurance proceeds or Condemnation award paid or payable on account of a Casualty or Condemnation, as applicable (including all business interruption insurance proceeds paid as a result of such Casualty or Condemnation), less expenses to be reimbursed to Lender hereunder, is referred to herein as the "<u>Restoration Proceeds</u>."

(c)    <u>Application of Restoration Proceeds; Restoration Obligations</u>. Except as specifically hereafter provided in subsection (d) below,  Lender may, in its sole discretion, either (i) apply the Restoration Proceeds to payment of the Loan, whether or not then due and payable, or (ii) hold and release the Restoration Proceeds to Borrower (A) for the costs of Restoration undertaken by Borrower in accordance with this Agreement and (B) to cover any shortfall in Operating Income as a result of such Casualty or Condemnation that is necessary to pay in full the debt service payments due from Borrower on each Payment Due Date and other Operating Expenses falling due during the period until Restoration is completed; provided, however, that Lender shall have no obligation to release Restoration Proceeds to fund amounts contemplated by clause (B) unless (1) Lender is satisfied that Restoration Proceeds are sufficient to pay in full the estimated cost to complete Restoration and (2) all Operating Expenses to be funded with Restoration Proceeds are approved by Lender.   If Lender applies Restoration Proceeds to payment of the Loan and the Loan is still outstanding, interest will continue to accrue and be due on the unpaid principal at the Applicable Interest Rate.  If Lender makes the Restoration Proceeds available to Borrower for Restoration, Borrower shall diligently pursue Restoration so as to restore the Property to at least equal value and substantially the same character as existed immediately prior to such Casualty or Condemnation.  All plans and specifications for the Restoration and all contractors, subcontractors and materialmen to be engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to Lender's prior review and approval.  Lender may engage, at Borrower's expense, an independent engineer or inspector to assist Lender in its review of the approvals requested of Lender in connection with the Restoration and to periodically inspect the Restoration in progress and upon substantial completion.

31

EXHIBIT 1
Page 93

(d)    Condition to Release of Restoration Proceeds for Restoration.    Lender agrees to make the Restoration Proceeds available to Borrower for Restoration as long as:

(i)    The Restoration Proceeds recovered are less than the outstanding principal balance of the Loan.

(ii)    No Default or Event of Default exists.

(iii)    Borrower demonstrates to Lender's satisfaction that the Restoration Proceeds are sufficient to pay in full the estimated cost to complete Restoration and any shortfalls in Operating Income as a result of such Casualty or Condemnation that are anticipated until Restoration is substantially completed, or, if the Restoration Proceeds are determined by Lender to be insufficient to pay such costs in full, Borrower deposits with Lender, in cash or by a cash equivalent acceptable to Lender, the additional amount estimated by Lender to be necessary to pay the full cost of Restoration ("Restoration Deficiency Deposit").

(iv)    Restoration can be completed not later than the earlier of (A) not less than six (6) months prior to the Maturity Date (without taking into consideration any unexercised extension), (B) the earliest date by which completion is required under any Lease or the Ground Lease, (C) the earliest date by which completion is required under the Requirements of Law to preserve the right to rebuild the Improvements as they existed prior to the Casualty or Condemnation or (D) the expiration of Borrower's business interruption insurance.

(v)    If a Condemnation has occurred, less than ten percent (10%) of the Land is taken and the land taken is along the perimeter or periphery of the Land, and no portion of the Improvements are taken.

(vi)    If a Casualty has occurred, less than twenty-five percent (25%) of the total floor area of the Improvements is damaged or rendered unusable by the Casualty and Borrower demonstrates to Lender's satisfaction that a reasonable means of access exists to the Property and within the Improvements unaffected by the Casualty.

(vii)    Borrower demonstrates to Lender's satisfaction that Leases demising in the aggregate a percentage amount equal to or greater than ninety percent (90%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration,

32

EXHIBIT 1
Page 94

notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and Borrower furnishes to Lender evidence satisfactory to Lender that all tenants under Leases shall continue to operate their respective space at the Property after the completion of the Restoration without rent abatement.

(viii)   Lender shall be satisfied that, upon the completion of the Restoration, the fair market value and cash flow of the Property will not be less than the fair market value and cash flow of the Property as the same existed immediately prior to the applicable Casualty or Condemnation.

(ix)   Borrower and Guarantor shall execute and deliver to Lender a completion guaranty in form and substance satisfactory to Lender pursuant to the provisions of which Borrower and Guarantor shall jointly and severally guaranty to Lender the lien-free completion by Borrower of the Restoration and shall deliver to Lender an additional non-consolidation opinion addressing such completion guaranty.

(x)   Borrower demonstrates to Lender's satisfaction that, upon completion of Restoration, the net cash flow of the Property will be restored to a level sufficient to cover all Operating Expenses of the Property, including, without limitation, supporting a Debt Service Coverage Ratio at least equal to, or greater than, the greater of (A) the Debt Service Coverage Ratio existing as of the Closing Date (or during the Extension Term, the Debt Service Coverage Ratio as of the commencement date of the Extension Term), or (B) the Debt Service Coverage Ratio which existed as of the date immediately preceding such Casualty or Condemnation.

(xi)   The Property and its use after completion of Restoration will be in compliance with, and permitted under, all Requirements of Law.

(e)   Disbursement Procedure; Holdback.   If the Restoration Proceeds will be made available by Lender to Borrower for Restoration and the estimated cost of Restoration approved by Lender (together with all other amounts then held by Borrower pursuant to this subsection (e)) is less than $50,000, Lender shall disburse the entire amount of the Restoration Proceeds to Borrower, and Borrower hereby covenants and agrees to use the Restoration Proceeds solely for Restoration performed in accordance with this Agreement.   If, however, the estimated cost of Restoration approved by Lender (together with all other amounts then held by Borrower pursuant to this subsection (e)) is $50,000 or more, Lender may retain the Restoration Proceeds in a non-interest bearing escrow account and make periodic disbursements to Borrower as follows:

(i)   Disbursements for Restoration.

33

EXHIBIT 1
Page 95

(A)     Lender will disburse Restoration Proceeds for the costs of Restoration to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (1) all materials installed and work and labor performed in connection with the Restoration have been paid in full (except to the extent that they are to be paid out of the requested disbursement), and (2) there exist no notices of pendency, stop orders, mechanics' liens or notices of intention to file same, or any other Liens of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded and discharged of record or, in the alternative, fully insured to Lender's reasonable satisfaction by the title company insuring the Lien of the Security Instrument.

(B)     Lender may limit disbursements to not more than one (1) per month.

(C)     Lender may hold back from each requested disbursement an amount equal to the greater of (1) ten percent (10%) of the requested disbursement or (2) the amount which Borrower is permitted to withhold under its contract with the contractor or supplier to be paid with the proceeds of such disbursement (either, a "Restoration Holdback"). Amounts held as the Restoration Holdback shall be disbursed once: (I) Lender receives satisfactory evidence that Restoration has been fully completed in accordance with all Requirements of Law; (II) Lender receives satisfactory evidence that all Restoration costs have been paid in full or will be fully paid from the remaining Restoration Proceeds and the Restoration Holdback; and (III) Lender receives, at Lender's option, a search of title to the Property, effective as of the date on which the Restoration Holdback is to be disbursed, showing no Liens other than the Permitted Encumbrances or an endorsement to its Title Insurance Policy which updates the effective date of such policy to the date on which the Restoration Holdback is to be disbursed and which shows no Liens since the date of recordation of the Security Instrument (other than the Permitted Encumbrances).

(D)     Notwithstanding subsection (C) above, Lender may release from the Restoration Holdback payments to a contractor or supplier if: (1) Lender receives satisfactory evidence that such contractor has satisfactorily completed its contract with Borrower; (2) such contractor or supplier delivers to Lender an acceptable written waiver of its mechanic's lien, in recordable form; and (3) Borrower provides written consent from the surety company, if any, which has issued a payment or performance bond with respect to such contractor or supplier.

(ii)     Disbursements for Shortfalls in Operating Income.  Provided that Lender determines that the Restoration Proceeds are sufficient to pay in full the estimated cost to complete Restoration, Lender will disburse Restoration Proceeds not reserved for Restoration to pay the shortfall in Operating Income necessary to pay (A) first, the debt service payments due from Borrower on each Payment Due Date falling due from the date of the Casualty or Condemnation through the date on which Restoration is substantially completed, (B) second, any deposits to any Reserves due from Borrower on each Payment Due Date falling due from the date of the Casualty

EXHIBIT 1
Page 96

or Condemnation through the date on which Restoration is substantially completed and (C) then, any Operating Expenses approved by Lender.  Lender may require satisfactory evidence that Operating Expenses to be paid have been incurred and may issue payments directly to the Person entitled to the payment claimed as an Operating Expense.

(iii)    <u>Restoration Proceeds Deemed Insufficient</u>.  If, in Lender's judgment, at any time during Restoration, the undisbursed portion of the Restoration Proceeds shall not be sufficient to pay the costs remaining for Restoration to be completed or to pay any shortfall in Operating Income needed to pay in full Borrower's debt service payments on the Loan, Borrower's deposits to any Reserves, and Operating Expenses anticipated to be incurred during the period of Restoration, Borrower shall deposit the deficiency with Lender, in cash or by a cash equivalent acceptable to Lender (also called a "<u>Restoration Deficiency Deposit</u>"), within ten (10) days after Lender's notice of such deficiency, and no further disbursement of the Restoration Proceeds will be made until such funds are deposited.  Amounts held by Lender as the Restoration Deficiency Deposit shall be disbursed in accordance with this <u>Section 7.012</u>.

(iv)    <u>Consequence of Default</u>.  Lender shall not be obligated to disburse Restoration Proceeds or amounts from the Restoration Holdback when an Event of Default exists, and upon the occurrence of an Event of Default, any undisbursed portion of the Restoration Proceeds (including the Restoration Deficiency Deposit and the Restoration Holdback) may, at Lender's option, be applied against the Loan, whether or not then due or accelerated, in such order and manner as Lender determines.

(v)    <u>Surplus Restoration Proceeds After Restoration Completion</u>.  Any Restoration Proceeds remaining after full payment of Restoration costs and unpaid expenses due to Lender for which Lender is permitted reimbursement under this <u>Section 7.012</u> shall be released to Borrower provided no Event of Default exists, and Borrower delivers evidence satisfactory to Lender that (A) Restoration has been fully completed in accordance with all Requirements of Law and (B) the Property is free and clear of all Liens which may be asserted with respect to the Restoration.

(f)    Notwithstanding anything to the contrary contained in the Ground Lease with respect to the disbursement of Restoration Proceeds, the provisions set forth in this Agreement and the other Loan Documents shall govern and Borrower hereby agrees that compliance with the terms of this Agreement and the other Loan Documents with respect to Restoration Proceeds shall not create a default under the terms and provisions of the Ground Lease. Borrower shall not grant its consent, approval or waiver with respect to any disbursement

35

EXHIBIT 1
Page 97

of Restoration Proceeds as may be requested or required in connection with the terms and provisions of the Ground Lease without first obtaining the written consent, approval, or waiver of Lender.

7.013  Inspections and Right of Entry.  Subject to the terms of the Ground Lease, applicable tenant leases, and all Requirements of Law, Lender and its agents may enter the Property upon prior notice to Borrower (notice to be given unless an Event of Default or an emergency exists, as determined by Lender in good faith) to inspect the Property and Borrower's books and records relating to the Property.  In making such entry and inspection, Lender agrees to use reasonable efforts to minimize disturbance to Borrower and tenants of the Property.  Lender and its agents shall have access, at all reasonable times, to the Property, including, without limitation, all contracts, plans and specifications, permits, licenses and approvals required or obtained in connection with the Property.

7.014  Ground Lease. Borrower shall observe the following covenants with respect to the Ground Lease:

(a)  Borrower shall, at its sole cost and expense, promptly and timely perform and observe all the material terms, covenants and conditions required to be performed and observed by Borrower as lessee under the Ground Lease (including, but not limited to, the payment of all rent, additional rent, percentage rent and other charges required to be paid under the Ground Lease).

(b)  If Borrower shall be in default or risk of default under the Ground Lease, Borrower hereby grants Lender the right (but not the obligation), to cause such default under the Ground Lease to be remedied or prevented and otherwise exercise any and all rights of Borrower under the Ground Lease, as may be necessary to prevent or cure such default, and Lender shall have the right to enter all or any portion of the Property at such times and in such manner as Lender deems necessary, to prevent or to cure any such default.

(c)  The actions or payments of Lender to cure or prevent any default by Borrower under the Ground Lease shall not remove or waive, as between Borrower and Lender, the default that occurred under this Agreement by virtue of the default by Borrower under the Ground Lease.  All sums expended by Lender to cure or prevent any such default shall be paid by Borrower to Lender, within five (5) Business Days following demand, with interest on such sum at the Default Rate from the date such sums were expended by Lender to and including the date the reimbursement payment is made to Lender.  All such indebtedness shall be deemed to be secured by the related Security Instrument.

(d)  Borrower shall notify Lender promptly in writing of the occurrence of any default by Ground Lessor under the Ground Lease or following the receipt by Borrower of any written notice from Ground Lessor under the Ground Lease noting or claiming the occurrence of any default by Borrower under the Ground Lease or the occurrence of any event that, with the passage of time or service of notice, or both, would constitute a default by Borrower under the Ground Lease.  Borrower shall promptly deliver to Lender a copy of any such written notice of default.

36

EXHIBIT 1
Page 98

(e)      Promptly upon Lender's written request, Borrower shall request and use commercially reasonable efforts to obtain and furnish to Lender an estoppel certificate from the Ground Lessor under the Ground Lease stating the date through which rent has been paid and whether or not there are any defaults thereunder and specifying the nature of such claimed defaults, if any.

(f)      Borrower shall promptly execute, acknowledge and deliver to Lender such instruments as may be reasonably required to permit Lender to cure or prevent any default under the Ground Lease or permit Lender to take such other action required to enable Lender to cure or remedy the matter in default and preserve the security interest of Lender under the Loan Documents with respect to the Property.  Borrower irrevocably appoints Lender as its true and lawful attorney-in-fact to do, in its name or otherwise, any and all acts and to execute any and all documents that are necessary to preserve any rights of Borrower under or with respect to the Ground Lease, including, without limitation, the right to effectuate any extension or renewal of the Ground Lease, or to preserve any rights of Borrower whatsoever in respect of any part of the Ground Lease (and the above powers granted to Lender are coupled with an interest and shall be irrevocable).

(g)      Notwithstanding anything to the contrary contained in this Agreement with respect to the Ground Lease:

      (i)      The lien of the Security Instrument attaches to all of Borrower's rights and remedies at any time arising under or pursuant to Subsection 365(h) of the Bankruptcy Code, including, without limitation, all of Borrower's rights, as lessee under the Ground Lease, to remain in possession of the Property.

      (ii)      Borrower shall not, without Lender's written consent, elect to treat the Ground Lease as terminated under subsection 365(h)(l) of the Bankruptcy Code.  Any such election made without Lender's prior written consent shall be void.

      (iii)      As security for the Debt, Borrower unconditionally assigns, transfers and sets over to Lender all of Borrower's claims and rights to the payment of damages arising from any rejection by the lessor under the Ground Lease under the Bankruptcy Code. Lender and Borrower shall proceed jointly or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of the Ground Lease, including, without limitation, the right to file and prosecute any proofs of claim, complaints, motions, applications, notices and other documents in any case in respect of lessor under the Bankruptcy Code.  This assignment constitutes a present, irrevocable and unconditional assignment of the foregoing claims, rights and remedies, and shall continue in effect until all of the Obligations shall have been satisfied and discharged in full.  Any amounts received by Lender or Borrower as damages arising out of the rejection of the Ground

37

EXHIBIT 1
Page 99

Lease as aforesaid shall be applied to all out-of-pocket costs and expenses of Lender (including, without limitation, attorney's fees and costs) incurred in connection with the exercise of any of its rights or remedies in accordance with the applicable provisions of this Agreement.

(iv)    If, pursuant to subsection 365(h) of the Bankruptcy Code, Borrower seeks to offset, against the rent reserved in the Ground Lease, the amount of any damages caused by the nonperformance by the lessor of any of its obligations thereunder after the rejection by lessor of the Ground Lease under the Bankruptcy Code, then Borrower shall not effect any offset of the amounts so objected to by Lender.

(v)    If any action, proceeding, motion or notice shall be commenced or filed in respect of Ground Lessor or in connection with any case under the Bankruptcy Code in respect of Ground Lessor, Lender and Borrower shall cooperatively conduct and control any such litigation with counsel agreed upon between Borrower and Lender in connection with such litigation. Borrower shall, within five (5) Business Days following demand, pay to Lender all reasonable and actual out-of-pocket costs and expenses (including reasonable and out-of-pocket attorneys' fees and costs) incurred in connection with the cooperative prosecution or conduct of any such proceedings. All such costs and expenses shall be secured by the Lien of the Security Instrument.

(vi)    Borrower shall upon it obtaining notice or knowledge thereof, notify Lender in writing of any filing by or against Ground Lessor of a petition under the Bankruptcy Code, setting forth any information available to Borrower as to the date of such filing, the court in which such petition was filed, and the relief sought in such filing. Borrower shall deliver to Lender any and all notices, summonses, pleadings, applications and other documents received by Borrower in connection with any such petition and any proceedings relating to such petition promptly following Borrower's receipt thereof.

(vii)    Borrower shall not consent to, acquiesce in or fail to object to any attempt by Ground Lessor of which Borrower has actual knowledge to sell, transfer or otherwise convey the fee estate of the Property free and clear of the Ground Lease under subsection 363(f) of the Bankruptcy Code. Borrower acknowledges that the Lien of the related Security Instrument attaches to all of Borrower's rights and remedies, if any, at any time arising under or pursuant to subsection 363(f) of the U.S. Bankruptcy Code to consent to any such sale, transfer or other assignment.

38

EXHIBIT 1
Page 100

(h)    if Lender, its nominee, designee, successor, or assignee acquires title and/or rights of Borrower under the Ground Lease by reason of foreclosure of the Security Instrument, deed in lieu of foreclosure or otherwise, such party shall (i) succeed to all of the rights of and benefits accruing to Borrower under the Ground Lease, and (ii) be entitled to exercise all of the rights and benefits accruing to Borrower under the Ground Lease.  At such time as Lender shall request, Borrower agrees to execute and deliver and to cause any third party to execute and deliver to Lender such documents as Lender and its counsel may require in order to insure that the provisions of this section will be validly and legally enforceable and effective against Borrower and all parties claiming by, through, under or against Borrower.

(i)    Borrower shall not, without Lender's written consent, fail to exercise any option or right to renew or extend the term of the Ground Lease, and shall execute, acknowledge, deliver and record any document requested by Lender to evidence the Lien of the Security Instrument on such extended or renewed lease term.  If Borrower shall fail to exercise any such option or right as aforesaid, Lender may exercise the option or right as Borrower's agent and attorney-in-fact as provided above in Lender's own name or in the name of and on behalf of a nominee of Lender.

(j)    Borrower shall not waive, excuse, condone or in any way release or discharge the Ground Lessor under the Ground Lease of or from the Ground Lessor's material obligations, covenant and/or conditions under the Ground Lease without the prior written consent of Lender.

(k)    Borrower shall not, without Lender's prior written consent, surrender, terminate, forfeit, or suffer or permit the surrender, termination or forfeiture of, or change, modify or amend or make any election pursuant to or under the Ground Lease or take any action with respect to the election of or performance of the mechanisms and procedures therein for determining and/or re-setting the rental rates thereunder (a "Ground Rent Reset"). Consent by Lender to one amendment, change, agreement, modification or election shall not be deemed to be a waiver of the right to require consent to other, future or successive amendments, changes, agreements, modifications or elections. Neither Borrower nor any Affiliate of Borrower shall acquire Ground Lessor's interest in the Ground Lease without Lender's prior written consent, and any such acquisition with Lender's prior written consent shall be accomplished by Borrower in such a manner so as to avoid a merger of the interests of lessor and lessee in the Ground Lease, unless consent to such merger is granted by Lender.

(l)    Borrower shall provide prompt written notice to Lender of any notice received or sent by Borrower, Borrower's Affiliates, Ground Lessor (or any of its Affiliates) or Property Manager (or any of its Affiliates) with respect to or relating to the Ground Lease, together with a complete copy of any such notice (if such notice was provided in writing) or detailed description of any oral notices sent or received by Borrower, Borrower's Affiliates, Ground Lessor (or any of its Affiliates) or Property Manager (or any of its Affiliates) with respect thereto and shall keep Lender informed as to meetings or other communications with Ground Lessor or its Affiliates, both in advance of the occurrence of any such meetings or communications and following the completion of such meetings and communications.

EXHIBIT 1
Page 101

7.015    <u>Right to Enter into New Leases</u>. All proposed Leases shall require Lender's prior written approval at Borrower's expense (including reasonable legal fees and expenses). Borrower shall promptly deliver to Lender a copy of each Lease or amendment thereto entered into after the Closing Date, together with written certification from a Responsible Officer which confirms that (x) the copy delivered is a true, complete and correct copy of such Lease or amendment thereto and (y) Borrower has satisfied all conditions of this <u>Section 7.015</u>. Lender's acceptance of Borrower's certification or a copy of any Lease or amendment thereto shall not be deemed a waiver of the requirements of this <u>Section 7.015</u> if the Lease or amendment thereto is not in compliance herewith. Provided no Default or Event of Default is then occurring, Lender shall, at Borrower's sole cost and expense, execute a subordination, non-disturbance and attornment agreement in form and substance reasonably acceptable to Lender if requested by any tenant (excluding residential tenants), provided that under no circumstance shall such agreement impose upon Lender obligations or liabilities relating to acts or omissions of Borrower or any prior landlord. Each request for Lender's consent to a proposed Lease or amendment thereto shall be made in writing to Lender.

7.016    <u>Leasing Decisions</u>.   Borrower may not, without Lender's prior written consent: (i) amend, supplement or modify in any way any Lease or waive any term thereof (including, without limitation, shortening the Lease term, reducing Rents, granting Rent abatements, or accepting a surrender of all or any portion of the leased space); (ii) cancel or terminate any Lease; (iii) consent to a tenant's assignment of its Lease or subleasing of space; or (iv) amend, supplement, waive or terminate any Lease Guaranties.  Any action set forth in this <u>Section 7.016</u> requires Lender's prior written approval at Borrower's expense (including reasonable legal fees and expenses). Borrower shall promptly deliver to Lender a copy of all instruments documenting the action taken, together with written certification from a Responsible Officer that (x) the copies delivered are true, complete and correct copies of the materials represented thereby and (y) Borrower has satisfied all conditions of this <u>Section 7.016</u>. Lender's acceptance of Borrower's certification or a copy of such Lease materials shall not be deemed a waiver of the requirements of this <u>Section 7.016</u> if the action taken is not in compliance herewith.

7.017    <u>Observance of Lessor Obligations</u>. Borrower (i) shall observe and perform all obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of any of the Leases as security for the Loan; (ii) upon Lender's request, shall promptly send copies to Lender of all notices of default which Borrower shall send or receive (or may have sent or received) under any Lease; (iii) shall enforce in a commercially reasonable manner all of the material terms, covenants and conditions contained in the Leases to be observed or performed by the tenant; (iv) shall not collect any Rents more than one (1) month in advance (and for this purpose a security deposit shall not be deemed Rent collected in advance); and (v) shall not execute any assignment or pledge of the lessor's interest in any of the Leases or the Rents (other than in connection with the Loan).

7.018    <u>Subleases</u>. Borrower shall use best efforts to promptly notify Lender when any portion of the Property has been sublet and the name of any subtenant.

7.019    <u>LCS Settlement Agreement</u>. Borrower shall comply in all respects with each and every term and condition of the LCS Settlement Agreement and shall cause all parties thereto to

EXHIBIT 1
Page 102

confirm in writing that all conditions to the release of funds under the LCS Settlement Agreement have been fully satisfied before any funds are released in connection therewith.

7.020  <u>Use of Property</u>.  Borrower shall not allow changes in the use of the Property without Lender's prior written consent.  Borrower shall not initiate, join in, or consent to any change in any private restrictive covenant or zoning or land use ordinance limiting or defining the uses which may be made of the Property.  If use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming portion of the Property to be abandoned without Lender's prior written consent.

7.021  <u>Maintenance of Property</u>.  Borrower shall maintain the Property in a good and safe condition and repair.  No portion of the Property shall be removed, demolished or materially altered (except for normal repair or replacement) without Lender's prior written consent.  Borrower shall promptly repair or replace any portion of the Property which may become damaged, worn or dilapidated.

7.022  <u>Waste</u>.  Borrower shall not commit or suffer any waste of the Property or do or permit to be done thereon anything that may in any way impair the value of the Property or invalidate the insurance coverage required hereunder to be maintained by Borrower.  Borrower will not, without Lender's prior written consent, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof.

7.023  <u>Obligation to Perform</u>.  Subject to the requirements of the Chapter 11 Case, Borrower shall promptly and fully comply with all (i) Requirements of Law (including, without limitation, all Access Laws) now or hereafter affecting the Property, and (ii) all licenses, permits, registrations, certificates and other approvals, governmental or otherwise, necessary for the use, occupancy and operation of the Property and the conduct of its business thereat.  Borrower shall notify Lender promptly upon Borrower's knowledge or receipt of any notice related to a violation of any Requirements of Law or of the commencement of any proceedings or investigations which relate to compliance with Requirements of Law.  At Lender's request, Borrower shall provide Lender with copies of all notices, reports or other documents relating to any litigation or governmental investigation relating to Borrower or the Property.

7.024  <u>Right to Contest</u>.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the Requirements of Law affecting the Property or alleged violation thereof, provided that: (i) no Event of Default exists; (ii) such proceeding shall be permitted under and be conducted in accordance with the Requirements of Law; (iii) the Property will not be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) non-compliance with such Requirement of Law shall not impose any civil, criminal or environmental liability on Lender or Borrower; (v) Borrower deposits with Lender cash (or other security acceptable to Lender) in such amount as Lender deems sufficient to cover loss or damage that may result from Borrower's failure to prevail in such contest; (vi) Borrower furnishes to Lender all other items reasonably requested by Lender; and (vii) upon a final determination thereof, Borrower complies with the obligations determined to be applicable.

EXHIBIT 1
Page 103

7.025    Property Management.

(a)    Borrower shall, within forty-five (45) days after the Closing Date, or such earlier date as may be required by Section 7.032 hereof, appoint a Property Manager and enter into a Property Management Contract. In no event shall the Property Manager at any time be an Affiliate of Borrower. Borrower shall not remove or replace the Property Manager (which shall be deemed to occur upon a change of direct or indirect ownership of the Property Manager which results in Property Manager becoming an Affiliate of Borrower) or modify or waive any material terms of the Property Management Contract, or enter into a new property management contract without Lender's prior written consent. The property management fee and all other fees payable under the Property Management Contract shall not exceed three percent (3%) of gross revenues of the Property and shall be subordinate in all respects to the Loan

(b)    Termination of Property Manager.  Borrower agrees that, if (i) an Event of Default exists, (ii) a default or event of default exists on the part of the Property Manager under the Property Management Contract after notice and lapse of any applicable cure periods thereunder, or (iii) Property Manager becomes insolvent or the debtor in any insolvency or bankruptcy proceeding, Lender may direct Borrower to terminate the Property Management Contract and to replace Property Manager with a management company acceptable to Lender.

7.026    Other Agreements.

(a)    New Agreements.  All proposed contracts and agreements (including Operating Agreements) or any amendments, modifications, supplements, extensions or terminations thereof relating to or affecting the Property or the ownership, leasing, management, use operation, maintenance, repair or restoration thereof having an amount payable thereunder or liability in excess of $10,000 shall require Lender's prior written approval at Borrower's expense (including legal fees and expenses). Borrower shall promptly deliver to Lender a copy of each such contract or amendment thereto entered into after the Closing Date, together with written certification from a Responsible Officer which confirms that (x) the copy delivered is a true, complete and correct copy of such contract or amendment thereto and (y) Borrower has satisfied all conditions of this Section 7.026. Lender's acceptance of Borrower's certification or a copy of any contract or amendment thereto shall not be deemed a waiver of the requirements of this Section 7.026 if the contract or agreement or amendment thereto is not in compliance herewith. Each request for Lender's consent to a proposed contract or amendment thereto shall be made in writing to Lender.

(b)    Performance of Agreements.  Subject to the requirements of the Chapter 11 Case, Borrower shall observe and perform in a timely manner each and every obligation to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property or the ownership, leasing, management, use operation, maintenance, repair or restoration thereof (including, without limitation, the Operating Agreements). Without limiting the foregoing, Borrower shall (a) give prompt notice to Lender of any notice received by Borrower with respect to any of the Operating Agreements which alleges a default or nonperformance by Borrower thereunder, together with a complete copy of any such notice; (b) enforce, short of termination, performance of the Operating Agreements to be performed or observed, and (c) not terminate or amend, or waive compliance with, any of the

42

EXHIBIT 1
Page 104

Operating Agreements without Lender's prior written consent, except as may be (i) permitted pursuant to the respective terms thereof or (ii) absent the existence of an Event of Default, done in the ordinary course of business. If the absence of an Operating Agreement that has terminated will have an adverse effect on the value of the Property, Borrower agrees to enter into a new Operating Agreement in replacement of the terminated Operating Agreement, containing terms and conditions no less favorable to Borrower than the terminated Operating Agreement. Borrower shall notify Lender if Borrower does not replace the terminated Operating Agreement.

7.027   Further Assurances.  Without expense or cost to the Lender, the Borrower shall from time to time hereafter execute, acknowledge, file, record, do and deliver all and any further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, security agreements, hypothecations, pledges, charges, assignments, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may from time to time reasonably request and that do not involve a material expansion of the Borrower's obligations or liabilities hereunder in order to carry out more effectively the purposes of this Agreement, the other Loan Documents, the DIP Order, including to subject any Collateral, intended to now or hereafter be covered, to the Liens created by the DIP Order, to perfect and maintain such Liens, and to assure, convey, assign, transfer and confirm unto the Lender the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that the Borrower may be or may hereafter become bound to convey or to assign to the Lender or for carrying out the intention of or facilitating the performance of the terms of this Agreement, any other Loan Documents, the DIP Order, including registering or recording this Agreement or any other Loan Document. Without limiting the generality of the foregoing, the Borrower shall deliver to the Lender, promptly upon receipt thereof, all instruments received by the Borrower after the Closing Date and take all actions and execute all documents necessary or reasonably requested by the Lender to perfect the Lender's Liens in any such instrument or any other Investment acquired by the Borrower.

7.028   ERISA.  Borrower shall not engage in any transaction which would cause any obligation or action taken or to be taken hereunder by Borrower (or the exercise by Lender of any of its rights under any of the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA. Borrower agrees to deliver to Lender such certifications or other evidence throughout the term of the Loan as requested by Lender in its sole discretion to confirm compliance with Borrower's obligations under this Section 7.028 or to confirm that Borrower's representations and warranties regarding ERISA remain true.

7.029   Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.  Borrower shall comply with all Requirements of Law relating to money laundering, anti-terrorism, trade embargoes and economic sanctions, now or hereafter in effect. Without limiting the foregoing, Borrower shall not take any action, or permit any action to be taken, that would cause Borrower's representations and warranties in Section 6.026 of this Agreement to become untrue or inaccurate at any time during the term of the Loan. Borrower shall notify Lender promptly of Borrower's actual knowledge that the representations and warranties in Section 6.026 of this Agreement may no longer be accurate or that any other violation of the foregoing Requirements of Law has occurred or is being investigated by Governmental Authorities. In connection with such an event, Borrower shall comply with all

43

EXHIBIT 1
Page 105

Requirements of Law and directives of Governmental Authorities and, at Lender's request, provide to Lender copies of all notices, reports and other communications exchanged with, or received from, Governmental Authorities relating to such event. Borrower shall also reimburse Lender for any expense incurred by Lender in evaluating the effect of such an event on the Loan and Lender's interest in the collateral for the Loan, in obtaining any necessary license from Governmental Authorities as may be necessary for Lender to enforce its rights under the Loan Documents, and in complying with all Requirements of Law applicable to Lender as the result of the existence of such an event and for any penalties or fines imposed upon Lender as a result thereof.

7.030   <u>No Other Indebtedness</u>.   Other than the Loan, Borrower shall not incur or be obligated at any time with respect to any loan or other indebtedness secured by the Property or the direct or indirect Equity Interests in Borrower (including, without limitation, mezzanine debt) or with priority senior to or pari passu with the Loan without the consent of Lender, which may be withheld in Lender's sole discretion.  Notwithstanding the foregoing, Borrower shall have the right to incur indebtedness relating to trade payables incurred in the ordinary course of owning and operating the Property provided that the same are paid within sixty (60) days of the date incurred and do not exceed at any one time an aggregate amount equal to $25,000.

7.031   <u>Capital Expenditures; Alterations</u>. Borrower shall not make, cause the Property Manager to make, or apply to the Court for the authority to make, any capital improvements requiring Capital Expenditures or any other alterations or improvements to the Property without Lender's prior written approval, which may be withheld in Lender's sole and absolute discretion.

7.032   <u>Receivership</u>. Borrower shall (i) not cause or cooperate to cause the Receivership to be terminated and (ii) endeavor to cause the Receiver to stay in place, until the Exit Loan Conversion occurs. If at any time prior to the Exit Loan Conversion Borrower becomes aware that the Receivership is going to be terminated, Borrower shall immediately notify Lender of the same. In any event that the Receivership is being terminated prior to the Exit Loan Conversion, Borrower shall enter into cash management arrangements with Lender in form and substance acceptable to Lender effective upon the termination of such Receivership and otherwise in form and substance substantially similar to the cash management system provided for under the Exit Loan Documents, including without limitation any and all reserves as required by Lender including reserves for the payment of Taxes, insurance, ground lease payments and operating expenses and providing (i) for Lender approval of operating expenses and capital expenses and all amounts in excess of a budget approved by Lender (subject to a variance to be agreed upon) and (ii) for all excess cash flow to be deposited with Lender and to be applied to the payment of Accrued Interest. Additionally, if at any time prior to the Exit Loan Conversion Borrower becomes aware that the Receivership is going to be terminated and Property Manager has not been put into place pursuant to <u>Section 7.025</u>, Borrower shall, subject in each instance to Lender's prior written consent, (i) appoint a new property manager and (ii) enter into a new property management contract.

7.033       <u>Change in Nature of Business</u>. Borrower shall not make, or apply to the Court for the authority to make, any material change in the nature of the business of Borrower, as carried on as of the Closing Date.

EXHIBIT 1
Page 106

7.034     <u>Transactions with Affiliates</u>. Borrower shall not enter into, or apply to the Court for the authority to enter into, any transaction with any Affiliate without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion.

7.035  <u>Transfers.</u>

(a)     <u>Prohibition Against Transfers</u>.  Borrower acknowledges that Lender has examined and relied on the creditworthiness and experience of Borrower and Guarantor and their respective stockholders, general partners, members and principals in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Loan.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should an Event of Default occur, Lender can enforce its remedies pursuant to <u>Article 9</u> hereunder.  Without Lender's prior written consent, Borrower shall not permit any Transfer to be undertaken or cause any Transfer to occur other than a Permitted Transfer.  Any Transfer made in violation of this Agreement shall be void *ab initio*.

(b)     <u>Lender Approval</u>.  Lender's decision to approve any Transfer proposed by Borrower shall be made in Lender's sole discretion and Lender shall not be obligated to approve any Transfer.  Borrower agrees to supply all information Lender may request to evaluate a Transfer, including, without limitation, information regarding the proposed transferee's ownership structure, financial condition and management experience for comparable properties. Borrower acknowledges that Lender may impose conditions to its approval of a Transfer, including, without limitation, (a) no Default or Event of Default has occurred and is continuing, (b) approval of the proposed transferee's ownership structure, financial condition and management experience for comparable properties, (c) payment of a fee in connection with any Transfer, (d) adding guarantors or changing the scope of the Guaranty, (e) assumption in writing (acceptable to Lender in its sole discretion) by the transferee and a replacement guarantor (acceptable to Lender in its sole discretion) of all obligations of the transferor and prior Guarantor under the Loan Documents and execution and delivery of such other documentation as may be required by Lender and the Rating Agencies, (f) delivery of a new substantive non-consolidation opinion, a tax opinion and other applicable opinions as required by Lender, (g) adjusting amounts required for the TI/LC Reserve or any other account, (h) adding pledgors or changing the scope of any pledge agreement, (i) delivery of a replacement pledge agreement and other related documentation, and (j) receipt of any documentation and other information about the proposed transferee and replacement guarantor that Lender determines is required by any Governmental Authority under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.  Borrower agrees to pay all of Lender's expenses incurred in connection with reviewing and documenting a Transfer, which amounts must be paid by Borrower whether or not the proposed Transfer is approved. Upon Borrower's failure to pay such amounts, and in addition to Lender's remedies for Borrower's failure to perform, the unpaid amounts shall be added to principal, shall bear interest at the Default Rate until paid in full, and payment of such amounts shall be secured by the Security Instrument and other collateral given to secure the Loan.

45

EXHIBIT 1
Page 107

(c)     Other Releases of the Property.  Lender may release any portion of the Property for such consideration and upon such conditions as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the Lien or priority of the Security Instrument or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and Lender may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  Notwithstanding anything to the contrary herein, Lender shall have no obligation to grant its consent to any release pursuant to this Section 7.035(c).

(d)     OFAC Compliance; Substantive Consolidation Opinion.  Notwithstanding anything to the contrary contained in this Section 7.034, (a) no transfer (whether or not such transfer shall constitute a Transfer) shall be made to any Person on the OFAC List and (b) in the event any transfer (whether or not such transfer shall constitute a Transfer) results in any Person owning in excess of forty-nine percent (49%) of the ownership interest in Borrower or any Borrower Affiliate (if such Person has not owned at least forty-nine percent (49%) of the ownership interest in Borrower prior to such transfer), Borrower shall, prior to such transfer, deliver a new substantive non-consolidation opinion letter with respect to the new equity owners which is acceptable in all respects to Lender.

(e)     Transfer Documentation.   Upon the effective date of any Transfer, Borrower shall deliver to Lender copies of all documents evidencing any such transfer and shall provide Lender an updated organizational structure chart, certified by a Responsible Officer of Borrower as true, complete and correct.

## ARTICLE 8

## EXIT LOAN FINANCING

8.01   Conditions to Exit Loan Conversion.  Upon satisfaction of the conditions precedent set forth below, as determined by Lender, the Loan shall convert (the "Exit Loan Conversion") to an exit loan (the "Exit Loan"):

(a)     the execution and/or delivery (as applicable) of all definitive documentation, and other customary documents and deliverables, including, without limitation, the following (collectively, the "Exit Loan Documents"), each in substantially the forms attached hereto as Exhibit E, with such modifications as may be required by Lender following the Closing Date:

(i)     a loan agreement between Borrower and Lender;

(ii)     a promissory note made by Borrower in favor of Lender;

(iii)     a leasehold mortgage, assignment of leases and rents, security agreement and fixture filing encumbering the Property executed by Borrower to Lender;

46

EXHIBIT 1
Page 108

(iv)    an assignment of leases and rents from Borrower to Lender;

(v)     an assignment of property management contract and subordination of management fees from Borrower to Lender and acknowledged by Property Manager;

(vi)    an environmental indemnity agreement from Borrower and Guarantor to Lender;

(vii)   a recourse guaranty from Guarantor to Lender;

(viii)  a lockbox agreement between Borrower, Lender, and a bank chosen by Lender to serve as lockbox bank;

(ix)    a cash management agreement between Borrower, Manager and Lender;

(x)     a pledge and security agreement between Pledgor (as hereinafter defined) and Lender;

(xi)    a guaranty by Pledgor for the benefit of Lender;

(xii)   a recycled single-purpose entity certificate from Borrower to Lender;

(xiii)  a recycled single-purpose entity certificate from Pledgor to Lender;

(xiv)   an assignment of agreements affecting real estate from Borrower to Lender;

(xv)    a UCC-1 financing statement to be filed with the Delaware Secretary of State with respect to the Borrower;

(xvi)   a UCC-1 financing statement to be filed with the County of Los Angeles, State of California with respect to the Borrower;

(xvii)  a UCC-1 financing statement to be filed with the Delaware Secretary of State with respect to the Pledgor;

(xviii) a reconveyance of the U.S. Bank Deed of Trust;

(xix)   a UCC-3 financing statement and any other necessary release documents with respect to the U.S. Bank Deed of Trust;

(xx)    an estoppel and agreement from the Ground Lessor along with any necessary documents or notices that are required under the Ground Lease, including, without limitation, a notice to the airport manager, a notice to the Ground Lessor, and a recorded request for notice as more specifically described in the Ground Lease;

47

EXHIBIT 1
Page 109

(xxi)   an estoppel from each of the tenants under the Leases;

(xxii)   a certification of the Rent Roll;

(xxiii)   direction letters addressed to each of the tenants under the Leases;

(xxiv)   any organizational or authority documents required by Lender, including, without limitation, operating agreements, resolutions, certificates of good standing, certificates of formation, and officer's certificates from each of Borrower, Pledgor and Guarantor;

(xxv)   any legal opinions required by Lender, including without limitation, a non-consolidation opinion;

(xxvi)   an updated title insurance policy acceptable to Lender in its sole and absolute discretion (the "Exit Loan Title Insurance Policy");

(xxvii)   any necessary deliveries, affidavits or documentation necessary for Lender to obtain the Exit Loan Title Insurance Policy;

(xxviii) a current survey of the Property (the "Survey");

(xxix)   a current zoning report with respect to the Property (the "Zoning Report");

(xxx)   any deliveries or documentation necessary for Lender to satisfy its "know your customer" or "KYC" requirements;

(xxxi)   all requested financial or operational documentation, including, without limitation, certified financial and operating statements, a capital expenditures budget, a business plan, and insurance certificates;

(xxxii) all requested diligence reports with respect to the Property, including, without limitation, an appraisal, a property condition report, an architectural and engineering report, a Phase I environmental report (including asbestos, radon and toxic mold), and a seismic report (collectively, "Property Reports"); and

(xxxiii) any searches to be run with respect to Borrower and Guarantor, including, without limitation, UCC, judgment, litigation, bankruptcy, federal and state tax lien searches, OFAC/PATRIOT Act searches, and credit searches (collectively, "Searches").

   (b)   the perfection of a first priority security interest in the collateral described in the Exit Loan Documents;

48

EXHIBIT 1
Page 110

(c)     the assumption of all Leases and Ground Leases by Borrower;

(d)     the timely satisfaction of each of the DIP Loan Milestones on or before the dates required therefor, including without limitation the confirmation and consummation of a Plan, which shall provide for, among other items, (i) the payment in full of all allowed Claims against the Borrower and (ii) that no waivers of any portion of the Plan shall be effective without Lender's prior written approval;

(e)     the accuracy of all representations and warranties and the absence of (i) any information disclosed after the date hereof that is inconsistent with any information previously provided in writing to Lender or its affiliates, (ii) any default or Event of Default under this Loan, and (iii) any binding applicable law, regulation, ruling, judgment, order, injunction or other restraint that restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the Borrower, this Loan, the Exit Loan or the transactions contemplated hereby;

(f)     the payment of all of Lender's out-of-pocket expenses in connection with the Loan, including, without limitation, the cost of Searches, title insurance, the Survey, the Zoning Report, Property Reports, legal fees (including the fees and expenses of Lender's primary and local counsel in connection with this Loan and the Exit Loan, its processing and/or closing and/or in connection with any legal proceeding with respect to this Loan and the Exit Loan), insurance review fees, loan set-up fees, and any other third party due diligence costs or expenses;

(g)     the Receivership over the Property shall have been terminated as of the Exit Loan Conversion Date;

(h)     One Hundred Percent (100%) of the Equity Interests in Borrower shall be owned by a single purpose entity acceptable to Lender in Lender's sole discretion (the "Pledgor"); and

(i)     such other conditions have been satisfied as are usual and customary for exit financing credit facilities of this type.

## ARTICLE 9

## EVENTS OF DEFAULT; REMEDIES

9.01    Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, the occurrence of any one or more of the following events, regardless of the reason therefore, shall constitute an "Event of Default" hereunder:

(a)     any portion of the Loan is not paid on or before the date the same is due and payable;

(b)     any representation or warranty made by or relating to Borrower or Guarantor herein, in the Guaranty, or in any other Loan Document, or in any certificate, report,

49

EXHIBIT 1
Page 111

financial statement or other instrument or document furnished to Lender in connection herewith or hereafter, or in connection with any request for consent by Lender made during the term of the Loan shall have been false or misleading in any material respect as of the date made;

(c)     Borrower or Guarantor breach any covenant made by or relating to Borrower or Guarantor herein, in the Guaranty, or in any other Loan Document;

(d)     Borrower defaults in the payment, observance, or performance of any Indebtedness in excess of $25,000 or any agreement relating to any such Indebtedness;

(e)     Guarantor defaults in the payment, observance, or performance of any Indebtedness in excess of $500,000 or any agreement relating to any such Indebtedness;

(f)     Borrower or Guarantor is enjoined from conducting business;

(g)     Borrower or Guarantor suffers a material damage to or loss of its assets;

(h)     the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(i)     the entry of any order dismissing the Chapter 11 Case unless such order was entered with Lender's consent;

(j)     the appointment of a trustee or an examiner with expanded powers under section 1104(c) of the Bankruptcy Code of the Chapter 11 Case;

(k)     the termination of either or both of Borrower's plan exclusivity periods under section 1121 of the Bankruptcy Code;

(l)     the granting of any other security interest, Lien, claim, or encumbrance that is *pari passu* with or senior to (1) the claims of the Lender in respect of the Obligations, including, without limitation, the DIP Superpriority Claim or (2) the DIP Liens (other than the Prior Liens);

(m)     the entry of an order after entry of the DIP Order granting relief from the automatic stay under section 362 of the Bankruptcy Code to the holder or holders of any security interest or Lien in any material part of the Collateral to permit the pursuit of any transfer or other remedy against any assets of the Borrower, or the granting of relief from the automatic stay on assets of Borrower or Guarantor with a value in excess of $25,000;

(n)     the entry of an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral;

(o)     the entry of an order amending, modifying, staying, revoking or reversing the DIP Order, the Plan Confirmation Order, or any other order of the Court affecting the Loan without the express written consent of the Lender;

50

EXHIBIT 1
Page 112

(p)  actual invalidity of any Liens or security interests securing the Obligations;

(q)  any challenge or objection by the Borrower as to the extent, amount, validity, priority, perfection, enforceability or non-avoidability of the DIP Liens or the DIP Superpriority Claim;

(r)  failure by the Borrower to comply with any term of this Agreement or the DIP Order (including, without limitation, the failure of Borrower to meet each of the DIP Loan Milestones);

(s)  any filing of the Borrower in Court which was not consented to by Lender in accordance with Section 7.02(b) of this Agreement;

(t)  Borrower's failure to comply with Section 7.014(k) with respect to any Ground Rent Reset;

(u)  Borrower's failure to comply with Section 7.032 of this Agreement; and

(v)  Borrower's failure to comply with Section 7.025 of this Agreement.

9.02    Action Upon the Occurrence of an Event of Default.

(a)  Upon the occurrence and during the continuance of any Event of Default, the Lender may (notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court) by written notice to the Borrower and subject to the DIP Order, declare (i) the unpaid principal amount of and accrued interest on the Loan and (ii) all other Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower, and the same shall forthwith become immediately due and payable.

(b)  Further upon the occurrence and during the continuance of any Event of Default, the Lender may, subject to the DIP Order and following the giving of five (5) business days' notice to the Borrower of the occurrence of such Event of Default (a "Default Notice") (which Default Notice shall be delivered by facsimile, electronic transmission or overnight courier), Lender shall have relief from the automatic stay and may foreclose on all or any portion of the security for the Loan, collect accounts receivable and apply the proceeds thereof to the obligations arising under the Loan, occupy the premises or otherwise exercise remedies against the security for the Loan permitted by applicable non-bankruptcy law. Lender shall not have any obligation of any kind to make a motion or application to the Court to exercise its rights and remedies set forth or referred to in this Agreement or in the other Loan Documents. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

(c)  The Borrower waives, (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all

51

EXHIBIT 1
Page 113

commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the Lender on which the Borrower may in any way be liable and hereby ratify and confirm whatever the Lender may lawfully do in this regard, (ii) subject to the notice provisions of the preceding paragraph, all rights to notice and hearing prior to the Lender's taking possession or control of, or to the Lender's reply, attachment or levy upon, the Collateral, or any bond or security which might be required by any court prior to allowing the Lender to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal and exemption laws. The Borrower acknowledges it has been advised by counsel of its choice with respect to the effect of the foregoing waivers and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

## ARTICLE 10

### MISCELLANEOUS PROVISIONS

10.01  Notices.  All notices and other communications under this Agreement are to be in writing and addressed to each party as set forth below.  Default or demand notices shall be (a) hand delivered, (b) sent via reputable overnight courier service, having a reliable tracking system, or (c) sent by U.S. Postal Service, certified mail, postage prepaid, return receipt requested, and deemed to have been duly given upon the earlier of: (x) actual receipt; (y) one (1) Business Day after having been timely deposited for overnight delivery, fee prepaid, with a reputable overnight courier service, having a reliable tracking system; or (z) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested, and in the case of clause (y) and (z) irrespective of whether delivery is accepted.  All other notices and other communications under this Agreement shall be sent via electronic mail (with convenience copies sent via overnight courier or certified mail as described in the immediately preceding sentence), and shall be deemed to have been duly given when verbal or electronic communication of receipt is obtained.  A new address for notice may be established by written notice to the other parties; provided, however, that no change of address will be effective until written notice thereof actually is received by the party to whom such address change is sent. Notice to outside counsel or parties other than the named Borrower and Lender, now or hereafter designated by a party as entitled to notice, are for convenience only and are not required for notice to a party to be effective in accordance with this section. Notice addresses are as follows:

| | |
|---|---|
| Address for Lender: | Macquarie Bank Limited |
| | Macquarie Bank Limited - Representative Office |
| | 125 West 55th Street |
| | New York, New York 10019 |
| | Attn: Sean Campbell and MCAF Debt US |
| | Fax: (212) 231-1870 |
| | Email: sean.campbell @macquarie.com; |
| | MCAFDebtUSPortfolio@macquarie.com |
| | |
| with a copy to: | Kirkland & Ellis LLP |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |

EXHIBIT 1
Page 114

Attn.: Andrew D. Small, Esq.
Fax: (312) 862-2200
Email: andrew.small@kirkland.com

Address for Borrower:     AP-Long Beach Airport LLC
                          Attn: Dennis J. Loput, Jr.
                          14770 Firestone Boulevard, Suite 206
                          La Mirada, CA 90638
                          Fax: 562.435.2109
                          Email: dloput@theabbeyco.com<mailto:dloput@theabbeyco.com>

with a copy to:           Alan J. Friedman
                          Kyle Kawakami
                          Irell & Manella LLP
                          840 Newport Center Drive, Suite 400
                          Newport Beach, CA 92660
                          Telephone: 949-760-5224

10.02  Entire Agreement; Modifications; Time of Essence.  This Agreement, together with the other Loan Documents, contain the entire agreement between Borrower and Lender relating to the Loan and supersede and replace all prior discussions, representations, communications and agreements (oral or written). If the terms of any of the Loan Documents are in conflict, this Agreement shall control over all of the other Loan Documents unless otherwise expressly provided in such other Loan Document. No Loan Document shall be modified, supplemented or terminated, nor any provision thereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.  Time is of the essence with respect to all of Borrower's obligations under the Loan Documents.

10.03  Indemnification. The Lender and its Affiliates, officers, directors, partners, managers, trustees, employees, shareholders, advisors, agents, attorneys and controlling persons and each of their respective heirs, successors and assigns, in each case in their capacity as such, will have no liability for, and will be indemnified and held harmless by the Borrower against, any loss, liability, fees (including attorneys' fees), cost or expense incurred in any matter relating to or arising out of, in connection with or as a result of the financing contemplated hereby or the use or the proposed use of proceeds hereof, including without limitation, (i) any Loan Document or any actual or proposed amendment, restatement, replacement, waiver, supplement, termination or other modification thereof, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan, (ii) the DIP Order and the proceedings related thereto, (iii) any actual or proposed commitment letter, proposal letter or term sheet with any Person or any contractual obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of the Borrower or any Affiliate of any of them in connection with any of the foregoing, (iv) with respect to any act, event or transaction related, contemplated in or attendant to any of the foregoing, any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such indemnitee, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such indemnitee is a party thereto, and whether or not based on any securities or commercial law or

53

EXHIBIT 1
Page 115

regulation or any other Requirement of Law, including common law, equity, contract, tort or otherwise or (v) any other act, event or transaction related, contemplated in or attendant to any of the foregoing, (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by final non-appealable judgment of a court of competent jurisdiction).

10.04   <u>Successors and Assigns</u>. This Agreement and the other Loan Documents, all DIP Liens, the DIP Superpriority Claim and all other rights, benefits and privileges created hereby or pursuant hereto or pursuant to any other Loan Documents shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Lender, the Borrower, any Committee, and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Borrower or with respect to the property of the Chapter 11 estate of Borrower) whether in the Chapter 11 Case, in any Successor Cases, or upon dismissal of the Chapter 11 Case or any Successor Cases, and shall inure to the benefit of the Lender and its respective successors and assigns; provided, however, that the Borrower may not assign or transfer its rights, benefits, obligations or duties hereunder.

10.05   <u>PATRIOT Act</u>. The Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and its Affiliates, which information includes the name and address of the Borrower and such Affiliates and other information that will allow such Lender to identify the Borrower and any such Affiliate in accordance with the PATRIOT Act. The Borrower agrees to provide, and to cause Guarantor and any Borrower Affiliate to provide, such information promptly upon request.

10.06   <u>Duplicate Originals; Counterparts</u>.  This Agreement and each of the other Loan Documents may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original.  This Agreement and each of the other Loan Documents (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatures do not appear on the same document.

10.07   <u>Unenforceable Provisions</u>.  Any provision of this Agreement or any other Loan Document which is determined by a court of competent jurisdiction or government body to be invalid, unenforceable or illegal shall be ineffective only to the extent of such determination and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

10.08   <u>Governing Law</u>.   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE) WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

EXHIBIT 1
Page 116

10.09  Expenses. Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with: (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's, and Guarantor's ongoing performance of and compliance with its respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's, and Guarantor's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Lender pursuant to this Agreement and the other Loan Documents and any amendment thereof; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower or Guarantor under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence or willful misconduct of Lender (as finally determined by a court of competent jurisdiction).  Any cost and expenses due and payable to Lender may be paid from any amounts in the Reserves.  Any amounts payable by Borrower hereunder shall be deemed a part of the Loan, shall be secured by this Agreement and shall bear interest at the Default Rate if not fully paid within ten (10) days of written demand for payment.

10.010 Special California Provision.

EXCEPT AS OTHERWISE EXPRESSLY PERMITTED IN THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, BORROWER HEREBY EXPRESSLY (A) WAIVES ANY RIGHTS IT MAY HAVE UNDER LAW, PURSUANT TO CALIFORNIA CIVIL CODE SECTION 2954.10 OR OTHERWISE, TO PREPAY THIS LOAN, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE, AND (B) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF ALL OR ANY PORTION OF THE PRINCIPAL AMOUNT OF THE LOAN IS MADE INCLUDING, WITHOUT LIMITATION, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE BY LENDER ON ACCOUNT OF ANY EVENT OF DEFAULT BY

EXHIBIT 1
Page 117

BORROWER, INCLUDING, WITHOUT LIMITATION, ANY TRANSFER, DISPOSITION, OR FURTHER ENCUMBRANCE PROHIBITED OR RESTRICTED BY THE LOAN DOCUMENTS, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY WITH SUCH PREPAYMENT THE PREPAYMENT CONSIDERATION TO THE EXTENT REQUIRED UNDER THIS AGREEMENT. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT (1) EACH OF THE FACTUAL MATTERS SET FORTH IN THIS PARAGRAPH IS TRUE AND CORRECT, (2) LENDER' S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS AGREEMENT AT THE INTEREST RATE AND FOR THE TERM SET FORTH IN THE LOAN DOCUMENTS CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT, AND HAS BEEN GIVEN INDIVIDUAL WEIGHT BY BORROWER AND LENDER, (3) BORROWER IS A SOPHISTICATED AND KNOWLEDGEABLE REAL ESTATE INVESTOR WITH COMPETENT AND INDEPENDENT LEGAL COUNSEL, AND (4) BORROWER FULLY UNDERSTANDS THE EFFECT OF THIS WAIVER AND AGREEMENT.

Borrower's
Initials _____

## ARTICLE 11

### LIST OF DEFINED TERMS

11.01  <u>Definitions</u>.  The following words and phrases shall have the meaning specified below.

"**Access Laws**" means the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all similar state and local laws and ordinances related to access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"**Accrued Interest**" has the meaning set forth in <u>Section 2.02(c)</u> of this Agreement.

"**Affiliate**" of any Person means (a) any other Person, which, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person; (b) any other Person, which, directly or indirectly, owns ten percent (10%) or more of legal, beneficial or economic interests in such Person (c) any other Person who is a director or officer of (i) such Person, (ii) any subsidiary of such Person, or (iii) any Person described in clause (a) or (b) above; or (d) any corporation, limited liability company or partnership which has as a director any Person described in clause (b) above.

"**Allowed**" means with respect to Claims: (a) any Claim, proof of which is timely filed by the applicable claims bar date (or for which Claim under the Plan, the Bankruptcy Code, or a final order of the Court, a proof of claim is not or shall not be required to be filed); (b) any Claim that is listed in the Borrower's bankruptcy schedules as not contingent, not unliquidated, and not disputed, and for which no proof of claim has been timely filed; or (c) any Claim allowed

EXHIBIT 1
Page 118

pursuant to the Plan or a final order of the Court; provided that, with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Court, or such an objection is so interposed and the Claim shall have been Allowed by a final order.

"**Agreement**" means, on any date, this Secured, Superpriority Debtor-in-Possession Credit Agreement as originally in effect on the Closing Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified and in effect on such date.

"**Applicable Interest Rate**" has the meaning set forth in Section 2.01(b) of this Agreement.

"**Applicable Taxes**" has the meaning set forth in Section 2.01(e) of this Agreement.

"**Avoidance Actions**" has the meaning set forth in Section 1.05(a) of this Agreement.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978 codified as 11 U.S.C. §101 et seq., and the regulations issued thereunder, both as hereafter modified from time to time.

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Breakage Costs**" means means the sum of all breakage costs, expenses, fees and liabilities (including, without limitation, attorneys' fees and costs) payable by Lender or incurred by Lender or its Affiliates in connection with the unwinding, breakage or termination of any interest rate or other hedging agreement entered into by Lender or its Affiliates in connection with the Loan.

"**Business Day**" means any day other than a Saturday, a Sunday, or days when Federal Banks located in the State of New York are closed for a legal holiday or by government directive.

"**Capital Expenditures**" means expenditures for upgrades, replacements and improvements to the Property that are required to be capitalized according to GAAP.

"**Capitalized Lease Liabilities**" means all monetary obligations of the Borrower under any leasing or similar arrangement which, in accordance with GAAP, would be classified as capitalized leases, and, for purposes of this Agreement and each other Loan Document, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due unless paid prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Cash Collateral**" shall have the meaning ascribed to such term in section 363(a) of the Bankruptcy Code.

EXHIBIT 1
Page 119

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (x) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (y) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within thirty days after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within thirty days after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either S&P or Moody's; (iii) commercial paper maturing no more than thirty days from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-l from S&P or at least P-l from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within thirty days after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $1,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Casualty**" means the occurrence of damage or destruction to the Property, or any part thereof, by fire, flood, vandalism, windstorm, hurricane, earthquake, acts of terrorism or any other casualty.

"**Change of Control**" means Donald G. Abbey ceasing to (i) own at least 95% of the Equity Interests in Borrower and (ii) have Control over Borrower.

"**Chapter 11 Case**" shall have the meaning ascribed to such term in the Background to this Agreement.

"**Claim**" means a "claim" (as defined in section 101(a)(5) of the Bankruptcy Code) against Borrower.

"**Closing Date**" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

"**Collateral**" shall have the meaning ascribed to such term in Section 1.05.

"**Committee**" means, collectively, any official committee of unsecured creditors and any other committee appointed by the U.S. Trustee or approved by the Court in the Chapter 11 Case, and each of such Committees shall be referred to herein as a "Committee."

"**Commitment Fee**" means a loan origination fee in an amount equal to $770,000.00.

"**Compliance Certificate**" means a compliance certificate substantially in the form of Exhibit D hereto, signed by a Responsible Officer of Borrower.

EXHIBIT 1
Page 120

"**Condemnation**" means the taking by any Governmental Authority of the Property or any part thereof through eminent domain or otherwise (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of such taking).

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, beneficial interests, by contract or otherwise. The definition is to be construed to apply equally to variations of the word "Control" including "Controlled," "Controlling" or "Controlled by."

"**Court**" has the meaning set forth in the Background to this Agreement.

"**Default**" means the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Notice**" has the meaning set forth in Section 9.02(b) of this Agreement.

"**Default Rate**" has the meaning set forth in Section 2.03(e) of this Agreement.

"**DIP Liens**" means the Liens granted to the Lender pursuant to the DIP Order, as applicable, as more particularly described in Section 1.05.

"**DIP Loan Milestones**" shall mean the following required milestones in connection with the Chapter 11 Case: (i) the Court shall have entered the final DIP Order approving the DIP Loan on or before April 3, 2015; (ii) Borrower shall file the Plan, Disclosure Statement, and motion to approve the Disclosure Statement and to authorize solicitation of votes on the Plan on or before April 3, 2015; (iii) the Court shall have entered an order approving the Disclosure Statement and authorizing solicitation of votes on the Plan on or before May 4, 2015; (iv) Borrower shall commence solicitation of votes on the Plan on or before May 8, 2015; (v) the Court shall have entered the Plan Confirmation Order on or before June 30, 2015; and (vi) Borrower shall have consummated the Plan and terminated its Receivership on or before July 15, 2015; provided, however, that the Receivership shall not be terminated prior to the consummation of the Plan unless Borrower and Lender shall have entered into cash management arrangements in form and substance acceptable to Lender effective upon the termination of such Receivership and otherwise in form and substance substantially similar to the cash management system provided for under the Exit Loan Documents, including without limitation any and all reserves as required by Lender including reserves for the payment of Taxes, insurance, ground lease payments and operating expenses and providing (i) for Lender approval of operating expenses and capital expenses and all amounts in excess of a budget approved by Lender  (subject to a variance to be agreed upon) and (ii) for all excess cash flow to be deposited with Lender and to be applied to the payment of Accrued Interest.

"**DIP Order**" means the Interim Order and/or the Final Order, as applicable.

"**DIP Superpriority Claim**" means the superpriority administrative expense claim granted by the Court in the DIP Order in respect of the Obligations, as described in Section 1.04.

EXHIBIT 1
Page 121

"**Disclosure Statement**" means the disclosure statement with respect to the Plan, which disclosure statement shall be acceptable in all respects to Lender in its sole discretion.

"**Disposition**" means any sale, assignment, transfer or other disposition of any material property or asset (whether now owned or hereafter acquired) by the Borrower to any Person and any sale, transfer, set-off or forgiveness of any indebtedness or any receivables owed to the Borrower.

"**Equity Interests**" means (a) partnership interests (whether general or limited) in an entity which is a partnership; (b) membership interests in an entity which is a limited liability company; (c) the shares or stock interests in an entity which is a corporation or (d) beneficial interests in a trust.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the regulations issued thereunder, all as amended or restated from time to time.

"**Event of Default**" means any of the events of default specified in Section 9.01 of this Agreement or in the DIP Order.

"**Exit Fee**" has the meaning set forth in Section 2.04(b)(iv) of this Agreement.

"**Exit Loan**" has the meaning set forth in Section 8.01 of this Agreement.

"**Exit Loan Conversion**" has the meaning set forth in Section 8.01 of this Agreement.

"**Exit Loan Conversion Date**" means the date on upon which the conditions precedent to the Exit Loan Conversion set forth in Article 8 of this Agreement are satisfied, as such satisfaction is determined by Lender in its sole discretion.

"**Exit Loan Documents**" has the meaning set forth in Section 8.01(a) of this Agreement.

"**Exit Loan Title Insurance Policy**" has the meaning set forth in Section 8.01(a)(xxvi) of this Agreement.

"**Final Order**" means the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court which order shall be satisfactory in form and substance to Lender in its sole discretion, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender in its sole discretion, which order, among other matters but not by way of limitation, (i) authorizes the Borrower to (A) obtain credit and incur Indebtedness under this Agreement up to the aggregate principal amount of $40,500,000 and (B) grant Liens to the Lender pursuant to this Agreement, (ii) approves this Agreement, the Loan Documents, the Loan and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to constitute allowed super-priority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code.

EXHIBIT 1
Page 122

"**Financial and Business Reports**" shall have the meaning ascribed to such term in Section 7.02(a).

"**Fitch**" means Fitch, Inc.

"**F.R.S. Board**" means the Board of Governors of the Federal Reserve System or any successor thereto.

"**Funding Losses**" means the reduction of any amounts received or receivable from Borrower, in either case, due to the introduction of, or any change in, law or applicable regulation or treaty (including the administration or interpretation thereof), whether or not having the force of law, or due to the compliance by Lender with any directive, whether or not having the force of law, or request from any central bank or domestic or foreign governmental authority.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to such government.

"**Ground Lease**" shall mean that certain Long Beach Municipal Airport Lease dated as of October 17, 1997, by and between The City of Long Beach, as landlord, and Advanced Aerodynamics & Structures, Inc., as tenant, as amended by that certain First Amendment to Ground Lease dated as of April 27, 1999, assigned to Borrower pursuant to that certain Assignment and Assumption of Tenant's Interest in Lease and Consent of Landlord Thereto, as amended by that certain Second Amendment to Long Beach Municipal Airport Lease dated June 14, 2005, as amended by that certain Third Amendment to Ground Lease dated May 17, 2007, and as modified by that certain Ground Lessor's Consent, Nondisturbance and Attornment and Estoppel Agreement dated February [__], 2015 by and among Ground Lessor, Borrower and Lender.

"**Ground Lessor**" means the ground lessor under the Ground Lease.

"**Ground Rent Reset**" has the meaning set forth in Section 7.014(k) of this Agreement.

"**GSA Lease**" means that certain U.S. Government Lease for Real Property dated as of May 23, 2011 by and between Borrower, as landlord, and the United States General Services Administration, as tenant, as amended by that certain Supplemental Agreement No. 1 dated August 25, 2011, as amended by that certain Supplemental Agreement No. 2 dated November 29, 2011, as amended by that certain Supplemental Lease Agreement No. 3 dated February 19, 2013, as amended by that certain Supplemental Lease Agreement No. 4 dated May 8, 2013, as amended by that certain Supplemental Lease Agreement No. 5 dated March 22, 2014, and as amended by that certain Supplemental Lease Agreement No. 6 dated May 22, 2014.

"**GSA Reimbursement Payment**" means that portion of the annual rent payable by the tenant under the GSA Lease in an amount equal to $124,188.23 (payable in monthly installments equal to $10,349.02), constituting reimbursement to the landlord under the GSA Lease by the

EXHIBIT 1
Page 123

tenant under the GSA Lease for certain tenant improvements previously paid for by the landlord under the GSA Lease.

"**Guarantor**" means, collectively, (i) Donald G. Abbey, an individual, (ii) Abbey-Properties II LLC, a California limited liability company, and (iii) The Abbey Companies LLC, a Delaware limited liability company.

"**Guaranty**" means, individually or collectively, as the context may require, the Guaranty (Exceptions to Nonrecourse Liability) dated as of the Closing Date from Guarantor to Lender as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Improvements**" has the meaning set forth in the Security Instrument.

"**Indebtedness**" of any Person means, without duplication:

      (a)    all obligations, contingent or otherwise, of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

      (b)    all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for the account of such Person;

      (c)    all obligations, contingent or otherwise, of such Person as lessee under leases which have been or should be, in accordance with GAAP, recorded as Capitalized Lease Liabilities; and

      (d)    all Liens in respect of any of the foregoing.

"**Initial TI/LC Deposit**" has the meaning set forth in Section 3.01 of this Agreement.

"**Insurance Premiums**" means the premiums for the insurance Borrower is required to provide pursuant to Section 7.011 of this Agreement.

"**Interest Accrual Period**" means, with respect to any Payment Due Date, the period beginning on the fifteenth (15th) day of the month prior to such Payment Due Date, through and including the fourteenth (14th) day of the month of such Payment Due Date. By way of example, for a Payment Due Date of February 9, the Interest Accrual Period would run from January 15 through and including February 14. Upon prior notice to Borrower, Lender may change the period of the Interest Accrual Period.

"**Interim Order**" means the order of the Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Lender, in its sole discretion, which order, among other matters but not by way of limitation, on an interim basis, (i) authorizes the Borrower to (A) obtain credit and

EXHIBIT 1
Page 124

incur Indebtedness under this Agreement up to the aggregate principal amount of $40,500,000 and (B) grant Liens to the Lender pursuant to this Agreement, (ii) approves this Agreement, the Loan Documents, the Loan and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to constitute allowed super-priority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code.

"**Investments**" means, for any Person:  (a) the acquisition (whether for cash, property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership, member or other ownership or equity interests or other securities of any other Person other than a Borrower or any agreement to make any such acquisition (including any "short sale" or any sale of any securities or such interests at a time when such securities or interests are not owned by the Person entering into such sale); (b) any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of a Person, or any business or division of a Person, or (ii) any Person becoming a Subsidiary of the Borrower, (c) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); and (d) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness or any other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"**Land**" means that certain parcel or parcels of land located in the County of Los Angeles and State of California, and as more particularly described in Exhibit B.

"**LCS**" has the meaning set forth in Section 1.06.

"**LCS Settlement Agreement**" has the meaning set forth in Section 1.06.

"**Lease**" shall mean any lease, sublease, license, concession or other agreement (whether written or oral and whether now or hereinafter in effect, other than the Ground Lease).

"**Lease Guaranties**" has the meaning set forth in the Security Instrument.

"**Lease Termination Payments**" means all payments made to Borrower in connection with any termination, cancellation, surrender, sale or other disposition of any Lease.

"**Leasing Commissions**" means leasing commissions incurred by Borrower in connection with the leasing of the Property or any portion thereof (including any so-called "override" leasing commissions which may be due to any leasing or rental agent engaged by Borrower for the Property if an agent other than such agent also is entitled to a leasing commission, but excluding commissions due any principal, member, general partner or shareholder of Borrower or any Affiliate of Borrower).

"**Lender**" has the meaning in the introductory paragraph of this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any

EXHIBIT 1
Page 125

conditional sale or other title retention agreement, the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of any of the foregoing and a mechanics' or materialmen's lien).

"**Loan**" means the aggregate of all principal and interest payments that accrue or are due and payable in accordance with this Agreement, together with any other amounts due under the Loan Documents.

"**Loan Amount**" has the meaning set forth in <u>Section 1.01(a)</u>.   Reference in this Agreement to "Loan Amount" means the principal amount outstanding or actually advanced to Borrower during the term of the Loan (including, for the avoidance of doubt, all Accrued Interest that accrues and is added to the outstanding principal balance of the Loan).

"**Loan Document**" means this Agreement, the Security Instrument, the Guaranty, the Notes (if any), the DIP Order and each other agreement, document, certificate, or instrument delivered in connection with this Agreement and the Notes.

"**Mandatory Payment**" has the meaning set forth in <u>Section 2.02(a)</u> of this Agreement.

"**Mandatory Payment Amount**" has the meaning set forth in <u>Section 2.02(a)</u> of this Agreement.

"**Material Adverse Effect**" means (i) an impairment of the ability of the Borrower, to perform fully and timely any of its other Obligations under any Loan Document in any material respect, or (ii) a material adverse effect on the rights and/or remedies of the Lender under the Loan Documents or upon the legality, validity, binding effect, enforceability against the Borrower, or perfection of any Loan Document or the Liens granted to the Lender thereunder or under the DIP Order.

"**Maturity Date**" means the earlier to occur of (a) July 15, 2015, (b) the Exit Loan Conversion Date or (c) the occurrence of an Event of Default.

"**Monthly Payment Rate**" means a rate per annum equal to six percent (6%).

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Note**" means the promissory notes of the Borrower payable to the Lender, in the form of <u>Exhibit A</u> hereto (as such promissory notes may be amended, endorsed or otherwise modified from time to time), evidencing the Loan, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"**Obligations**" means the Loan, the Commitment Fee, the Exit Fee, and all other obligations and liabilities of the Borrower to Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with the Loan the Loan Documents, whether on account of principal, interest, fees, indemnities, penalties, premiums, costs, expenses (including, without limitation, all reasonable fees and disbursements of legal counsel) or otherwise.

EXHIBIT 1
Page 126

"**Operating Agreements**" has the meaning set forth in the Security Instrument.

"**Operating Expenses**" means all cash expenses actually incurred by or charged to Borrower (appropriately pro-rated for any expenses that, although actually incurred in a particular period, also relate to other periods), with respect to the ownership, operation, leasing and management of the Property in the ordinary course of business, determined in accordance with GAAP, and adjusted by Lender in accordance with Lender's customary underwriting procedures and policies then in effect, which Operating Expenses are also adjusted to include any underwritten reserves for Replacements and any other underwritten reserves as determined by Lender whether or not required to be reserved, but not to account for any deductions for Tenant Improvements or Leasing Commissions. Operating Expenses shall specifically exclude (1) capital expenditures, (2) depreciation, (3) payments made in connection with the payment of the outstanding principal balance of the Loan, (4) costs of Restoration following a Casualty or Condemnation, (5) funds disbursed from the TI/LC Reserve, and (6) any other non-cash items.

"**Other Charges**" means all maintenance charges, impositions (other than Taxes) and similar charges (including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property), now or hereafter assessed or imposed against the Property, or any part thereof, together with any penalties thereon.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001), and the regulations issued thereunder, all as amended or restated from time to time.

"**Payment Due Date**" has the meaning set forth in Section 2.02(c) of this Agreement. Upon prior notice to Borrower, Lender may change the Payment Due Date.

"**Permitted Encumbrances**" means those exceptions shown in the Title Insurance Policy and each other Lien which has been approved in writing by Lender.

"**Permitted Liens**" means:

(a)     Liens imposed by law for Taxes accrued after the funding of the Loan, real estate taxes, assessments and/or other similar governmental levies, fees or charges imposed with respect to real property, in each case, that are not yet due;

(b)     pledges and deposits (including to secure one or more letters of credit) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(c)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business (taking into account the existence of the Chapter 11 Case);

(d)     Permitted Encumbrances;

EXHIBIT 1
Page 127

(e)     Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction;

(f)     pre-Petition Date Liens comprising netting or set-off arrangements entered into by the Borrower in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(g)     Liens in the form of deposits (including deposits to secure letters of credit) securing liability insurance carriers under insurance arrangements of the Borrower; and

(h)     Liens in the form of utility deposits securing utility providers of the Borrower; provided, that the term "Permitted Liens" shall not include any Lien securing Indebtedness not permitted hereby.

"**Permitted Transfer**" means each of the following:

(a)     Transfers of Equity Interests which, in the aggregate over the term of the Loan (i) do not exceed forty-nine percent (49%) of the direct or indirect interests in Borrower; (ii) do not result in any Person holding an Equity Interest in Borrower which exceeds forty-nine percent (49%) of the total Equity Interests in Borrower, unless such Person holds an Equity Interest which exceeds 49% in Borrower on the Closing Date; and (iii) do not result in a Change of Control.

(b)     Transfers with respect to any Person whose stocks or certificates are traded on a nationally recognized stock exchange.

(c)     Permitted Encumbrances.

(d)     All Leases which have been approved by the Lender.

(e)     If the transferor is an individual, Transfers of Equity Interests of such transferor to such transferor's immediate family members or trusts established for the benefit of such family members for estate planning purposes, provided that (i) Borrower provides prior written notice of such Transfers to Lender, together with all supporting information and documentation required by Lender in connection with such Transfers, (ii) Borrower pays any and all Lender's costs in connection with the review of any such Transfer, and (iii) no such Transfer results in a Change of Control.

(f)     Involuntary transfers caused by the death of any of the partners, members or shareholders of Borrower, provided that the Persons responsible for the management and Control of Borrower and the Property remain unchanged as a result of such death or are approved by Lender.

"**Person**" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

EXHIBIT 1
Page 128

"**Petition Date**" shall have the meaning ascribed to such term in the Background to this Agreement.

"**Plan**" shall mean the Borrower's Chapter 11 plan of reorganization, which plan of reorganization shall be acceptable in all respects to Lender in its sole discretion.

"**Plan Confirmation Order**" shall mean the Court's order confirming the Plan.

"**Pledgor**" has the meaning set forth in Section 8.01(a)(x) of this Agreement.

"**Prepetition Credit Facility**" has the meaning set forth in Section 1.03 of this Agreement.

"**Prepetition Indebtedness**" means Indebtedness of the Borrower outstanding on the Petition Date.

"**Prior Liens**" means any valid, duly perfected, non-avoidable Liens in existence as of the Petition Date (or valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code) including, without limitation, valid, duly perfected, non-avoidable pre-Petition Date Liens referred to on any schedule to any lender or owner title insurance policy of any of the property of the Borrower.

"**Property**" has the meaning set forth in the Security Instrument.

"**Property Management Contract**" means a written property management agreement between Borrower and Property Manager in form and substance acceptable to Lender in its sole and absolute discretion.

"**Property Manager**" means a property manager acceptable to Lender in its sole and absolute discretion.

"**Property Reports**" has the meaning set forth in Section 8.01(a)(xxxii) of this Agreement.

"**Rating Agencies**" means Fitch, Moody's and S&P, or any successor entity of the foregoing, or any other nationally recognized statistical rating organization to the extent that any of the foregoing have been or will be engaged by Lender or its designees in connection with or in anticipation of any sale or grant of participation interest in the Loan (or any part thereof).

"**Receiver**" shall mean that certain receiver, David P. Stapleton, an individual, appointed by the Court in connection with the Chapter 11 Case.

"**Receivership**" shall mean that certain receivership with respect to the Property established pursuant to that certain Order Appointing Receiver and Preliminary Injunction recorded October 09, 2014 as Instrument No. 20141069847 of Official Records.

EXHIBIT 1
Page 129

"**Rent Roll**" means a written statement from Borrower, substantially in the form of the rent roll as of the Closing Date attached hereto as Exhibit C, detailing the names of all tenants of the Property, the portion of Property occupied by each tenant, the base rent and any other charges payable under each Lease, the term of each Lease, the beginning date and expiration date of each Lease, whether any tenant is in default under its Lease (and detailing the nature of such default), and any other information as is reasonably required by Lender, all certified by a Responsible Officer of Borrower to be true, correct and complete.

"**Rents**" has the meaning set forth in the Security Instrument.

"**Request**" has the meaning set forth in Section 3.02 of this Agreement.

"**Requirements of Law**" means (a) the organizational documents of an entity, and (b) any law, regulation, ordinance, code, decree, treaty, ruling or determination of an arbitrator, court or other Governmental Authority, or any Executive Order issued by the President of the United States, in each case applicable to or binding upon such Person or to which such Person, any of its property or the conduct of its business is subject including, without limitation, laws, ordinances and regulations pertaining to the zoning, occupancy and subdivision of real property.

"**Reserve Item**" means, individually and collectively, as the context requires, the Tenant Improvements, the Leasing Commissions, and any other reserve items to be funded pursuant to Article 3 of this Agreement.

"**Reserves**" shall mean, collectively the TI/LC Reserve, Working Capital Reserve, and Cash Collateral Reserve.

"**Responsible Officer**" means, as to any Person, an individual who is a managing member, a general partner, the chief executive officer, the president or any vice president of such Person or, with respect to financial matters, the chief financial officer or treasurer of such Person or any other officer authorized by such Person to deliver documents with respect to financial matters pursuant to this Agreement.

"**Restoration**" means the repairs, replacements, improvements, or rebuilding of or to the Property following a Casualty or Condemnation.

"**Restoration Deficiency Deposit**" has the meanings set forth in Sections 7.012(d)(iii) and (e) of this Agreement. All amounts deposited by Borrower with Lender as the Restoration Deficiency Deposit shall become a part of the Restoration Proceeds and disbursed by Lender for Restoration on the same conditions applicable to disbursement of Restoration Proceeds and, until so disbursed, are pledged to Lender as security for the Loan and Obligations.

"**Restoration Holdback**" has the meaning set forth in Section 7.012(e)(i)(C) of this Agreement.

"**Restoration Proceeds**" has the meaning set forth in Section 7.012(b) of this Agreement.

"**S&P**" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

68

EXHIBIT 1
Page 130

"**Searches**" has the meaning set forth in <u>Section 8.01(a)(xxxiii)</u> of this Agreement.

"**Security Instrument**" means the Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing encumbering the Property and executed by Borrower to Lender, in order to secure Borrower's payment of the Loan and performance of the Obligations, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Subsidiary**" means with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or, in the case of a limited liability company, more than 50% of the member interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.

"**Successor Cases**" means a case or cases under chapter 7 of the Bankruptcy Code to which the Chapter 11 Case may be converted or any other proceedings superseding the Chapter 11 Case.

"**Survey**" has the meaning set forth in <u>Section 8.01(a)(xxviii)</u> of this Agreement.

"**Taxes**" means all real estate taxes, government assessments or impositions, lienable water charges, lienable sewer rents, assessments due under owner association documents, vault charges and license fees for the use of vault chutes and all other charges (other than the Other Charges), now or hereafter levied or assessed against the Land and Improvements.

"**Tenant Improvements**" means improvements made to the Property to prepare the same for tenant occupancy in connection with each Lease and made by Borrower in conformity with the terms of the related Lease and this Agreement.

"**TI/LC Reserve**" has the meaning set forth in <u>Section 3.01(a)</u> of this Agreement.

"**Title Insurance Policy**" means the mortgagee title insurance policy obtained by Lender in connection with the Loan, and, until the issuance of such policy, the commitment for title insurance as marked-up as of the Closing Date, in either case in form and substance (with such endorsements and affirmative coverages) as is satisfactory to Lender, insuring that the Security Instrument constitutes a perfected first Lien against the Property in the Loan Amount, subject only to Permitted Encumbrances.

"**Transfer**" means any action by which any of (a) the direct or indirect legal or beneficial ownership of the Equity Interests in Borrower, (b) the legal or equitable title to the Property, or Borrower's leasehold interest therein or in the Ground Lease, or any part thereof, or (c) the cash flow from the Property or any portion thereof, are sold, assigned, transferred, hypothecated, pledged or otherwise encumbered or disposed of, in each case (a), (b) or (c) whether undertaken,

EXHIBIT 1
Page 131

directly or indirectly, or occurring by operation of law or otherwise, including, without limitation, each of the following actions:

(i)     the sale, conveyance, assignment, grant of an option with respect to, mortgage, deed in trust, pledge, grant of a security interest in, or any other transfer, as security or otherwise, of the Property or with respect to the Ground Lease, the Leases or Rents (or any thereof), including, without limitation, any mezzanine financing or preferred equity investment;

(ii)    the grant of an easement across the Property or any other agreement granting rights in or restricting the use or development of the Property (including, without limitation, air rights);

(iii)   an installment sale wherein Borrower agrees to sell the Property for a price to be paid in installments;

(iv)    an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder; or

(v)     the issuance of additional partnership, membership or other equity interests, as applicable.

"**UCC**" means the Uniform Commercial Code in effect in the state where the Property is located, as from time to time amended or restated.

"**Unencumbered Property**" has the meaning set forth in Section 2.01(e) of this Agreement.

"**United States**" or "**U.S.**" means the United States of America, its fifty States and the District of Columbia.

"**U.S. Bank Deed of Trust**" has the meaning set forth in Section 1.03 of this Agreement.

"**U.S. Trustee**" means the office of the United States Trustee for the Central District of California (Los Angeles).

"**Yield Maintenance Amount**" shall mean an amount equal to the greater of (a) an amount equal to 1% of the amount prepaid; or (b) an amount equal to the present value as of the date on which the prepayment is made of the Calculated Payments (as defined below) from the date on which the prepayment is made through the date that is the second (2nd) anniversary of the Closing Date (i.e. the maturity date of the Exit Loan) determined by discounting such payments at the Discount Rate (as defined below).  As used in this definition, the term "Calculated Payments" shall mean the monthly payments of interest which would be due based on the principal amount of the Loan being prepaid on the date on which prepayment is made (inclusive of the amount of interest at the Applicable Interest Rate that would have been payable on the Accrued Interest) and assuming an interest rate per annum equal to the difference (if such

70

EXHIBIT 1
Page 132

difference is greater than zero) between (y) the Applicable Interest Rate and (z) the Yield Maintenance Treasury Rate (as defined below) plus 25 basis points. As used in this definition, the term "Discount Rate" shall mean the rate which, when compounded monthly, is equivalent to the Yield Maintenance Treasury Rate (as defined below), when compounded semi-annually. As used in this definition, the term "Yield Maintenance Treasury Rate" shall mean the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading "U.S. Government Securities/Treasury Constant Maturities" for the week ending prior to the date on which prepayment is made, of U.S. Treasury Constant Maturities with maturity dates (one longer or one shorter) most nearly approximating the date which is the second (2nd) anniversary of the Closing Date (i.e. the maturity date of the Exit Loan). In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise. Lender's calculation of the Yield Maintenance Premium shall be conclusive absent manifest error.

"**Zoning Report**" has the meaning set forth in Section 8.01(a)(xxix) of this Agreement.

*[Remainder of page is blank; signatures appear on next page.]*

EXHIBIT 1
Page 133

IN WITNESS WHEREOF, Lender and Borrower hereby sign, seal and deliver this Agreement.

**LENDER:**

**MACQUARIE BANK LIMITED**, an
Australian corporation

By: _____
Name: Sean Campbell
Title: Authorized Signatory

By: _____
Name: Althea Hennedige
Title: Authorized Signatory

**BORROWER:**

**AP-LONG BEACH AIRPORT LLC**, a
Delaware limited liability company

By:_____
Name:
Title:

72

EXHIBIT 1
Page 134