1   Alan J. Friedman (State Bar No. 132580)
    afriedman@irell.com
2   Kerri A. Lyman (State Bar No. 241615)
    klyman@irell.com
3   IRELL & MANELLA LLP
    840 Newport Center Drive, Suite 400
4   Newport Beach, California 92660-6324
    Telephone:  (949) 760-0991
5   Facsimile:  (949) 760-5200

6   *Attorneys for AP-Long Beach Airport LLC*

7

8

9                   UNITED STATES BANKRUPTCY COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                     LOS ANGELES DIVISION

12

13  In re                          )  Case No. 2:14-bk-33372-VZ
                                    )
14  AP-LONG BEACH AIRPORT LLC, a    )  Chapter 11 Case
    Delaware limited liability      )
15  company,                        )  **DISCLOSURE STATEMENT AND PLAN**
                                    )  **OF REORGANIZATION FOR AP-LONG**
16                                  )  **BEACH AIRPORT LLC**
              Debtor and Debtor-    )
17            in-Possession.        )  Disclosure Statement Hearing:
                                    )  Date: April 23, 2015
18                                  )  Time: 1:30 p.m.
                                    )  Place: Courtroom 1368
19                                  )
                                    )  Confirmation Hearing:
20                                  )  Date: TBD
                                    )  Time: TBD
21                                  )  Place: Courtroom 1368
                                    )
22                                  )
                                    )
23                                  )
                                    )
24                                  )
                                    )
25                                  )
                                    )
26                                  )
                                    )
27                                  )

28  _____

TABLE OF CONTENTS

TABLE OF CONTENTS........................................... 1

I.    INTRODUCTION.......................................... 1

II.   GENERAL DISCLAIMER AND VOTING PROCEDURE................ 2

III.  WHO MAY OBJECT TO CONFIRMATION OF THE PLAN............. 4

IV.   WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN............. 4

V.    VOTES NECESSARY TO CONFIRM THE PLAN................... 7

VI.   INFORMATION REGARDING VOTING IN THIS CASE............. 8

VII.  DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS
PRECIPITATING BANKRUPTCY FILING............................ 9

VIII. .CRITICAL PLAN PROVISIONS ......................... 20

IX.   DESCRIPTION AND TREATMENT OF CLAIMS.................. 21

X.    SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS....... 31

XI.   FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED
PAYMENT IS FEASIBLE ...................................... 33

XII.  ASSETS AND LIABILITIES OF THE ESTATE................. 33

XIII  TREATMENT OF NONCONSENTING CLASSES .................. 34

XIV.  TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS
(CHAPTER 7 LIQUIDATION ANALYSIS)........................... 36

XV.   MULTI-PURPOSE POST-CONFIRMATION AGENT................ 37

XVI.  SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND
LEASES; OTHER PROVISIONS.................................. 38

XVII. BANKRUPTCY PROCEEDINGS ............................. 40

XVIII. TAX CONSEQUENCES OF PLAN ......................... 45

XIX.  EFFECT OF CONFIRMATION OF PLAN...................... 48

XX.   DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN.. 67

## I.   INTRODUCTION

On December 19, 2014 (the "Petition Date"), AP-Long Beach Airport LLC ("Debtor") filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code ("Code").  The document you are reading is both the Plan of Reorganization ("Plan") and the Disclosure Statement.  The Debtor and Donald G. Abbey ("Mr. Abbey" and, collectively, the "Proponents") have proposed the Plan to treat the claims of the Debtor's creditors and, if applicable, the interests of equityholders, members, or partners and to reorganize the Debtor's business affairs.  A disclosure statement describes the assumptions that underlie the Plan and how the Plan will be executed.  The Bankruptcy Court ("Court") has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The Proponents have reserved June _____, 2015 at _____ __.m. in Courtroom 1368 for a hearing to determine whether the Court will confirm the Plan.

Any interested party desiring further information should contact:

IRELL & MANELLA LLP
Attn: Alan J. Friedman
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone:  (949) 760-0991
Facsimile:  (949) 760-5200

**II. GENERAL DISCLAIMER AND VOTING PROCEDURE**

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY. IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN. IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. IT ALSO TELLS ALL CREDITORS AND ANY EQUITYHOLDERS OR PARTNERS WHAT TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE PLAN BE CONFIRMED BY THE COURT.

THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XX BELOW. ALL REPRESENTATIONS ARE TRUE TO THE PROPONENTS' BEST KNOWLEDGE.

NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

After carefully reviewing this document and the attached exhibits, please vote on the enclosed ballot and return it in the enclosed envelope.  Please note that only holders of impaired claims and interests are entitled to vote on the Plan.  Since this Plan provides for the payment in full, with interest, of all claims, all holders of claims are deemed to have accepted the Plan and will not receive a ballot.  The only party that will receive a ballot is Abbey-Properties II LLC ("APII"), which is the sole member of the Debtor and owns 100% of the interests in the Debtor.

Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claimant | Status | Voting Right |
|---|---|---|---|
| | Tax Claims | Unimpaired | Deemed to Accept |
| Class One | Unsecured Creditors | Unimpaired | Deemed to Accept |
| Class Two | Unsecured Claim of U.S. Bank | Unimpaired | Deemed to Accept |
| Class Three | Unsecured Claim of LCS Constructors | Unimpaired | Deemed to Accept |
| Class Four | Membership Interest of APII | Impaired | Entitled to Vote |

The Proponents have reserved a hearing date for a hearing to determine whether the Court will confirm the Plan.  Please refer to Section I above for the specific hearing date.  If, after receiving the ballots, it appears that the Proponents have the requisite number of votes required by the Code, the Proponents will file a motion (the "Motion") on or about May 21, 2014 for an order confirming the Plan (the "Confirmation Order").

The Motion shall be served on all creditors and equityholders, including all impaired creditors and partners or equityholders who reject the Plan, all parties that have requested notice in this case, and on the Office of the United States Trustee.  Any opposition to the Motion shall be filed and served on the

Proponents no later than fourteen days prior to the hearing date. Failure to oppose the confirmation of the Plan may be deemed consent to the Plan's confirmation.

**III. WHO MAY OBJECT TO CONFIRMATION OF THE PLAN**

Any party in interest may object to confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN**

It requires both an allowed and impaired claim or interest in order to vote either to accept or reject the Plan.  A claim is defined by the Code to include a right to payment from the Debtor.  An interest represents an ownership stake in the Debtor.

In order to vote a creditor or interest-holder must first have an allowed claim or interest. With the exceptions explained below, a claim is allowed if proof of the claim or interest is properly filed before any bar date and no party in interest has objected, or if the Court has entered an order allowing the claim or interest.  Please refer to Section VI below for specific information regarding bar dates in this case.

4

1  Under certain circumstances a creditor may have an allowed claim

2  even if a proof of claim was not filed and the bar date for filing

3  a proof of claim has passed.  A claim is deemed allowed if the

4  claim is listed on the Debtor's schedules and is not scheduled as

5  disputed, contingent, or unliquidated.  Exhibit "1" contains a

6  list of claims and whether they are disputed, contingent, or

7  unliquidated as of March 17, 2015.  Since the general bar date

8  established by the Court (April 17, 2015) had not passed as of the

9  date of the filing of this Plan, the Debtor will update Exhibit

10  "1" following the passing of the bar date but prior to the hearing

11  to approve the disclosure statement (April 23, 2015).

12

13

14  Similarly, an interest is deemed allowed if it is shown on the

15  list of equity security holders filed by the Debtor with the Court

16  and is not scheduled as disputed.

17

18  In order to vote, an allowed claim or interest must also be

19  impaired by the Plan.

20

21  Impaired creditors include those whose legal, equitable, and

22  contractual rights are altered by the Plan, even if the alteration

23  is beneficial to the creditor.  A contract provision that entitles

24  a creditor to accelerated payment upon default does not, however,

25  necessarily render the claimant impaired, even if the Debtor

26  defaulted and the Plan does not provide the creditor with

27  accelerated payment.  The creditor is deemed unimpaired so long as

28

1 the Plan cures the default, reinstates the maturity of such claim

2 as it existed before default, compensates for any damages incurred

3 as a result of reasonable reliance upon the acceleration clause,

4 and (except for a default arising from failure to operate a

5 nonresidential lease subject to 11 U.S.C.A. § 365 (b)(1)(A) (West

6 Supp. 2006)) compensates for any actual pecuniary loss incurred as

7 a result of any failure to perform a non-monetary obligation.

8

9 Impaired interest-holders include those whose legal, equitable,

10 and contractual rights are altered by the Plan, even if the

11 alteration is beneficial to the interest holder.

12

13

14 There are also some types of claims that the Code requires be

15 treated a certain way.  For that reason they are considered

16 unimpaired and therefore holders of these claims cannot vote.

17

18 To summarize, there are two prerequisites to voting: a claim or

19 interest must be both allowed and impaired under the Plan.

20

21 If a creditor or interest-holder has an allowed and impaired claim

22 or interest, then he or she may vote either to accept or reject

23 the Plan (unimpaired claimants or interest-holders are deemed to

24 have accepted the Plan).  Impaired claims or interests are placed

25 in classes and it is the class that must accept the Plan.  Members

26 of unimpaired classes do not vote, although as stated above, they

27 may object to confirmation of the Plan.  Even if all classes do

28

1   not vote in favor of the Plan, the Plan may nonetheless be

2   confirmed if the dissenting classes are treated in a manner

3   prescribed by the Code.  Please refer to Section VI below for

4   information regarding impaired and unimpaired classes in this

5   case.

6

7   Section IX sets forth which claims are in which class.  Secured

8   claims are placed in separate classes from unsecured claims.  Fed.

9   R. Bankr. P. 3018(d) provides: "A creditor whose claim has been

10  allowed in part as a secured claim and in part as an unsecured

11  claim shall be entitled to accept or reject a plan in both

12  capacities."

13

14

15  **V.    VOTES NECESSARY TO CONFIRM THE PLAN**

16

17  The Court may confirm the Plan if at least one noninsider impaired

18  class of claims has accepted and certain statutory requirements

19  are met as to both nonconsenting members within a consenting class

20  and as to dissenting classes.  A class of claims has accepted the

21  Plan when more than one-half in number and at least two-thirds in

22  amount of the allowed claims actually voting, vote in favor of the

23  Plan.  A class of interests has accepted the Plan when at least

24  two-thirds in amount of the allowed interests of such class

25  actually voting have accepted it.  It is important to remember

26  that even if the requisite number of votes to confirm the Plan are

27  obtained, the Plan will not bind the parties unless and until the

28

Court makes an independent determination that confirmation is appropriate.  That is the subject of any upcoming confirmation hearing.

**VI.   INFORMATION REGARDING VOTING IN THIS CASE**

The general bar date for filing a proof of claim in this case is April 17, 2015.  The bar date for a governmental entity to file a proof of claim is June 17, 2015.

Exhibit "1" contains a list of claims and whether they are disputed, contingent, or unliquidated as of March 17, 2015.  Since the general bar date established by the Court (April 17, 2015) had not passed as of the date of the filing of this Plan, the Debtor will update Exhibit "1" following the passing of the bar date but prior to the hearing to approve the disclosure statement (April 23, 2015).  The Debtor will further update Exhibit "1" following the passage of the bar date for governmental entities to file proofs of claim on June 17, 2015.

The bar date for objecting to claims has not been set as the April 17, 2015 bar date has not yet passed.

In this case the Proponents believe that Class Four is impaired and therefore entitled to vote.  Classes One, Two and Three are unimpaired and therefore do not vote.  A party that disputes the

1  Proponents' characterization of its claim or interest as

2  unimpaired may request a finding of impairment from the Court in

3  order to obtain the right to vote.

4

5  Ballots must be received by the Proponents, addressed to IRELL &

6  MANELLA LLP, Attn: Lori Gauthier, 840 Newport Center Drive, Suite

7  400, Newport Beach, California 92660-6324, Telephone: (949) 760-

8  0991, Facsimile: (949) 760-5200 by May ___, 2015.

9

10 **VII. DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS**

11 **PRECIPITATING BANKRUPTCY FILING**

12

13

14 The Debtor is a limited liability company and a single asset real

15 estate company within the meaning of 11 U.S.C.A. § 101(51B).

16

17

18

19

20

21

22

23

24

25

26

27

28

Debtor conducted 100% of its business activity from its headquarters located at 14770 Firestone Blvd., Suite 206, La Mirada, CA  90638 since May 2012.

What follows is a brief description of the Debtor's business.

**The Debtor is in the business of leasing real estate.**

The Debtor is a property-level subsidiary of The Abbey Companies LLC ("ABLLC").  ABLLC and its more than 60 separate subsidiaries were founded by Mr. Abbey.

The Debtor is a single asset real estate company that owns a 206,945-square-foot building at Long Beach Airport located at 3205 Lakewood Boulevard, Long Beach, California (the "Long Beach Property") that originally was an airplane hangar.  The Long Beach Property is owned and operated by the Debtor on land owned by the City of Long Beach (the "City") that is leased to the Debtor.

The Debtor developed the Long Beach Property for a variety of uses and tenants, including significant facilities for the City and the U.S. Customs and Border Protection, a division of the Department of Homeland Security (the "CBP").  The space leased by CBP (the "CBP Space") is the subject of a lease between the Debtor and the General Services Administration ("GSA"), which leases the CBP Space for use by the CBP and is responsible for making payments on behalf of the CBP.  Under the U.S. Government Lease for Real

Property, dated May 23, 2011, by and between, the Debtor, as landlord, and the United States of America, as tenant (as amended, restated, supplemented, or otherwise modified from time to time, the "GSA Lease"), the Debtor was required to make substantial improvements to the CBP Space before the CBP/GSA would take possession.  Prior to the Petition Date, the Debtor was involved in the multi-year efforts to complete the tenant improvements in the CBP's space, completion of which had cost approximately $21 million as of the Petition Date.  The CBP/GSA formally accepted the CBP Space in June 2014 and the GSA began paying rent.

Under the GSA Lease, the GSA had an obligation to reimburse the Debtor approximately $11.9 million for improvements made to the CBP space no later than 30 days after the CBP took possession of the space.  In June 2014, after the CBP formally accepted the space, the GSA made a payment of approximately $11.3 million, holding back approximately $593,000 for the uncompleted work discussed below (the "GSA Lump Sum").

What follows is a brief summary of the dates and circumstances that led Debtor to file bankruptcy.

Prior to the Petition Date, the Debtor was the borrower under that certain Construction Loan Agreement with U.S. Bank National Association ("U.S. Bank") in the principal amount of $37,764,469 (as amended, restated, supplemented, or otherwise modified from

time to time, the "U.S. Bank Loan").  As of the Petition Date, the

Debtor owed approximately $33.7 million plus unpaid interest and

fees under the U.S. Bank Loan.  The obligations under the U.S.

Bank Loan were secured by a construction deed of trust and

assignment of leases and rents on the Long Beach Property.  Mr.

Abbey personally guaranteed the obligations under the U.S. Bank

Loan.

On July 18, 2014, U.S. Bank issued a notice of default with

respect to the U.S. Bank Loan and pursued its remedies, including

a non-judicial foreclosure sale.  On August 11, 2014, U.S. Bank

filed a complaint in the Superior Court of the State of California

for the County of Los Angeles, Southern District against, the

Debtor and Mr. Abbey seeking, among other things, the appointment

of a receiver and to foreclose on the Long Beach Property (the

"U.S. Bank Litigation").

On August 15, 2014, the state court appointed a receiver for the

limited purpose of collecting rents on behalf of U.S. Bank at the

Long Beach Property (the "Receiver").  Following a hearing on

August 29, 2014, the state court expanded the powers of the

Receiver.  David Stapleton was appointed as the Receiver.

In addition, although the GSA took possession of the CBP Space in

June 2014, the CBP stated that certain additional improvements

were required, while the general contractor handling the tenant

improvements required by the GSA Lease opined that the CBP's

demands were outside the original scope of work.  In connection

with this dispute, secured claims totaling approximately

$1,700,000 were asserted against the Long Beach Property on

account of mechanics' liens arising from the tenant improvements.

Shortly before the commencement of the Chapter 11 case and on the

eve of a non-judicial foreclosure sale of the Long Beach Property,

on December 17, 2014, the Debtor and Mr. Abbey entered into a

comprehensive agreement (as modified from time to time, the "U.S.

Bank Agreement") with U.S. Bank.  The U.S. Bank Agreement

incorporated a significant compromise by the Debtor's direct and

indirect parent entities, including Mr. Abbey.  As a result, many

of the claims of the Debtor's creditors were satisfied before the

bankruptcy.  Specifically, the parent entities (a) repaid $3

million of principal of the U.S. Bank Loan plus approximately

$500,000 of accrued fees and expenses and (b) paid approximately

$1.1 million to settle and satisfy mechanics' liens asserted in an

aggregate amount of approximately $1.7 million.  In exchange,

pursuant to the U.S. Bank Agreement, U.S. Bank agreed to provide

the Debtor until March 1, 2015, to repay the U.S. Bank Loan

through a refinancing or sale of the Debtor's assets.

In connection with the U.S. Bank Agreement, the Debtor and U.S.

Bank also entered into the Release and Settlement Agreement, dated

as of December 17, 2014, among LCS Constructors, Inc. ("LCS"),

Debtor and U.S. Bank (the "LCS Settlement Agreement") to provide

for the completion of tenant improvement work required under the

GSA Lease.  The LCS Settlement Agreement granted LCS certain

rights with respect to the GSA Lump Sum.


The Debtor filed its Chapter 11 petition on December 19, 2014.


What follows is a brief summary of the important dates and

circumstances following the Debtor filing its Chapter 11 petition.


As noted above, shortly before the commencement of the Chapter 11

case, the Debtor and Mr. Abbey entered into a comprehensive

agreement with U.S. Bank.  Pursuant to the U.S. Bank Agreement,

the Debtor and U.S. Bank entered into a stipulation immediately

after the Chapter 11 petition was filed (the "U.S. Bank

Stipulation"), on December 19, 2014, subject to Court approval.

Among other things, the U.S. Bank Stipulation provided for the

lifting of the automatic stay set forth in section 362 of the

Bankruptcy Code to enable U.S. Bank to foreclose upon the Long

Beach Property.  U.S. Bank, however, agreed to forbear from such

foreclosure provided that certain requirements relating to the

repayment of the U.S. Bank Loan were satisfied on or before March

1, 2015.  As part of the U.S. Bank Stipulation, U.S. Bank

consented to the use of its cash collateral to maintain the Long

Beach Property.

Immediately following the filing, on December 19, 2014, the Debtor also filed a motion asking the Court to authorize the Debtor to use U.S. Bank's cash collateral, on the terms set forth in the U.S. Bank Stipulation, to allow for the continued appointment of the Receiver to maintain the Long Beach Property, and waiving the requirement that the Debtor and the Receiver open new "debtor in possession" bank accounts.  By an Order entered January 2, 2015, the Court approved the Debtor's interim use of U.S. Bank's cash collateral and approved on an interim basis the continued retention of the Receiver, but denied the Debtor's request to waive the requirement that the Debtor and the Receiver open new accounts.

By an Order entered on January 6, 2015, the Court granted U.S. Bank relief from the automatic stay, subject to the terms and conditions contained in the U.S. Bank Stipulation.

By an Order entered on February 3, 2015 (the "U.S. Bank Order"), the Court approved the motion to assume the U.S. Bank Agreement and enter into the U.S. Bank Stipulation, as modified by the Court and the parties.  Pursuant to the U.S. Bank Order, the Debtor also assumed a number of executory contracts and unexpired leases, including, but not limited to, the following:

- the Long Beach Municipal Airport Lease, dated October 17, 1997, by and between the City, as landlord, and the Debtor, as tenant (by assignment);

- the AIR Commercial Real Estate Association, Standard
  Industrial/Commercial Single-Tenant Lease—Net, dated May 17,
  2007, by and between the Debtor, as landlord, and the City,
  as tenant;
- the GSA Lease; and
- the LCS Settlement Agreement.

Following entry of the U.S. Bank Order, the Debtor turned its focus to locating new financing.  Prior to the Petition Date, to resolve the default and the U.S. Bank Litigation, the Debtor had solicited financing from third parties to loan sufficient funds to the Debtor to repay the U.S. Bank Loan in full.  Following the Petition Date, the Debtor redoubled its efforts to locate financing to repay the U.S. Bank Loan and spoke to numerous potential financing sources.  In late January, the Debtor engaged Mount Nebo Capital, Inc. ("Nebo") to assist in locating a source of financing to pay off the U.S. Bank Loan.  Nebo contacted eight potential lenders who, based on Nebo's experience, would be receptive to non-standard transactions with short time frames. Despite engaging in discussions with these potential financing sources and receiving term sheet offers from two lenders, no viable offers emerged at first.

In late February 2015, the Debtor's efforts were successful and the Debtor entered into a financing arrangement with Macquarie Bank Limited (or an affiliate thereof, the "DIP Lender").  The

loan (the "DIP Financing") is a single draw loan in the amount of $40,500,000, at 10% interest (of which 6% will be paid current and the remainder will accrue unless cash flow is otherwise available to pay accrued interest).  The DIP Financing provided the Debtor with sufficient funds to pay the U.S. Bank Loan in full, as well as establish a $3,000,000 reserve to pay costs associated with new leases at the Long Beach Property.  As discussed below, the DIP Financing will convert to exit financing upon confirmation of the Plan and subject to the terms and conditions set forth in: (a) that certain letter agreement, dated as of February 13, 2015, by and among the DIP Lender, the Debtor and ABLLC, and (b) that certain Secured, Superpriority Debtor-in-Possession Credit Agreement, dated as of February 26, 2015, by and between the Debtor and the DIP Lender.  The DIP Financing is secured by a first priority perfected security interest in all of the Debtor's unencumbered assets and a junior perfected security interest in all of the Debtor's encumbered assets, including all real and personal property.  In addition, the DIP Lender's obligations carry superpriority administrative expense status, which means that the DIP Lender's claims have priority over all other administrative expense claims.  However, the security interests securing the DIP Financing and the DIP Lender's superpriority claims are also junior to the rights of LCS with respect to the GSA Lump Sum.  Mr. Abbey guaranteed certain of the Debtor's obligations under the DIP Financing.

On February 25, 2015, the Court entered an Order approving the DIP Financing (as amended by Order dated March 10, 2015, the "DIP Financing Order"), which, among other things, (a) authorized the Debtor to enter into the DIP Financing and to use cash collateral on an interim basis, and (b) granted the DIP Lender the security interests and superpriority administrative expense claims described above.  The DIP Financing Order preserves the rights of LCS to the GSA Lump Sum, as set forth in the LCS Settlement Agreement.

The DIP Financing closed on February 28, 2015 and the U.S. Bank Loan was paid in full on that date, although U.S. Bank continues to have certain rights under the U.S. Bank Agreement.  The payment of the U.S. Bank Loan also resolved the pending U.S. Bank Litigation.  It is anticipated that U.S. Bank will file a notice of dismissal with respect to the U.S. Bank Litigation and request the dismissal of the Receiver and the turnover of control of the Long Beach Property to the Debtor.  In order to ensure a smooth transition from the management of the Long Beach Property by the Receiver, the Debtor engaged the Receiver to act as property manager with respect to the Long Beach Property during this Chapter 11 case and, potentially, following the Debtor's emergence from Chapter 11.

What follows is a _brief_ description of the Debtor's future business plans.  Further details relating to the Debtor's

financial condition and post-confirmation operation of the Debtor are found in sections X, XI, XII, XVI, and XV.

**The Debtor is in the business of leasing real estate.**
The Debtor is a property-level subsidiary of its ultimate parent ABLLC.

The Long Beach Property is a 206,945-square-foot building at Long Beach Airport located at 3205 Lakewood Boulevard, Long Beach, California that originally was an airplane hangar.  The property is owned and operated by the Debtor on land owned by the City that is leased to the Debtor through January 13, 2038, pursuant to that certain Long Beach Municipal Airport Lease, dated as of October 17, 1997, by and between The City of Long Beach and Advanced Aerodynamics & Structures, Inc., as subsequently amended and assigned from time to time.

As discussed above, the Debtor leases a portion of the space to the GSA, which leases the space for use by the CBP and is responsible for making payments on behalf of the CBP.  The CBP Space is approximately 16.6% of the Long Beach Property.  The City also rents space at the Long Beach Property and currently occupies approximately 62.3% of the property.  Following the successful completion of its Chapter 11 case, the Debtor will continue to lease space in the Long Beach Property to the GSA and the City.

21.1% of the Long Beach Property is currently vacant.  Following confirmation of the Plan, the Debtor intends to locate tenants for the remainder of the Long Beach Property.  The DIP Financing established a $3,000,000 reserve to pay for costs associated with entering into new tenant leases at the Long Beach Property, including costs for tenant improvements.

**VIII.    CRITICAL PLAN PROVISIONS**

Listed below are the sources of money earmarked to pay creditors and interest-holders.

a.    Dedicated funds of $131,690 held by the Receiver for the payment of non-insider unsecured creditors, in accordance with the terms of the (1) U.S. Bank Order and (2) DIP Financing Order.

b.    Cash collateral of the DIP Lender held by the Receiver that the DIP Lender has authorized to be used for the payment of certain post-petition expenses, in accordance with the budget agreed to by the Debtor and the DIP Lender and approved by the DIP Financing Order.

c.    Funds to be received by the Debtor from Mr. Abbey.

Most likely, general unsecured creditors can expect payment:

a.    On the Effective Date of the Plan, which is estimated to be no later than July 15, 2015 (the "Effective Date"); and

b.    In the amount of 100% of all allowed claims plus interest at the federal judgment rate as of the Effective Date.

## IX.   DESCRIPTION AND TREATMENT OF CLAIMS

   a.   Overview of Plan Payments

Below is a summary of who gets paid what and when and from what source.   The identity of members within a particular class is explained beginning on the next page.   The second column lists two amounts.   First, the amount of each payment, or if only one is to be made, then that amount; second, the total amount that will be paid.   The Debtor is usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced. The "Payment Due Date" column states the frequency with which payments will be made and the starting and ending dates.   Look at the starting date to figure out who will be paid before and after you and in what amount.   The "Source of Payment" column describes the expected source of payment.   Further details regarding the source of payment are found in sections X and XI.

The timing of payments to many creditors is determined by the "Effective Date."   Administrative claims, unless otherwise stated, must be paid by the Effective Date.   The timing of payments to impaired creditors is measured from the Effective Date.   In this case, the Effective Date is anticipated to be no later than July 15, 2015.

| Payment Recipient | Amount of each Payment (Total amount to be paid) | Payment Due Date | Source of Payment |
|---|---|---|---|
| Administrative Claims | Est. $4,875 | On or before the Effective Date | Funds held by Receiver |
| Professional Claims: Irell & Manella LLP<br><br>Stapleton Group | Est. $830,000<br><br>Est. TBD | 30 days after the Effective Date (or as soon thereafter as such Professional Claims are approved by the Court) | $85,000 in Funds held in Retainer as of the Petition Date Funds currently being held in escrow in the amount of $476,000 (subject to DIP Lender approval) Funds received from Mr. Abbey |
| Tax Claims | Est. $6,600 | Effective Date | Funds held by Receiver |
| Class One: Unsecured Creditors | Est. $48,000 | Effective Date | Funds held by Receiver (If necessary, funds received from Mr. Abbey) |
| Class Two: Unsecured Claim of U.S. Bank | Est. $0 as of the Effective Date – Claim is for rights, if any, arising under the U.S. Bank Agreement | No Payment Necessary | No Payment Necessary |
| Class Three: Unsecured Claim of LCS Constructors | Est. $0 as of the Effective Date – Claim is with respect to rights arising under the | No Payment Necessary | No Payment Necessary; LCS' sole recourse is to the GSA Lump Sum of approximately |

| | | | LCS Settlement Agreement | | $593,000 |
|---|---|---|---|---|---|
| Class Four: Membership Interests of APII | No Payment Necessary | No Payment Necessary – Interest holder will receive 100% of the membership interests in a newly formed entity that will become the 100% holder of the Debtor's membership interests | No Payment Necessary |

On the Effective Date, the Disbursing Agent (as defined below) will deposit into a segregated account ("Reserve Account") an amount of cash equal to 100% of the aggregate amount of disputed claims (if any) plus interest at the federal judgment rate. Cash together with interest accruing thereon will be held in trust for the benefit of holders of disputed claims (if any). When a disputed claim (if any) becomes allowed, the Disbursing Agent will distribute to the holder thereof an amount equal to 100% of its claim plus accrued interest thereon. If a surplus arises from the fact that not all claims are allowed, then that money shall revert back to the Debtor to be held in accordance with any required cash management practices under the Exit Financing Documents (as defined below).

APII, which holds the equity interests of the Debtor, is an affiliate of the Debtor. No holder of claims against the Debtor

1  is an affiliate of the Debtor.

2

3  Below is a detailed description and treatment of administrative

4  expenses, claims and interests

5

6      b.    Administrative Expenses

7          1.    These include the "actual, necessary costs and

8                expenses of preserving the estate" as determined by

9                the Court after notice to creditors of a request

10               for payment and after a hearing thereon.

11         2.    The Code requires that allowed administrative

12               expenses be paid on the effective date, unless the

13               party holding the administrative expense agrees

14               otherwise.  The sole administrative expense

15               claimant has not agreed otherwise.

16         3.    The bar date to file an administrative expense

17               claim shall be thirty (30) days after the Effective

18               Date.

19

20

21         Administrative Expense #1.

22         Claimant:  the Office of the United States Trustee

23         Total amount of claim: est. at $4,875

24         Total amount of cash payment: $4,875

25         Payment Date: the Effective Date or other such date as

26  the expense comes due

27

28

TOTAL: estimated at $4,875

c.  Administrative Claims of Professionals

    1.  These include the fees and expenses incurred by professionals employed by the Debtor under section 327 of the Bankruptcy Code and entitled to seek compensation for professional services and costs and expenses related to such services from the Debtor or the Debtor's estate, as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.

    2.  The Code requires that allowed administrative claims of professionals be paid on the effective date, unless the party holding the administrative expense agrees otherwise.  The holders of administrative claims of professionals have not agreed otherwise.

    3.  The bar date for a professional to file an application for final compensation for services rendered and for reimbursement of expenses shall be thirty (30) days after the Effective Date.

Professional Expense #1.

Claimant:  Irell & Manella LLP

Est. at $830,000, subject to Court approval

Payment Date: thirty (30) days after the Effective Date.
The claimant has not agreed otherwise.


Professional Expense #2.

Claimant:  Stapleton Group

Est. at $TBD, subject to Court approval

Payment Date: thirty (30) days after the Effective Date.
The claimant has not agreed otherwise.


TOTAL $830,000


d.  Payment of the DIP Financing

1.  In full satisfaction of the DIP Lender's claims
    under the DIP Financing, the DIP Loan shall be
    converted to exit financing (the "Exit Financing")
    on the Effective Date, subject to the terms of the
    documents filed with the Court on March ___, 2015
    and approved by Order entered April ___, 2015 (the
    "Exit Financing Documents").  The Exit Financing
    Documents will not become operative until the
    Effective Date.

2.  A summary of the principal terms of the Exit
    Financing is as follows:

(1)   Loan of $38,500,000.

(2)   Interest rate of 10% interest (of which 6% will be paid current and the remainder will accrue subject to payment if cash flow permits).

(3)   Secured by first priority, senior liens on and security interests in certain of the Debtor's property.

(4)   Events of default: (i) the Debtor's failure to comply with the covenants or perform any of its obligations in accordance with the terms of the Exit Financing and (ii) the occurrence and continuance of any "Event of Default" (as that term is defined in the Exit Financing Documents).

(5)   Bankruptcy protections: under the Exit Financing Documents, if the Debtor becomes subject to certain subsequent bankruptcy events, the DIP Lender is entitled to automatic relief from the automatic stay, the Debtor must consent to such relief, and the Debtor has agreed that the existence of any Event of Default, in and of itself, constitutes "cause" for relief from the automatic stay.

(6)   Outside maturity date: February 27, 2017.

e.    Unsecured Tax Claims

1.    These include certain types of property, sales, and income taxes.

2.    The Code requires that the holders of such claims receive regular installment payments in cash over a period ending not later than five years after the date of the order for relief, unless agreed otherwise.  The claimant has not agreed otherwise. The total cash payments must have a present value equal to the amount of the allowed claim.  The treatment of this claim is in a manner not less favorable than the most favored nonpriority unsecured claim provided in this Plan (other than any cash payments to an administratively convenient class). The amount of the allowed claim includes the amount of tax owed plus interest equal to the underpayment rate specified in 26 U.S.C. § 6621 (determined without regard to 26 U.S.C. § 6621(c)) as of the Effective Date or such higher rate as required by 11 U.S.C. § 511(a).  The present value is calculated as of the Effective Date.

Tax Claim # 1.

Claimant: Franchise Tax Board

Total amount of allowed claim as of April 23, 2015:

28

1    $6,000 priority; $600 unsecured

2    Total amount of cash payment to satisfy the claim:

3    $6,600

4    Interest rate: underpayment rate specified in 26 U.S.C.

5    § 6621

6    Payment Date: claim will be paid in full with interest

7    on the Effective Date

8

9    TOTAL UNSECURED TAX CLAIM(S) $6,600

10

11    f.    CLASS ONE

12    Unsecured Claims

13

14    See Exhibit "**1**" for list of claims and whether they are

15    disputed, contingent, or unliquidated as of March 17, 2015.  Since

16    the general bar date established by the Court (April 17, 2015) had

17    not passed as of the date of the filing of this Plan, the Debtor

18    will update Exhibit "1" following the passing of the bar date but

19    prior to the hearing to approve the disclosure statement (April

20    23, 2015).

21

22    Total amount of allowed claims: estimated to be $48,000

23    Total amount of payments to satisfy claims: $48,000 plus

24    interest.

25    Interest rate: interest at the federal judgment rate as

26    of the date of confirmation of the Plan.

27    Unimpaired

28

Payment date: payment of 100% of claims plus interest on the Effective Date.

g.   CLASS TWO

Unsecured Claim of U.S. Bank with respect to rights, if any, arising under the U.S. Bank Agreement

Total amount of allowed claims: estimated to be $0 as of the Effective Date

Unimpaired

Additional comments: the Debtor does not believe that any claims have arisen under the U.S. Bank Agreement.

h.   CLASS THREE

Unsecured Claim of LCS with respect to rights arising under the LCS Settlement Agreement

Total amount of allowed claims: estimated to be $0 as of the Effective Date.

Unimpaired

Additional comments: pursuant to the LCS Settlement Agreement, LCS' sole recourse is to the GSA Lump Sum on the terms set forth in the LCS Settlement Agreement.

30

    i.    CLASS FOUR

       Member's interest in the Debtor

     1.    The sole member of the Debtor is APII.  APII is an insider.

     2.    Under the Plan, APII's interests in the Debtor will be transferred to a newly created limited liability company, LB Hangar 3205 LLC ("LB Hangar").  APII shall be the sole member of LB Hangar and LB Hangar shall be the sole member of the Debtor.  Therefore, although APII's rights with respect to the Debtor have been modified, APII will remain the ultimate owner of 100% of the Debtor.

     3.    APII has informed the Debtor that it consents to the foregoing treatment and intends to vote in favor of the Plan.

## X.   SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Proponents have timely submitted evidence establishing that the Debtor will have sufficient funds available to satisfy all expenses, including all payments to be made under the Plan, as discussed above.

On the Effective Date, the Plan pays all allowed claims under the

Plan.  The Receiver is currently holding dedicated funds of $131,690 for the payment of non-insider unsecured creditors, in accordance with the terms of the (1) U.S. Bank Order and (2) DIP Financing Order.

On the Effective Date, the Disbursing Agent will deposit into the Reserve Account an amount of cash equal to 100% of the aggregate amount of disputed claims (if any) plus interest at the federal judgment rate.  Cash together with any interest accruing thereon will be held in trust for the benefit of holders of disputed claims (if any).  When a disputed claim (if any) becomes allowed, the Disbursing Agent will distribute to the holder thereof an amount equal of 100% of its claim plus accrued interest thereon. If a surplus arises from the fact that not all claims are allowed, then that money shall revert back to the Debtor.

The Receiver is also holding funds sufficient for the payment of the UST fees and all tax claims.

Prior to the date set for the confirmation hearing on the Plan, Mr. Abbey will provide Irell & Manella LLP with funds to be held in trust in an amount sufficient to pay the administrative claims of all professionals in full (although such claims will not be paid until allowed by the Court).

Since all undisputed claims will be paid, with interest, on the

Effective Date and reserves established for all disputed claims
and the administrative claims of professionals, no cash flow
projections or forward-looking financial information is required
or has been submitted with this Plan.

## XI.   FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED PAYMENT IS FEASIBLE

On the Effective Date, the Plan pays all allowed claims under the
Plan.  The Receiver is currently holding funds sufficient to pay
all unsecured claims in full with interest and a reserve will be
established for the payment of the administrative claims of
professionals.  Therefore, no forward-looking financial
information is required or has been submitted with this Plan, in
accordance with the instructions of the Court.

## XII. ASSETS AND LIABILITIES OF THE ESTATE

   a.   Assets

The identity and fair market value of the estate's assets are
listed in Exhibit "2" so that the reader can assess what assets
are at least theoretically available to satisfy claims and to
evaluate the overall worth of the bankruptcy estate.  Whether the
Plan proposes to sell any of these assets is discussed in Section
XVI.

1    b.    Liabilities

2 Exhibit "3" shows the allowed claims against the estate, claims

3 whose treatment is explained in detail by section IX.

4

5    c.    Summary

6 The fair market value of all assets equals $43,000,000.  Total

7 liabilities equal $39,388,875 as follows: (1) $38,500,000 owed to

8 the DIP Lender; (2) $830,000 owed on account of professional

9 claims; (3) $6,000 owed on account of priority claims; (4) $4,875

10 owed for UST fees; and (5) $48,000 owed on account of unsecured

11 claims.

12

13

14 **XIII.    TREATMENT OF NONCONSENTING CLASSES**

15 As stated above, even if all classes do not consent to the

16 proposed treatment of their claims under the Plan, the Plan may

17 nonetheless be confirmed if the dissenting classes are treated in

18 a manner prescribed by the Code.  The process by which dissenting

19 classes are forced to abide by the terms of a plan is commonly

20 referred to as "cramdown."  The Code allows dissenting classes to

21 be crammed down if the Plan does not "discriminate unfairly" and

22 is "fair and equitable."  The Code does not define discrimination,

23 but it does provide a minimum definition of "fair and equitable."

24  The term can mean that secured claimants retain their liens and

25 receive cash payments whose present value equals the value of

26 their security interest.  For example, if a creditor lends the

27 Debtor $100,000 and obtains a security interest in property that

28

is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash payments whose present value equals $80,000 and not $100,000.  The term means that unsecured claimants whose claims are not fully satisfied at least know that no claim or interest that is junior to theirs will receive anything under the Plan, except where the Debtor is an individual, has elected to retain property included in the Estate under 11 U.S.C.A. § 1115 (West Supp. 2006) and has satisfied 11 U.S.C.A. § 1129(b)(2)(B)(ii) (West Supp. 2006).  "Fair and equitable" means that each holder of an interest must receive the value of such interest or else no junior interest is entitled to receive anything.

Therefore, if a class of general unsecured claims votes against the Plan, the Plan cannot be confirmed where the Debtor or a class of interest holders (e.g. equityholders or partners) will receive or retain any property under the Plan, unless the Plan provides that the class of general unsecured claims shall be paid in full with interest.  If a class of interest holders votes against the Plan, the Plan cannot be confirmed where the Debtor will receive or retain any property under the Plan, unless the Plan provides that the class of interest holders shall be paid in full with interest.  These are complex statutory provisions and the preceding paragraphs do not purport to state or explain all of them.

**XIV. TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS (CHAPTER 7 LIQUIDATION ANALYSIS)**

The Plan must provide that a nonconsenting impaired claimant or interest holder of a consenting class receive at least as much under the Plan as would be available to such non-consenting impaired claimant or interest holder would have recovered had the Debtor filed a Chapter 7 petition instead.

In a Chapter 7 case the general rule is that the Debtor's assets are sold by a trustee.  Unsecured creditors generally share in the proceeds of sale only after secured creditors and administrative claimants are paid.  Certain unsecured creditors get paid before other unsecured creditors do.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

In this case, on the Effective Date, the Plan pays all allowed claims in full under the Plan.  Holders of administrative claims of professionals will be paid in full upon approval of their fees and the administrative claim of the UST will be paid in full on the date it comes due.  Holders of allowed unsecured claims will be paid in full with interest.  Since all creditors are being paid in full and, in the case of unsecured claims, with interest, creditors could not recover a greater amount in a Chapter 7 case.

## XV.   MULTI-PURPOSE POST-CONFIRMATION AGENT

David Stapleton was appointed as the Receiver in August 2014 in connection with the U.S. Bank Litigation.  As a result of the Debtor repaying the U.S. Bank Loan in full with proceeds of the DIP Financing in accordance with the DIP Financing Order, it is anticipated that U.S. Bank will file a notice of dismissal with respect to the U.S. Bank litigation and request the dismissal of the Receiver and the turnover of control of the Long Beach Property to the Debtor.  In order to ensure a smooth transition from the management of the Long Beach Property by the Receiver, the Debtor intends to engage the Receiver to act as property manager with respect to the Long Beach Property during the Chapter 11 case.  As part of that engagement, among other things, the Receiver has agreed to be employed by the Debtor for the purpose of distributing the proceeds in accordance with the Plan (the "Disbursing Agent").  The Disbursing Agent has no affiliation with the Debtor.

The rate of compensation of the Disbursing Agent is as follows: [to be added].

The Disbursing Agent will pay all amounts due under the Plan from a fund hereby authorized to be opened.  This fund shall be maintained in a segregated, interest-bearing account in a depository approved by the United States Trustee for the Central

District of California for deposits of funds by trustees.

Following confirmation of the Plan, the Debtor and the DIP Lender will employ an agreed upon property manager to manage the Long Beach Property.

**XVI. SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND LEASES; OTHER PROVISIONS**

Assumption, Rejection or Assignment of Executory Contracts and Unexpired Leases

The Plan provides for the assumption, rejection, or assignment of the executory contracts and unexpired leases set forth on Exhibit "4".

Any monetary defaults under each executory contract and unexpired lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in cash on the Effective Date, or upon such other terms as the parties to such executory contract or unexpired lease may agree.  Exhibit "4" contains the Debtor's calculation of the cure amount for each executory contract and unexpired lease. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or cure amount must be filed, served and actually received by the Debtor at least fourteen (14) days prior to the hearing to consider confirmation

of the Plan (set for June ___, 2015) (the "Confirmation Hearing").
Any counterparty to an executory contract and unexpired lease
that fails to object timely to the proposed assumption or cure
amount will be deemed to have consented and will be deemed to have
forever released and waived any objection to the proposed
assumption.

Any executory contract or unexpired lease not set forth above
shall be deemed rejected as of the Effective Date in accordance
with, and subject to, the provisions and requirements of sections
365 and 1123 of the Bankruptcy Code, except for those executory
contracts (including, without limitation, employment agreements)
and unexpired leases that: (1) have been assumed by separate order
of the Court; or (2) are the subject of a motion to assume pending
on the Effective Date.  All proofs of claim with respect to claims
arising from the rejection of executory contracts or unexpired
leases, pursuant to this Plan, if any, must be filed with the
Court within thirty (30) days after the date of entry of an order
of the Court (including the Confirmation Order) approving such
rejection.

Objection to Claims

After the Effective Date, the Debtor, as reorganized pursuant to
this Plan on or after the Effective Date (the "Reorganized
Debtor"), shall have and shall retain any and all rights and
defenses that the Debtor had with respect to any claim, except for

any such rights or defenses (a) with respect to any claim deemed allowed under this Plan or by prior orders of the Court or (b) to the extent discharged, released, exculpated, or enjoined under the Plan.   After the Effective Date, the Reorganized Debtor shall have the exclusive authority to file objections to claims and settle, compromise, withdraw or litigate to judgment objections to any and all claims, regardless of whether such claims are in an unimpaired class or otherwise.   From and after the Effective Date, the Reorganized Debtor may settle or compromise any disputed claim without any further notice to or action, order or approval of the Court.

The Court must make certain findings of fact before approving the aforementioned provisions as part of the Plan.   The Proponents will request that the Court make the appropriate findings at the Confirmation Hearing, based upon evidence submitted in support of the confirmation motion.

## XVII.      BANKRUPTCY PROCEEDINGS

Following is a discussion of the various orders entered in the Debtor's case:

On December 22, 2014, the Court entered an Order extending the deadline for the Debtor to file its schedules and statements of financial affairs (as amended from time to time, the "Schedules")

through and until February 2, 2015.   The Schedules were filed on or about January 12, 2015.

On January 2, 2015, the Court entered an Order authorizing the Debtor's continued use of U.S. Bank's cash collateral and the continued appointment of the Receiver, on an interim basis, but denying the Debtor's request to continue to use pre-petition bank accounts.   A final hearing on the relief sought is scheduled on April 2, 2015.   At the April 2, 2015 hearing, the Debtor intends to seek to withdraw the motion and request that the Debtor excuse the Receiver from his duties as the U.S. Bank Loan has been paid in full and the U.S. Bank Litigation has been resolved.   As noted above, Stapleton Group will continue to serve as the property manager of the Long Beach Property, subject to approval of the Court.   In addition, since the U.S. Bank Loan was paid in full following the Debtor entering into the DIP Financing, the Debtor's request to use U.S. Bank's cash collateral is no long relevant.

Also on January 2, 2015, the Court entered an Order limiting the parties to whom notice needed to be provided.

On January 6, 2015, the Court entered an Order denying the Debtor's motion to pay certain prepetition mechanics' lien claims.  The Debtor had filed this motion out of an abundance of caution as the Debtor was not aware of any unpaid mechanic lien claims, and no such claims have been asserted.   Moreover, all known

mechanics' lien claims had been paid prior to the commencement of the Chapter 11 case.

Also on January 6, 2015, the Court entered an Order granting U.S. Bank relief from the automatic stay to permit it to foreclose on the Long Beach Property, subject to the terms of the U.S. Bank Agreement and the U.S. Bank Stipulation.

On January 22, 2015, the Court entered an Order granting the Debtor's motion requesting authorization to pay deposits to various unities and preventing such utilities from altering the Debtor's service.

On January 23, 2015, the Court entered an Order granting the Debtor's application to employ Irell & Manella LLP as its general insolvency counsel.

On February 2, 2015, the Court entered an Order granting the Debtor's motion to approve the U.S. Bank Agreement and the U.S. Bank Stipulation, as discussed in greater detail above.

On February 4, 2015, the Court entered an Order setting April 17, 2015 as the general bar date and June 17, 2015 as the bar date for governmental entities to file a proof of claim in the Debtor's case.

On February 25, 2015, the Court entered an Order (a) authorizing the Debtor to enter into the DIP Financing and to use cash collateral on an interim basis and (b) granting the DIP Lender the security interests and superpriority administrative expense claims described above.  A final hearing on the relief sought is scheduled on April 2, 2015.

On March 4, 2015, the Court entered an Order authorizing the Debtor to employ and compensate Mount Nebo Capital, Inc. ("Nebo"), as a broker, in connection with Nebo's services relating to the DIP Financing.

Following is a list of the currently pending motions and adversary proceedings:

The Debtor intends to file a motion to employ The Stapleton Group as the post-petition property manager of the Long Beach Property.

A Chapter 11 status conference is set for April 2, 2015.

A final hearing with respect to the Debtor's motion to use U.S. Bank's cash collateral and the continued appointment of the Receiver is set for April 2, 2015.  However, the U.S. Bank Loan was paid in full and its security interests in the Debtor's cash were released and terminated in connection with the DIP Financing.  Accordingly, at the April 2, 2015 hearing, the Debtor intends to

1   seek to withdraw the motion and request that the Debtor excuse the

2   Receiver from his duties.   As noted above, Stapleton Group will

3   continue to serve as the property manager of the Long Beach

4   Property, subject to approval of the Court.

5

6   A final hearing with respect to (a) the Debtor's authorization to

7   enter into the DIP Financing and use the DIP Lender's cash

8   collateral and (b) the granting of security interests and

9   superpriority administrative expenses claims to the DIP Lender is

10  set for April 2, 2015.

11

12  There are no adversary proceedings currently pending.

13

14

15  Following is a list of the professionals that have been employed

16  by the Debtor:

17

18  On January 23, 2015, the Court entered an Order granting the

19  Debtor's application to employ Irell & Manella LLP as its general

20  insolvency counsel.

21

22  On March 4, 2015, the Court entered an Order authorizing the

23  Debtor to employ and compensate Mount Nebo Capital, Inc. ("Nebo"),

24  as a broker, in connection with Nebo's services relating to the

25  DIP Financing.

26

27  All professionals' employment has been approved by the Court.

28

## XVIII.    TAX CONSEQUENCES OF PLAN

The following disclosure (the "Tax Disclosure") summarizes certain federal income tax consequences of the implementation of the Plan to holders of allowed claims and the Debtor.  It does not address the specific federal income tax consequences to those with a unique position with respect to their treatment, such as the sole equity holder of the Debtor and those holding claims treated under the terms of separate agreements made with the Debtor.  Priority Claims are also not specifically addressed.  General withholding obligations are, however, addressed for all holders of claims.

Moreover, the Tax Disclosure summarizes only some of the federal income tax consequences associated with the Plan's implementation; other consequences are not addressed.  The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.

In addition, the Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular holder of a claim which may modify or alter the consequences described below.  Examples of particular taxpayers who might have special tax treatment include but are not limited to those who hold a claim as a capital asset, foreign taxpayers, broker-dealers, banks, mutual

funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities.  The Tax Disclosure also does not address state, local, or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following summary is based on the Tax Code, the regulations promulgated thereunder by the Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof.  Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the federal income tax consequences described below.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN EQUITY INTEREST OR A CLAIM.  EACH HOLDER OF AN EQUITY INTEREST OR A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

a.    Withholding Applicable to all Holders of Claims

All payments transferred under the Plan are subject to applicable tax withholding (including employment tax withholding).

Under federal income tax law, interest and other reportable payments may be subject to "backup withholding," at a rate of 28%. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to report properly interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding.

     b.   <u>Tax Consequences to Holders of Allowed General Unsecured Claims</u>

Holders of General Unsecured Claims should include cash payments received under the Plan as final payments for Claims, including post-petition interest payments, under their normal method of accounting.

     c.   <u>Tax Consequences for the Debtor</u>

The Debtor is a disregarded entity for income tax purposes.  The Debtor accordingly does not expect to have any tax consequences

arising in connection with the Plan.


   d.    General Disclaimer

THE FOREGOING FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR

INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS OR EQUITY

INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING

THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES OF THE PLAN.


**XIX. EFFECT OF CONFIRMATION OF PLAN**

   a.    General comments

The provisions of a confirmed Plan bind the Debtor, any entity

acquiring property under the Plan, and any creditor, interest

holder, or general partner of the Debtor, even those who do not

vote to accept the Plan.


The confirmation of the Plan vests all property of the estate in

the Debtor.


The automatic stay is lifted upon confirmation as to property of

the estate.  However, the stay continues to prohibit collection or

enforcement of pre-petition claims against the Debtor or the

Debtor's property until the date the Debtor receives a discharge,

if any.  Nevertheless, the Debtor requests that the automatic stay

imposed by section 362 of the Bankruptcy Code continue in full

force and effect through and including the Effective Date.

    b.    Conditions Precedent to Confirmation

Confirmation of this Plan shall be conditioned upon the

satisfaction or waiver by the Plan Proponents and the DIP Lender

of the following:

    1.    The Court shall have entered an Order in form and in

substance satisfactory to the Plan Proponents and DIP Lender,

approving the Disclosure Statement with respect to this Plan as

containing adequate information within the meaning of section 1125

of the Bankruptcy Code.

    2.    This Plan and all schedules, documents, supplements and

Exhibits to this Plan shall have been filed in form and substance

acceptable to the Plan Proponents and the DIP Lender.

    3.    The proposed Confirmation Order shall be in form and

substance acceptable to the Plan Proponents and the DIP Lender.


    c.    Conditions Precedent to Consummation

Consummation of this Plan shall be conditioned upon, and the

Effective Date shall not occur until, the satisfaction or waiver

by the Plan Proponents and the DIP Lender of the following:

    1.    The Confirmation Order shall have been entered and

either (a) become a Final Order or (b) the 14-day stay

contemplated by Bankruptcy Rule 3020(e) in respect thereof shall

have been terminated, and the Confirmation Order shall otherwise

be in a form and in substance satisfactory to the Plan Proponents

and the DIP Lender, and no stay of the Confirmation Order shall

have been entered and be in effect.    The Confirmation Order shall

provide that, among other things, the Debtor or the Reorganized

Debtor, as appropriate, is authorized and directed to take all

actions necessary or appropriate to consummate this Plan,

including, without limitation, entering into, implementing and

consummating the contracts, instruments, releases, leases,

indentures and other agreements or documents created in connection

with or described in this Plan.

2.    The Court shall have entered one or more Orders (which

may include the Confirmation Order) authorizing the assumption and

rejection of executory contracts and unexpired leases by the

Debtor as contemplated in this Plan.

3.    All documents and agreements necessary to implement this

Plan, including, without limitation, the Exit Financing Documents,

shall have (a) been tendered for delivery, and (b) been effected

by executed by, or otherwise deemed binding upon, all parties

thereto.  All conditions precedent to all such documents and

agreements shall have been satisfied or waived pursuant to the

terms of such documents or agreements.

4.    All material consents, actions, documents, certificates

and agreements necessary to implement this Plan shall have been

effected or executed and delivered to the required parties and, to

the extent required, filed with the applicable governmental units

in accordance with applicable laws.

   d.   Discharge of liability for payment of debts; status

        of liens

Unless the Debtor is not entitled to receive a discharge pursuant

to 11 U.S.C.A. 1141(d)(3) (West 2004), the debtor may obtain a

discharge upon specific order of the Court.


EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER

OR IN ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT ENTERED

INTO, DELIVERED, ASSUMED OR PRESERVED UNDER OR IN CONNECTION WITH

THE PLAN: (I) ON THE EFFECTIVE DATE, THE REORGANIZED DEBTOR SHALL

BE DEEMED DISCHARGED AND RELEASED FROM ALL CLAIMS, INCLUDING, BUT

NOT LIMITED TO, DEMANDS, LIABILITIES, AND CLAIMS THAT AROSE BEFORE

THE EFFECTIVE DATE AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS

502(G), 502(H) OR 502(I) OF THE BANKRUPTCY CODE, WHETHER OR NOT,

INTER ALIA: (A) A PROOF OF CLAIM BASED ON SUCH DEBT IS FILED OR

DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE, (B) A

CLAIM BASED ON SUCH DEBT IS ALLOWED PURSUANT TO SECTION 502 OF THE

BANKRUPTCY CODE, (C) THE HOLDER OF A CLAIM BASED ON SUCH DEBT HAS

ACCEPTED THE PLAN, OR (D) SUCH CLAIM IS LISTED IN THE SCHEDULES;

AND (II) ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST

THE REORGANIZED DEBTOR, ITS SUCCESSORS, OR ITS ASSETS OR

PROPERTIES ANY OTHER OR FURTHER CLAIMS BASED UPON ANY ACT OR

OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT

OCCURRED PRIOR TO THE EFFECTIVE DATE.  EXCEPT AS OTHERWISE

PROVIDED IN THE PLAN, THE CONFIRMATION ORDER OR IN ANY CONTRACT,

INSTRUMENT, RELEASE OR OTHER AGREEMENT ENTERED INTO, DELIVERED,

ASSUMED OR PRESERVED UNDER OR IN CONNECTION WITH THE PLAN, UPON

THE OCCURRENCE OF THE EFFECTIVE DATE, THE CONFIRMATION ORDER SHALL

ACT AS A DISCHARGE OF ANY AND ALL CLAIMS AGAINST, AND ALL DEBTS

AND LIABILITIES OF, THE REORGANIZED DEBTOR, AS PROVIDED IN

SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND SUCH DISCHARGE

SHALL VOID ANY JUDGMENT AGAINST THE REORGANIZED DEBTOR AT ANY TIME

OBTAINED TO THE EXTENT THAT IT RELATES TO A DISCHARGED CLAIM.


EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER

OR IN ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT ENTERED

INTO, DELIVERED, ASSUMED OR PRESERVED UNDER OR IN CONNECTION WITH

THE PLAN, ON THE EFFECTIVE DATE, ALL CLAIMS, MORTGAGES, DEEDS OF

TRUST, LIENS OR OTHER SECURITY INTERESTS AGAINST THE PROPERTY OF

ANY ESTATE SHALL BE FULLY RELEASED AND DISCHARGED.


The confirmation of the Plan does not discharge the Debtor from

any debt of a kind specified in 11 U.S.C.A. § 523(a)(2)(A)-(B)

(West 2004 & Supp. 2006) that is owed to a domestic governmental

unit, or owed to a person as the result of an action filed under

subchapter III of chapter 37 of title 31 or any similar State

statute, or for a tax or customs duty with respect to which the

debtor made a fraudulent tax return or willfully attempted in any

manner to evade or to defeat such tax or such customs duty.


    e.   <u>Exculpation</u>

THE DEBTOR, THE REORGANIZED DEBTOR, THE PLAN PROPONENTS, THE DIP

1  LENDER, U.S. BANK NATIONAL ASSOCIATION, AND THE FOREGOING PARTIES'

2  PREDECESSORS, SUCCESSORS, ASSIGNS AND PRESENT AND FORMER

3  AFFILIATES (WHETHER BY OPERATION OF LAW OR OTHERWISE) AND

4  SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER

5  OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, EQUITYHOLDERS, MEMBERS

6  (INCLUDING EX OFFICIO MEMBERS), MANAGERS, PARTNERS, TRUSTS,

7  AGENTS, AND ADVISORS (INCLUDING ANY FINANCIAL ADVISORS, ATTORNEYS,

8  ACCOUNTANTS, INVESTMENT BANKERS, INVESTMENT ADVISORS, CONSULTANTS,

9  REPRESENTATIVES, AND OTHER PROFESSIONALS RETAINED BY SUCH PERSON),

10  IN EACH CASE ACTING IN SUCH CAPACITY, (THE "EXCULPATED PARTIES")

11  SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY ENTITY OR PERSON

12  FOR ANY CLAIMS OR CAUSES OF ACTION ARISING BEFORE, ON OR AFTER THE

13  PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE FOR ANY ACT

14  TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO

15  FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING,

16  ADMINISTERING, CONFIRMING OR EFFECTING THE CONSUMMATION OF THIS

17  PLAN, THE DISCLOSURE STATEMENT OR ANY CONTRACT, INSTRUMENT,

18  RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN

19  CONNECTION WITH THIS PLAN OR ANY OTHER PRE-PETITION OR POST-

20  PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN

21  CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTOR, THE DIP FACLITY,

22  THE APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OR

23  CONSUMMATION OF THIS PLAN; PROVIDED, HOWEVER, THAT THE FOREGOING

24  PROVISIONS SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY

25  THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A

26  FINAL ORDER OF THE BANKRUPTCY COURT OR OTHER COURT OF COMPETENT

JURISDICTION TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL

MISCONDUCT; PROVIDED, FURTHER, THAT EACH EXCULPATED PARTY SHALL BE

ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES

PURSUANT TO, OR IN CONNECTION WITH, THE ABOVE REFERENCED

DOCUMENTS, ACTIONS OR INACTIONS; PROVIDED, FURTHER, HOWEVER THAT

THE FOREGOING PROVISIONS SHALL NOT APPLY TO ANY ACTS, OMISSIONS,

CLAIMS, CAUSES OF ACTION OR OTHER OBLIGATIONS EXPRESSLY SET FORTH

IN AND PRESERVED BY THIS PLAN.


    f.   Injunction

EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN, FROM AND AFTER THE

EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM

COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER

PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY

KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY,

OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR

REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED,

OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE

CONFIRMATION ORDER REGARDLESS OF WHETHER ANY CONSIDERATION WAS

RECEIVED HEREUNDER BY SUCH ENTITY.  IN ADDITION, BY ACCEPTING

DISTRIBUTIONS PURSUANT TO THIS PLAN, EACH HOLDER OF AN ALLOWED

CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY

CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED

FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR 362 OF THE

BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE

CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE

EFFECTIVE DATE.

g.   Binding Nature Of Plan

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE,

THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, ALL

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, AND

SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM

EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT

SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN

PROPERTY UNDER THIS PLAN, (B) HAS FILED A PROOF OF CLAIM OR

INTEREST IN THE CHAPTER 11 CASE OR WAS INCLUDED IN THE DEBTOR'S

SCHEDULES OF ASSETS AND LIABILITIES WITH SUCH CLAIM OR INTEREST,

(C) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR AFFIRMATIVELY

VOTED TO REJECT THIS PLAN, OR (D) WAS DEEMED TO VOTE FOR OR

AGAINST THE PLAN.

h.   Modification of the Plan

The Proponents may modify the Plan pursuant to 11 U.S.C.A. § 1127

(West 2004 & Supp. 2006).

i.   Post-Confirmation Causes of Action

To the best knowledge of the Proponents, the estate has no causes

of action.

To the extent any cause of action exists, the Debtor shall have

the right to assert any or all of the above causes of action post-

confirmation in accordance with applicable law; provided that, the

Debtor, as of the Effective Date, shall be deemed to release and

discharge the DIP Lender and its affiliates, agents, attorneys,

officers, directors, managers, and employees from any and all

claims or causes of action arising out of, based upon or related

to, in whole or in part, any act or omission, transaction,

agreement, event, or other occurrence taking place on or before

the Effective Date.


j.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and

notwithstanding the entry of the Confirmation Order and the

occurrence of the Effective Date, the Court shall, after the

Effective Date, retain such jurisdiction over the Chapter 11 Case

and all entities with respect to all matters related to the

Chapter 11 Case, the Debtor and this Plan as legally permissible,

including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify,

estimate or establish the priority or secured or

unsecured status of any claim or equity interest,

including, without limitation, the resolution of any

request for payment of any administrative claim and the

resolution of any and all objections to the allowance or

priority of any claim or equity interest, including,

without limitation, any claim that was or could have

been determined in a trial or appellate court of

competent jurisdiction;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; provided, however, that, from and after the Effective Date, the Reorganized Debtor shall pay professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Court;

3.    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which either Debtor is party or with respect to which either Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add executory contracts or unexpired leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.    ensure that distributions to holders of allowed claims are accomplished pursuant to the provisions of this Plan;

6.    decide or resolve any motions, adversary

proceedings, contested or litigated matters and any

other causes of action that are pending as of the

Effective Date or that may be commenced in the future,

and grant or deny any applications involving the Debtor

that may be pending on the Effective Date or instituted

by the Reorganized Debtor after the Effective Date,

provided that the Reorganized Debtor shall reserve the

right to commence actions in all appropriate forums and

jurisdictions;

7.    enter such orders as may be necessary or

appropriate to implement or consummate the provisions of

this Plan and all other contracts, instruments,

releases, indentures and other agreements or documents

adopted in connection with this Plan;

8.    resolve any cases, controversies, suits or disputes

that may arise in connection with the consummation,

interpretation or enforcement of this Plan or any

entity's obligations incurred in connection with this

Plan;

9.    hear and determine all causes of action that are

pending as of the Effective Date or that may be

commenced in the future;

10.    issue injunctions and enforce them, enter and

implement other orders or take such other actions as may

be necessary or appropriate to restrain interference by

any entity with consummation or enforcement of this

Plan, except as otherwise provided in this Plan;

11.   enforce the terms and conditions of this Plan and the Confirmation Order;

12.   resolve any cases, controversies, suits or disputes with respect to the releases, the exculpation, and other provisions set forth above and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.   hear and determine the causes of action by or on behalf of the Debtor or Reorganized Debtor;

14.   enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.   resolve any other matters that may arise in connection with or relate to this Plan, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

16.   enter an order concluding or closing the Chapter 11 case.

k.   Payment of Statutory Fees

All outstanding fees payable pursuant to section 1930 of title 28,

United States Code shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 case when due or as soon thereafter as practicable.

l.   Post-confirmation Status Report

Within 120 days of the Effective Date of the Plan, the Reorganized Debtor shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee and those parties that have requested notice pursuant to Bankruptcy Rule 2002.  Further status reports shall be filed every 120 days and served on the same entities until the Debtor's case has been closed.

m.   Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, after notice and hearing and entry of an order of the Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to

carry out the purpose and intent of this Plan.  A holder of a

claim or equity interest that has accepted this Plan shall be

deemed to have accepted this Plan, as altered, amended or

modified, if the proposed alteration, amendment or modification

does not materially and adversely change the treatment of such

claim or equity interest of such holder.  Notwithstanding the

foregoing, the Debtor shall not modify this Plan in any way that

alters or affects the description or treatment of the DIP

Financing, the claims arising thereunder, or the DIP Lender

without the express, written consent of the DIP Lender.


      n.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan

prior to the hearing on confirmation of the Plan and to file

subsequent chapter 11 plans.  If the Debtor revokes or withdraws

this Plan, or if confirmation of this Plan or consummation of this

Plan does not occur, then: (a) this Plan shall be null and void in

all respects; (b) any settlement or compromise embodied in this

Plan, assumption or rejection of executory contracts or unexpired

leases effected by this Plan and any document or agreement

executed pursuant hereto shall be deemed null and void except as

may be set forth in a separate order entered by the Court; and (c)

nothing contained in this Plan shall: (i) constitute a waiver or

release of any claims by or against, or any equity interests in,

the Debtor or any other entity; (ii) prejudice in any manner the

rights of the Debtor or any other entity; or (iii) constitute an

admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other entity.  Notwithstanding the foregoing, the Debtor shall not revoke this Plan without the express, written consent of the DIP Lender.

o.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor, and its respective successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits, and obligations of any person or entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such person or entity.

p.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Court enters the Confirmation Order.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) the Debtor with respect to the holders of claims or equity interests or other entity; or (b) any holder of a claim or an equity interest or other entity prior to the Effective Date.

q.    Further Assurances

The Debtor or the Reorganized Debtor, as applicable, all holders

of claims and equity interests receiving distributions hereunder

and all other entities shall, from time to time, prepare, execute

and deliver any agreements or documents and take any other actions

as may be necessary or advisable to effectuate the provisions and

intent of this Plan or the Confirmation Order.  On or before the

Effective Date, the Debtor shall file with the Court all

agreements and other documents that may be necessary or

appropriate to effectuate and further evidence the terms and

conditions hereof.

    r.   Severability

If, prior to confirmation of the Plan, any term or provision of

this Plan is determined by the Court to be invalid, void, or

unenforceable, the Court will have the power to alter and

interpret such term or provision to make it valid or enforceable

to the maximum extent practicable, consistent with the original

purpose of the term or provision held to be invalid, void, or

unenforceable, and such term or provision will then be applicable

as altered or interpreted.  Notwithstanding any such holding,

alteration or interpretation, the remainder of the terms and

provisions of this Plan will remain in full force and effect and

will in no way be affected, impaired, or invalidated by such

holding, alteration, or interpretation.  The Confirmation Order

will constitute a judicial determination and will provide that

each term and provision of this Plan, as it may have been altered

or interpreted in accordance with the foregoing, is (a) valid and

1  enforceable pursuant to its terms; and (b) nonseverable (unless

2  the DIP Lender otherwise agrees) and mutually dependent.

3

4       s.    Service of Documents

5  All notices, requests, and demands to or upon the Debtor or the

6  Reorganized Debtor to be effective shall be in writing and, unless

7  otherwise expressly provided herein, shall be deemed to have been

8  duly given or made when actually delivered or, in the case of

9  notice by facsimile transmission, when received and telephonically

10  confirmed, addressed as follows:

11

12

13  For the Debtor/Reorganized Debtor:

14  AP-Long Beach Airport LLC

15  14770 Firestone Blvd, Suite 206

16  La Mirada, CA 90638

17  Attn: Donald G. Abbey

18

19  with copies to:

20  Irell & Manella LLP

21  840 Newport Center Drive, Suite 400

22  Newport Beach, CA 92660

23  Attn: Alan J. Friedman, Esq.

24

25  For Mr. Abbey:

26  Donald G. Abbey

27  14770 Firestone Blvd, Suite 206

28

La Mirada, CA 90638

with copies to:

Lobel, Neue & Till, LLP

840 Newport Center Drive, Suite 750

Newport Beach, CA 92660

Attn: William N. Lobel, Esq.

    t.   Exemption from Certain Transfer Taxes Pursuant to
           Section 1146(a) of the Bankruptcy Code

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp or similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forgo the collection of any such stamp or similar tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such stamp or similar tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, and (ii) the maintenance or creation of security or any lien as contemplated by the Exit Financing.

1        u.    Governing Law

2   Except to the extent that the Bankruptcy Code, the Bankruptcy

3   Rules or other federal law is applicable, the rights and

4   obligations arising under this Plan shall be governed by, and

5   construed and enforced in accordance with, the laws of California,

6   without giving effect to the principles of conflicts of law of

7   such jurisdiction, except that matters arising under or in respect

8   the Debtor's operating agreement or other matters of corporation

9   or limited liability company law shall be governed by, and

10  construed and enforced in accordance with, the laws of Delaware,

11  without giving effect to the principles of conflicts of law of

12  such jurisdiction.

13

14

15       v.    Schedules

16  All Exhibits to this Plan are incorporated and are a part of this

17  Plan as if set forth in full herein.

18

19       w.    Final Decree

20  Once the Plan has been consummated, a final decree may be entered

21  upon motion of the Proponents.  The effect of the final decree is

22  to close the bankruptcy case.  After such closure, a party seeking

23  any type of relief relating to a Plan provision can seek such

24  relief in a state court of general jurisdiction.

25

26

27

28

## XX.    DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN

I, Donald G. Abbey, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

1.    Irell & Manella LLP, counsel for the Debtor, prepared this document at my direction.  I am the ultimate owner of the Debtor and one of the Plan Proponents.

2.    The source of all financial data was prepared by the Receiver (Stapleton Group) or was obtained from the Debtor's books and records.

3.    All facts and representations in the Plan and Disclosure Statement are true to the best of my knowledge.

4.    No fact material to a claimant or equity security holder in voting to accept or reject the proposed Plan has been omitted.

5.    Since all undisputed claims will be paid, with interest, on the Effective Date and a reserve established for all disputed claims and the administrative claims of professionals, no cash flow projections or forward-looking financial information is required or has been submitted with this Plan.  To the extent that the cash flow currently received by the Debtor from leasing the

Long Beach Property is insufficient to pay the operational
expenses associated with the Long Beach Property, I believe that
leasing the vacant portion of the Long Beach Property will
eliminate any shortfall.  If there is any operational cash
shortfall before the remainder of the Long Beach Property is
leased, I have the ability to pay and commit to paying such
expenses until the Long Beach Property is fully leased and
generates sufficient income to pay all operational expenses.

6.    I have agreed that, prior to the date set for the
confirmation hearing on the Plan,  I will provide Irell & Manella
LLP with funds to be held in trust in an amount sufficient to pay
the administrative claims of all professionals in full.

Date: 3/18/15

Donald G. Abbey

BALLOT FOR ACCEPTING OR REJECTING PLAN

AP Long Beach Airport LLC and Donald G. Abbey (the "Proponents")
filed a Plan of Reorganization on March 18, 2015.  By this ballot
you will decide whether to accept or reject this Plan.

The Plan referred to in this ballot can be confirmed by the Court
and thereby bind you if it is accepted by the holders of two-
thirds in amount and more than one-half in number of claims in
each class and the holders of two-thirds in amount of equity
security interests in each class voting on the Plan.

If the requisite acceptances are not obtained, the Court may
nevertheless confirm the Plan if the Court finds that the Plan
accords fair and equitable treatment to the class or classes
rejecting it and otherwise satisfies the requirements of 11
U.S.C.A. § 1129(b) (West 2004 & Supp. 2006).

Check the appropriate line below, which describes your interest:

_____ The undersigned, a creditor with an allowed claim in the
amount of $_____:

_____ The undersigned, a holder of a bond in the amount of
$_____, with a stated maturity date of _____,
registered in the name of _____, and bearing serial
number(s)_____:

_____ The undersigned, the holder of _____ shares of
_____ (explain type of stock) stock, with a certificate(s)
No. _____:

[ ]  Accepts the Plan

[ ]  Rejects the Plan

Print or type name: _____

State which class you are a member of: _____

Signed: _____

If appropriate, by: _____ as _____

Address:

Return this ballot on or before _____ to: IRELL & MANELLA LLP,
Attn: Lori Gauthier, 840 Newport Center Drive, Suite 400, Newport
Beach, California 92660-6324, Telephone: (949) 760-0991,
Facsimile: (949) 760-5200.